Charles JONES et al., Plaintiffs,

v.

Sol WITTENBERG et al., Defendants.

Civ. No. C 70–388.

United States District Court,
N. D. Ohio, W. D.

July 29, 1977.

62

Dale Wilker, Advocates for Basic Legal Equality, Toledo, Ohio, Stanley A. Bass, New York City, Frank S. Merritt, College of Law, University of Toledo, Gerald B. Lackey, Toledo, Ohio, for plaintiffs.

John F. Hayward, Anthony G. Pizza, Lucas County Prosecutor, Toledo, Ohio, for defendants.

## MEMORANDUM AND ORDER

DON J. YOUNG, District Judge.

This cause came to be heard upon the First Report of the Special Master evaluating the compliance of the defendants with this Court's order of July 30, 1971, as modified throughout the course of this litigation. The report was filed pursuant to the Court's Order of December 17, 1976. No objections having been filed by any of the parties, the Court being fully advised in the premises, it is ORDERED that the report is in all respects confirmed. Said report is attached hereto as an Appendix, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein.

To the extent the First Report of the Special Master deals with ¶ 11 concerning the interpretation of the Court's order of July 6, 1973, with regard to finding of a pre-trial bail release program, the Court adds the following clarification.

In order to effect compliance with the prior orders of the Court with regard to funding of the aforesaid program, the Defendant County Commissioners must provide such funds as are necessary to support a viable program to meet the goals recognized in ¶ 11.

In the July 6, 1973 Order, the Court recognized that funding of at least $14,000 per year is required to meet this end. This figure was not set, however, as a limitation on the obligation of said defendants to provide such funds as are necessary for the program. The Court therefore adopts the finding of the Special Master that the defendants are not in compliance with the provisions of ¶ 11. In confirming the First Report of the Special Master, the Court adopts the findings with respect to the state of compliance in all other aspects of the case as well.

## THEREFORE, FOR GOOD CAUSE APPEARING,

it is

FURTHER ORDERED that all of the named defendants, as well as their subordinates, proceed at once to effectuate full compliance with the July 30, 1971, Order of this Court, as modified by subsequent orders of the Court; and it is

FURTHER ORDERED that all steps taken by the defendants and their subordinates to effectuate full compliance with that order, as modified, be supervised, coordinated, and approved by the Special Master, acting for the Court.

In this connection, the Special Master shall have the authority to state to the defendants, their subordinates, and all persons acting in concert with them, or any of them, the actions required to be taken by them, or any of them, to effectuate full compliance, and to seek orders from the Court requiring any or all of said defendants, their subordinates, and persons acting in concert with them, or

any of them, to show cause why they should not be punished as for contempt for failure to carry out such actions required;

and it is

FURTHER ORDERED, because of the disclosures of noncompliance contained in the First Report of the Special Master, that the Special Master shall continue to investigate the defendants' state of compliance with the July 30, 1971, order of this Court, as modified, and shall make supplemental reports to the Court in the event that further or continuing instances of noncompliance are discovered.

For this purpose, the Special Master shall have all of the authority granted to him by the December 17, 1976, order of this Court;

and it is

FURTHER ORDERED that the prior order of the Court filed on July 30, 1971, is modified in the following respects:

(1) The words "awaiting trial" in line 3 of the introductory statement to ¶ 6 are deleted.

(2) ¶ 7 is deleted.

(3) The words "and provisions for limitation or removal of visiting privileges for disciplinary purposes, or for abuse of visiting privileges" are deleted from subparagraph 17(h);

and it is

FURTHER ORDERED, ADJUDGED, AND DECREED THAT the defendants, their employees, agents, successors, assigns, and all those in concert therewith are ENJOINED FROM:

(1) Incarcerating more than one prisoner in any cell originally designed for single occupancy and from incarcerating more than a total of 226 prisoners in the housing modules containing cells on the third, fourth, fifth, and sixth floors of the Lucas County Correction Center.

These limits shall not be exceeded unless there shall exist an extreme emergency where the protection of the public demands immediate confinement of a large number of persons and then the limits may be exceeded for not more than twenty-four (24) hours;

(2) Employing the attorney/client booths in the Lucas County Correction Center for use in attorney/client visits until the booths are modified as ordered herein unless the visiting attorney requests in writing a non-contact visit;

and it is

FURTHER ORDERED, ADJUDGED, AND DECREED that the defendants, their employees, agents, successors, assigns, and all those in concert therewith are ENJOINED TO:

(1) Remove the dividing wall in each of the attorney/client booths as well as to provide soundproof doors, adequate ventilation in the booths, and such furnishings as are necessary for attorney/client visits.

(2) Employ the multipurpose rooms for use in attorney/client visits until the aforesaid modifications in the attorney/client booths are completed.

(3) Provide adequate attorney/client visiting facilities on the second floor of the correction center.

(4) Either install toilets and sinks in the two cells on the first floor of the correction center which do not contain toilet facilities (these cells are numbered 1074 and 1078 and are designated on architectural drawings as "psychiatric cells") or remove the doors to the cells to render them unusable for occupancy by prisoners.

The defendants shall notify the Court in writing within ten (10) days of the filing of this order which alternative they elect to follow.

IT IS SO ORDERED.

APPENDIX

FIRST REPORT OF THE SPECIAL MASTER
ON THE DEFENDANTS'
STATE OF COMPLIANCE
Submitted by Vincent M. Nathan *

TABLE OF CONTENTS

Introduction ------------------------------------------------------------------ 66
Paragraph 1—Overcrowding -------------------------------------------------- 71
 Findings Relating to Compliance --------------------------------------- 73
Paragraph 2—Use of Space in Jail ---------------------------------------- 74
 Findings Relating to Compliance --------------------------------------- 75
Paragraph 3—Lighting System of Jail ------------------------------------- 75
 Findings Relating to Compliance --------------------------------------- 77
Paragraph 4—Food Service -------------------------------------------------- 77
 Minimum Nutritional Standards --------------------------------------- 77
 Temperature, Freshness, and Variety of Food ------------------------ 79
 Sanitary Conditions --------------------------------------------------- 81
 Food Service Personnel ----------------------------------------------- 83
 Inspection by Public Health Authorities ----------------------------- 84
 Findings Relating to Compliance --------------------------------------- 85
Paragraph 5—Medical Facilities -------------------------------------------- 86
 Findings Relating to Compliance --------------------------------------- 88
Paragraph 6—Communication Rights of Pre-Trial Prisoners ------------- 89
 Outgoing Mail --------------------------------------------------------- 89
 Incoming Parcels and Letters ----------------------------------------- 90
 Availability of Writing Materials and Postage ----------------------- 91
 Telephone Privileges -------------------------------------------------- 91
 Findings Relating to Compliance --------------------------------------- 92
Paragraph 7—Communication Rights of Sentenced Inmates ------------- 93
 Findings Relating to Compliance --------------------------------------- 95
Paragraph 8—Attorney/Client Visiting Facilities -------------------------- 95
 Findings Relating to Compliance --------------------------------------- 97
Paragraph 9—Physical Alterations and Repairs --------------------------- 98
 Findings Relating to Compliance --------------------------------------- 100
Paragraph 10—Library Services and Censorship -------------------------- 100
 Library Services ------------------------------------------------------- 100
 Censorship ------------------------------------------------------------- 102
 Findings Relating to Compliance --------------------------------------- 103
Paragraph 11—Pre-Trial Release Program -------------------------------- 103
 Findings Relating to Compliance --------------------------------------- 106
Paragraph 12—Purchase of Jail Food -------------------------------------- 107
 Findings Relating to Compliance --------------------------------------- 108
Paragraph 13—Medical Services -------------------------------------------- 108
 Findings Relating to Compliance --------------------------------------- 113
Paragraph 14—Guard Surveillance ----------------------------------------- 113
 The Old Jail ----------------------------------------------------------- 114
 The Lucas County Correction Center --------------------------------- 116
 The R.P.U. Reevaluation ---------------------------------------------- 119
 The Staffing Consultants ---------------------------------------------- 122
 Occupancy of the Lucas County Correction Center ------------------ 127
 Findings Relating to Compliance --------------------------------------- 129
Order of May 8, 1974—Inmate Offense Reports ------------------------- 129
 Findings Relating to Compliance --------------------------------------- 133

Paragraph 15—Programmed Instruction for Jail Personnel _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 134
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 135
Paragraph 16—Selection and In-Service Training of Jail Personnel _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 136
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 139
Paragraph 17—Programming _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 139
 Classification and Diagnostic Procedures _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 140
 Work/Study Release _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 143
 Group and Individual Counseling _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 144
 Educational Programs _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 146
 Recreation _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 148
 Religious Programs _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 150
 Work Programs _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 152
 Visiting Programs _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 153
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 158
Paragraph 18—Daily Cleaning _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 159
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 160
Paragraph 19—Linens, Clothing, and Toilet Articles _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 160
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 161
Paragraph 20—Punishment of Inmates Awaiting Trial _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 161
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 162
Paragraph 21—Use of Isolation _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 162
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 164
Paragraph 22—Discipline _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 165
 Findings Relating to Compliance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 166
Conclusion _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 167
Appendices _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 170

\* Professor of Law, The University of Toledo

## INTRODUCTION

On January 21, 1977, the Court issued an order appointing a Special Master in this case; shortly thereafter, the Special Master employed a second year law student, Fraser McAlpine, to serve as his assistant. The report which follows, as well as the negotiation, research, and investigation which underlie it, constitute a joint effort on the part of the Special Master and his assistant, the latter's contribution to the project having been invaluable.

During the six months which have passed between the appointment of the Special Master and the filing of this report, a very substantial amount of time has been devoted to meetings between the Special Master and the defendants with regard to the evacuation of the old Lucas County Jail and the occupancy of the new Lucas County Correction Center. It was not until April 22, 1977, that agreements reached in the course of these meetings resulted in the occupancy of the third floor of the new facility by female inmates and selected male inmates. On May 18, 1977, all inmates were transferred from the old jail.

During the course of the negotiations which occurred prior to the occupancy of the new facility, the Special Master raised a number of matters which he believed required resolution before the new facility could be occupied. These related to correctional officer staffing levels, lighting in the cells, the nature of the booths provided for attorney/client visits, and the unfinished and unusable state of the outdoor exercise decks on the housing floors of the facility. The first related directly to the safety of inmates housed in the new jail, and the others raised the prospect of physical alterations which might interfere with occupancy of the facility. The results of negotiations with respect to all of these matters are described fully in the report which follows. During the time that these negotiations were occurring, the final stages of construction of the new jail were being completed and the Special Master and his

assistant were attempting to gather the data and information necessary for this report.

It is with regret that the Special Master must report that his efforts to develop the required data and information were impeded by the repeated failure of the Correction Administrator and his staff to provide routine information and documentation. In the course of his first meetings with the Correction Administrator (the chief administrative officer of the jail) the Special Master asked that certain material be forwarded to him on a weekly or monthly basis. These requests are summarized in a letter written by the Special Master to the Correction Administrator on February 28, 1977. As materials failed to arrive, the Special Master both orally and in writing repeated his requests and indicated the nature of the material which was not being received. As this report is being written, the Special Master has failed to receive all of these records although most are maintained routinely and are required for the internal operation of the jail. Although the Special Master requested "reports of all incidents of physical or sexual assault of inmates, attempted suicides, and any other incidents resulting in injury to an inmate or staff person," he is personally aware of a number of such incidents which have not been reported to him. The same can be said with respect to "reports of all plumbing problems resulting from inmate misbehavior." Of particular importance, the Special Master requested copies of all Inmate Offense Reports (grievances) filed by inmates. The Special Master has obtained several such reports from inmates and is aware of the existence of others which have not been forwarded to him by the Correction Administrator.

Difficulties have been encountered as well in obtaining cooperation in the posting of required notices. In his letter of February 28, 1977, to the Correction Administrator, the Special Master made the following statement:

. . . it is absolutely essential that we take steps immediately to see to it that the notice of my appointment (the revised edition) be posted at all times in all ranges in the jail as well as in the medical cells and the juvenile ward.

On the occasion of numerous visits to the old jail, the Special Master noted that these notices were not posted and brought this matter to the attention of the Correction Administrator and other members of the staff. With the move to the new facility, these notices came to be posted only sporadically if at all. On the occasion of a tour of the jail held on June 13, 1977, the Special Master was unable to locate a single copy of the notice of his appointment in any of the housing areas. The absence of these notices has impeded severely communication between inmates and the Special Master.[1]

Much of what has been described above, in the opinion of the Special Master, reflects less any deliberate effort on the part of the Correction Administrator to impede investigation than it does the simple failure to recognize the need to assign a high priority to compliance with the Court's order. Six years of litigation have not yet impressed upon all of the principals that the Court's order is something to be taken seriously, let alone a matter of overriding importance.

In addition, it must be said that the general inefficiency and absence of clear lines of communication encountered in the jail by the Special Master have interfered with the development of information and data required for this report. On too many occasions written policies and actual practice do not coincide. Indeed in a number of in-

---

1. It should be noted that the Special Master prepared a form to be placed at each inmate module observation booth throughout the jail. The purpose of this form was to provide for verification by the sergeant on each shift that the notice of the Special Master's appointment was posted in each housing area. The Special Master requested that the sergeant sign the form indicating that the notice was posted only after making his own visual inspection. These forms were to be returned to the Special Master when completed. The last such completed form received by the Special Master was dated May 13, 1977.

stances, high ranking administrators are in disagreement about what the policies of the institution actually are. The problem is compounded by the absence of written records which could be used to verify what procedures in fact are followed. A careful effort has been made in this report to distinguish between policy and actual practice and to provide verifying data when it has been available.

Before moving to a description of the organization of this report, the Special Master must comment upon the new physical facility which is the focus of this litigation. In its second opinion in this case, the Court made the following observation:

. . . if a beautiful brand new jail were built and operated the way the present jail is operated, there would be little improvement in the difficulties at first, and what improvement there was would very rapidly disappear. *Jones v. Wittenberg,* 330 F.Supp. 707, 712 (N.D. Ohio 1971).

The Court's observation was indeed prophetic. While the construction of a new jail has eliminated, at least for the time being, the worst of the problems of overcrowding, separation of prisoners, and filth, this large and complicated structure has created a complex set of new problems to be overcome if adequate services, programming, and surveillance are to be accomplished. To say that the new structure is an improvement over the old Lucas County Jail, which was built in the last decade of the 19th century, is not to say very much. A better standard against which to measure the new facility is that provided by the National Sheriffs' Association:

 a. To provide decent and humane care for inmates

 b. To protect the public by securely detaining persons who present a danger to the community or to themselves

 c. To meet the correctional needs of the inmates by providing services which

will help overcome their handicaps and permit them to live law-abiding lives after their release.[2]

After acknowledging these to be the purposes of the Lucas County Correction Center, the Toledo/Lucas County Criminal Justice Regional Planning Unit summarized its opinion of the new facility in the following terms:

It is our opinion and the opinion of the experts we have consulted that on the whole, the new Lucas County Jail is an excellent facility which the entire community can be proud of.[3]

With this statement the Special Master and the experts he has consulted respectfully disagree.

In the course of his tour of the new facility, Dr. F. Warren Benton, the Director of the Oklahoma Department of Correction, observed to the Special Master that the new jail is based primarily upon 19th century conceptions of correctional architecture, the only exceptions being those areas which are more reminiscent of the 18th century.

Mr. William G. Nagel of the American Foundation's Institute of Corrections, in a report received by the Special Master, likened the new Lucas County Jail to one described in Mr. Nagel's highly regarded study of American correctional facilities, *The New Red Barn*:

Our first impression of almost all the jails inspected was that they were designed in hypocrisy. Often built as part of a criminal justice complex or civic center, they are frequently, on the exterior, inoffensive and even attractive structures. The approaches are attractively landscaped, sometimes even including fountains and reflection pools. One Warden proudly noted that no bars are visible to outsiders—a now frequent ploy. The overwhelming impression once inside is that the modern American jail, like its prede-

**2.** National Sheriffs' Association, *Jail Administration* 9 (1970).

**3.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the Lucas County Correction Center* at I–3 (1977).

cessor of the last century, is a cage that has changed only superficially. The concepts of repression and human degradation are remarkably intact.

Mr. Nagel commented at several points in his report about the difficulties of inmate movement which would be experienced in the new institution:

My experience has been that high-rise institutions operating off an elevator core, with doors and elevators remotely controlled, do not lend themselves to any ease of movement from the house modules to the recreation area. And as a result, the recreation areas are used much less frequently and under much more structured restrictions than are necessary or desirable.

The fact that provisions have been made for classrooms and for a library are both very positive, but my same reservations exist relative to their use because high-rise elevator core institutions, remotely controlled, do not lend themselves to movement from housing units to central activity space such as classrooms and libraries.

Finally, Mr. Nagel summarized his observations in the following words:

I would say that the design of the Lucas County Jail has many imperfections, including its overemphasis on steel and electronic devices. I think it is designed as the most restrictive alternative for the untried, rather than the least restrictive alternative. I think its visiting arrangements are archaic, as are its holding cells on the first floor and maximum security blocks on the top floor.

Mr. Anthony S. Kuharich, a jail consultant employed by the Toledo/Lucas County Criminal Justice Regional Planning Unit to submit a report on the staffing requirements of the new jail, characterized the new jail as "essentially a maximum security . . . facility."

Mr. Wayne Patterson, the Director of Corrections for the City and County of Denver, Colorado, acknowledged that:

There are many aspects of the facility which fall short of the ideal, both in the efficient use of space and consolidation of services provided.

While Mr. Patterson went on to describe the new facility as "pleasantly appointed" and "painted in appropriate decor," the Special Master fails to understand how the fixed tables and backless stools, which constitute the only furnishings in the housing areas, can be described as pleasant appointments. Even the Toledo/Lucas County Criminal Justice Regional Planning Unit has recommended that:

Each living module (dayroom) should be provided with additional seating of a comfortable nature. The additional chairs should be well spaced to provide for effective utilization of existing space. Such seating should be designed to withstand heavy use. We believe this recommendation is directly related to inmate safety and offer the following quote from Dr. Hartung in this regard:

"Men are in forced contact but they do not want to be in forced contact all the time. A good deal of bickering or conflict will be avoided if other seating is provided so they can sit by themselves when they wanted." (sic) [4]

As to Mr. Patterson's reference to the appropriateness of the choice of color, the Special Master is more in agreement with Mr. Nagel's observation concerning the sixth floor, which is intended to house the most dangerous and aggressive prisoners in the jail:

The sixth floor should be repainted before any inmates are placed in it. It has been painted in a red-orange, the very color that psychologists have found to be the most provocative in terms of aggressive responses.

Finally, the Special Master has noted the following observation made by Mr. Robert Christensen, Correctional Services Administrator for the North Central Regional Of-

---

**4.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements* and *Analysis of the Lucas County Correction Center* at I–8 (1977).

fice of the United States Bureau of Prisons, another consultant employed by the Toledo/Lucas County Criminal Justice Regional Planning Unit:

> The emphasis on the floor plan is to provide as little physical contact between staff and prisoners as possible. The facility lends itself well to this concept by providing several observation points and television coverage.

The Special Master agrees that the architectural design of the housing floors "lends itself well" to providing "as little physical contact between staff and prisoners as possible," but does not believe that this is a desirable architectural feature of the new facility.

Returning to the basic functions of a jail enumerated by the National Sheriffs' Association, the Special Master acknowledges that he does not possess sufficient expertise to comment extensively upon the physical security of the new facility. Apparently, a number of experts who toured the new jail for the Toledo/Lucas County Criminal Justice Regional Planning Unit believe the institution to be secure. Experience which has been gained already, however, indicates that inmates can open windows in their cells for the purpose of passing contraband and can enter the ventilating duct shafts located in the housing areas. In addition, one inmate almost removed his entire cell window with little more than his bare hands. Because the Court's order is not related directly to these security aspects of the new facility, the Special Master has not attempted to obtain the benefit of expert opinion in this area.

What is clear to the Special Master, however, is that little emphasis was given to the provision of "decent and humane care for inmates." The Toledo/Lucas County Criminal Justice Regional Planning Unit has pointed out, with respect to prisoners incarcerated in the Lucas County Jail, that "the vast majority of these persons (70%) have not been convicted or sentenced for any crime." When this fact is taken into account, the steel cages containing small windowless cells on the sixth floor, the failure to provide any semblance of comfortable seating in the dayroom areas, the failure to install adequate light for reading, the construction of archaic and dehumanizing visiting facilities, and the provision of padded cells without sinks or toilets for inmates who are mentally disturbed are all the more inexcusable.

With respect to meeting "correctional needs of the inmates by providing services," it is true that the new jail, as originally designed, contained four classrooms. All of these were converted to other non-educational uses within the first few weeks of occupancy of the new facility. It is true that the new jail contains what Mr. Nagel described as "probably the largest indoor recreation space I've seen in any County jail in the United States," a library, a chapel area, multipurpose rooms, and medical facilities. The problem is that use of these facilities may be minimized (and in some cases rendered impossible) by the core elevator concept unless the jail's administration is willing to develop creative and innovative solutions to this problem. In addition, as will be described in greater detail in this report, the presence of visiting facilities, and therefore visitors, on the housing floors will make simultaneous programming and visitation very difficult. The programming and service facilities which have been constructed fail to reflect the input and advice of those who will use them. The Food Service Director has described to the Special Master the failure of the planners and designers of the facility to accept his advice with respect to the configuration and arrangement of the new kitchen. Suggestions of the doctor as well as those of the Medical Director were ignored when the medical area was designed, with the result that this area is deficient in a number of important respects which are described in later portions of this report. Outside citizens groups such as the Jail Action Improvement League were not even permitted to have input in the design of the new facility, and the recommendations of a committee of the Toledo/Lucas County Correction Council, an organization whose mem-

bers are possessed of substantial correction expertise, were largely if not completely ignored.

In assessing the capacity of the new jail to "provide decent and humane care for inmates" and "to meet the correctional needs of the inmates by providing services which will help overcome their handicaps and permit them to live law-abiding lives after their release," one should consider the restatement of these objectives by Professor Hans W. Mattick, the Director of the Center for Research in Criminal Justice at the University of Illinois Chicago Circle, who reported his observations of the new jail:

> At the *minimum,* a jail should not do any harm to its staff or inmates, i. e., it should not expose the staff or inmates to dangerous or unhealthy conditions and it should not contribute to the further maladjustment of persons remanded or sentenced there. At the *optimum,* a jail should provide the opportunity for the staff (as representatives of the community) to have a constructive influence on the lives of the inmates and thereby increase the probability of their successful re-integration into the community upon their release.

In the opinion of the Special Master, a substantial amount of ingenuity and skill on the part of the jail's administration will be required to meet the minimum, let alone the optimum objective set forth by Professor Mattick. One's sense that more could and should have been done in planning and designing the new jail to promote humane care and adequate programming is accentuated by the fact that this new facility will stand for 75 to 100 years. As Dr. Benton said in his report, however:

> Since the facility is completely constructed, the County should seek to do the best with what it has.

All of these observations concerning the physical design of the new Lucas County Correction Center have not been put forward by the Special Master in order to carp; nor should they be taken as implying undue criticism of all of the defendants in this case, several of whom assumed their official positions too recently to be in a position to affect the design of the structure. As much of the remainder of this report will make clear, however, the physical configuration of the new jail is directly related to the achievement of a state of compliance with a number of the provisions of the Court's order. Thus, at the outset one must be aware that full compliance with the Court's order will require some alteration of the physical facility as well as the development of policies, procedures, and practices on the part of the jail's administration and staff.

In its opinion of July 9, 1971, the Court ordered counsel for the plaintiffs to prepare and submit an order expressive of the findings of fact and conclusions of law contained in that opinion. That order was submitted to and approved by the Court. The report which follows measures the conduct of the defendants against the language of that order and against that contained in modifications subsequently approved by the Court. The references to numbered paragraphs of the Court's order correspond to numbers utilized in that final order. Each provision of the Court's order is discussed, and findings with respect to compliance have been made by the Special Master in each instance. As a general rule, the Special Master has not attempted to propose plans for obtaining compliance in those areas in which findings of noncompliance have been made. In a few such instances, however, specific recommendations have been made. These recommendations relate primarily to matters which have been the subject of lengthy discussion and negotiation between the Special Master and the defendants in this case. Upon the Court's adoption of the findings of the Special Master contained in this report, the process of developing additional compliance plans can commence.

## PARAGRAPH 1

WITHIN NINETY (90) DAYS OF THIS ORDER, REDUCE THE INMATE POPU-

LATION OF THE LUCAS COUNTY JAIL TO NO MORE THAN TWO PERSONS PER CELL. THIS LIMIT SHALL NOT BE EXCEEDED UNLESS THERE SHALL EXIST AN EXTREME EMERGENCY WHERE THE PROTECTION OF THE PUBLIC DEMANDS IMMEDIATE CONFINEMENT OF A LARGE NUMBER OF PERSONS AND THEN THE LIMIT MAY BE EXCEEDED FOR NOT MORE THAN TWENTY–FOUR (24) HOURS EXCEPT THAT:

(a) IF A PROGRAM OF REMODELLING TAKES PLACE WHICH REQUIRES THE TEMPORARY VACATION OF SOME CELL BLOCKS, THE LIMITATION OF TWO PERSONS PER CELL MAY BE EXCEEDED DURING SUCH REMODELLING.

(b) IF SUCH PORTIONS OF THE BUILDING ARE CONVERTED FROM CELL HOUSING TO OPEN DORMITORY HOUSING, THIS ORDER MAY BE MODIFIED UPON APPLICATION.

As applied to the former Lucas County Jail, Paragraph 1 established an inmate population limit of 162. This figure is based upon the existence of 51 cells in three large cellblocks, 29 cells in six small cellblocks and one cell used for juvenile offenders. This total of 81 cells permitted a population of 162 assuming double occupancy. For the purpose of determining the capacity of the old jail, two medical cells on the third floor of the facility have been excluded. Since these cells were intended to house physically ill prisoners, they could not be considered in computing the number of cells available for the regular inmate population. The same is true of a single "isolation" cell in one of the small cellblocks on the first floor of the jail, which cell was designated for occupancy by mentally disturbed and violent inmates.

Daily population reports maintained by the jail administration from February 4, 1977 through April 22, 1977, reflected an average daily population of 180.4. During this period the lowest daily population was 167 and the highest was 197. Thus more than 162 inmates were housed in the facility on every day for which population reports were submitted to the Special Master.

During the period covered by these reports, there was no "extreme emergency" requiring protection of the public and constituting a justification for deviation from the population limit imposed by the Court. No program of remodelling took place during that period and no portions of the structure were converted to open dormitory housing.

On April 22, 1977, 30 inmates were moved to the newly constructed Lucas County Correction Center. From this date until May 18, 1977, when the old structure was totally evacuated, the daily population level in the old jail remained within the limit established by the Court.

During the period of overcrowding observed by the Special Master after his appointment, no more than two inmates were assigned to any cell. Inmates unable to be accommodated in cells were given beds in the dayroom areas adjoining the cells. On several occasions persons serving weekend sentences and other inmates were provided with nothing more than a mattress on the floor, and on one weekend, female inmates were moved to a conference room on the third floor of the jail where they slept on mattresses on the floor. This situation was alleviated only when the American Red Cross agreed to provide cots for several days until releases could be effected to reduce the population level. On virtually all occasions observed by the Special Master, four persons were incarcerated in the room designated for juvenile offenders.

Although written with the old facility in mind, Paragraph 1 has obvious ramifications for the administration of the new Correction Center. Almost all regular housing cells on the third, fourth, and fifth floors of the new facility contain 72.1 square feet. One cell in each of the four person modules on these floors contains 92.6 square feet. Sixth floor "maximum security" cells contain 50.6 square feet. It is

clear that all cells in the facility, apart from three 15 person holding areas on the first floor, were designed for single cell occupancy.[5] Only one bunk is attached to the wall of each cell and fixed furnishings in the dayroom areas provide seating for only one inmate per cell. In designing cells for single occupancy, the planners of the Lucas County Correction Center were complying with current correctional standards relating to construction of new facilities. The American Correctional Association recommends single cell occupancy,[6] and the minimum standards for local criminal detention facilities proposed by the Nebraska State Bar Association Committee on Correctional Law and Practice prohibit construction of multiple occupancy cells.[7] The National Advisory Commission on Criminal Justice Standards and Goals recommends maintenance of single occupancy cells containing at least 80 square feet.[8]

Any effort to house more than one inmate in the regular housing cells in the new facility will raise a serious constitutional question. In the recent case of *Wolfish v. United States,* 428 F.Supp. 333 (D.C.N.Y. 1977), Judge Marvin Frankel held unconstitutional the practice of double celling in cells originally intended for single occupancy. Many of the cells involved in that litigation contained a total floor space of 75 to 77 square feet; others varied from slightly less than 115 square feet to almost 123 square feet. In the course of his opinion, Judge Frankel cited six recent opinions condemning double celling as unconstitutional.

In the opinion of the Special Master, the purposes of Paragraph 1 of the Court's order were to relieve an intolerable state of overcrowding in the old jail and to provide housing facilities which would meet at least minimal constitutional requirements. In view of current correctional and legal standards requiring single cell occupancy in new facilities, this paragraph should be interpreted to forbid multiple occupancy of all cells in the Lucas County Correction Center which were constructed for occupancy by only one inmate. As the remainder of this report makes clear, compliance with numerous provisions of the Court's order will be difficult enough in the absence of overcrowding; double celling, in the opinion of the Special Master, will render full compliance virtually impossible.

On the basis of single occupancy, 226 inmates can be housed on the regular housing floors of the new jail. This figure does not take into account the existence of 14 cells on the second floor which are intended for inmates requiring medical attention and ten cells which are intended to hold unclassified inmates awaiting transfer to a regular housing module upon completion of the classification process. It also ignores the presence of 20 cells and three 15 person rooms on the first floor of the facility designed to hold incoming inmates for a period of no more than 12 hours prior to their removal to the classification area on the second floor. Finally, the total of 226 does not include those inmates who will be housed in dormitories on the second and fifth floors. The Work Release dormitories located on the second floor will accommodate approximately 80 inmates and the trusty dormitory on the fifth floor held 24 trusties as of June 29, 1977.

## FINDINGS RELATING TO COMPLIANCE

■ It is the finding of the Special Master that the defendants were in a state of

---

**5.** This fact is commented on in Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the New Lucas County Jail* at I–3 (1977).

**6.** American Correctional Association *Manual of Correctional Standards* 333 (1966).

**7.** Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Stan-*

dards at 4–2 (1977). These standards have been cited with approval and republished in part by the National Clearinghouse for Criminal Justice Planning and Architecture in a pamphlet, *The High Cost of Building Unconstitutional Jails* (1977).

**8.** National Advisory Commission on Criminal Justice Standards and Goals, *Corrections* 358 (1973).

noncompliance with Paragraph 1 of the Court's order during the period of observation described above in the former Lucas County Jail. It is the further finding of the Special Master that the purposes of Paragraph 1 apply with full force to the new Lucas County Correction Center and that such purposes will be thwarted by multiple occupancy of any cell in the new facility other than the three 15 person holding areas on the first floor and the dormitories located on the second and fifth floors.

## PARAGRAPH 2

TERMINATE THE USE OF SPACE IN THE JAIL BUILDING FOR ANY PURPOSE NOT DIRECTLY INVOLVED IN JAIL OPERATIONS AND MAKE WHATEVER CHANGES ARE NECESSARY TO FIT ALL USABLE SPACE IN THE JAIL BUILDING TO JAIL USE.

In the course of numerous inspections of the old Lucas County Jail, the Special Master observed that all space in the building was being used for activities directly involved in the operation of the facility. Like Paragraph 1 of the Court's order, Paragraph 2 was designed to alleviate to the extent possible the condition of extreme overcrowding which existed in the facility in 1971. In addition, effectuation of that provision of the Court's order created at least limited space for recreation and other program activities. The construction of the new Correction Center has addressed and to a large extent eliminated the problems of overcrowding and lack of space for programming dealt with by this paragraph. In the event that overcrowding or space limitations affecting programming should develop, however, Paragraph 2 will have obvious and direct application to the new facility.

All space on the third through the sixth floors of the recently opened Correction Center has been allocated for inmate housing and for program activity. For reasons which appear later in this report, however, certain space on these floors is not usable at this time. Because of the inadequacy of the

small booths which have been provided for attorney/client visits, more fully described in that portion of this report relating to Paragraph 8 of the Court's order, these areas cannot be regarded as usable. Likewise, the failure to provide a secure outer perimeter has rendered eight exercise decks on these floors unusable. As is pointed out in the Special Master's discussion of subparagraph 17(e) of the Court's order, these decks are necessary for the development of an adequate recreation program.

The second floor of the new facility is devoted to a number of functions directly involved in jail operations. The southern half of the floor is assigned to the medical department and to inmate classification. Large areas on the north and east sides of the floor are being utilized by the Work Release Program. Administrative offices and a library occupy the remainder of the space on this floor.

Large open lobby areas on the second through the sixth floors of the new jail constitute severely underutilized space. These lobbies, each containing more than 4000 square feet, are used only for inmate, staff, and other movement on each floor. These spaces are potentially usable for other activities and may well be needed in order to remedy shortcomings discussed in this report with respect to inmate food service and the visiting program.

The booking and incoming inmate holding areas occupy roughly the northern third of the first floor. Directly adjoining are the center lobby area and the main control room for the facility. The remainder of the first floor is devoted to administrative offices for the Sheriff and employees working the Sheriff's Department. While some of these offices are used for purposes not directly involved in the operation of the jail, the assignment of this space to activities relating to the overall administration of the Sheriff's Department is appropriate and does not interfere in any way with the functioning of the jail itself.

All space on the basement floor of the new facility is either unassigned or relates

directly to jail operations. This floor contains the kitchen, staff dining room, laundry facility, and other maintenance rooms.

The subbasement floor contains a multi-purpose recreation room, a chapel area, staff lockers, other staff support areas, and offices for the Criminal Justice Training and Education Center which will be responsible for training incoming jail staff. One large area on this floor remains unassigned.

## FINDINGS RELATING TO COMPLIANCE

 It is the finding of the Special Master that the defendants were in a state of compliance with Paragraph 2 of the Court's order during the period of the Special Master's observation of the former Lucas County Jail. In addition, all space assigned in the new facility either relates directly to jail operations or is being used for purposes which do not interfere with the operation of the facility. Unusable space represented by the present attorney/client visiting booths and the unfinished exercise decks, because these are necessary for activities mandated by other provisions of the Court's order, must be altered. Failure on the part of the defendants to accomplish these necessary changes will constitute noncompliance with Paragraph 2 of the Court's order.

## PARAGRAPH 3

WITHIN THIRTY (30) DAYS OF THIS ORDER PRESENT A PLAN TO THIS COURT TO CORRECT THE LIGHTING SYSTEM OF THE JAIL SO AS TO BRING IT INTO CONFORMITY WITH SECTION VII, § 7.04 OF REGULATION A1–68 OF THE TOLEDO DISTRICT BOARD OF HEALTH. THE PLAN SHALL TAKE INTO ACCOUNT THAT EACH SEPARATE CELL IS A HABITABLE ROOM WITHIN THE MEANING OF SAID REGULATION AND EACH LIGHT FIXTURE SHALL PROVIDE SUFFICIENT FOOT–CANDLE (LUMEN) ILLUMINATION IN EACH CELL TO PERMIT THE READING OF A NEWSPAPER ACCORDING TO ACCEPTED STANDARDS.

Section 7.04 of Regulation A1–68 of the Toledo District Board of Health, referred to in the text of this paragraph of the Court's order, reads as follows:

Where there is electric service available from power lines which are not more than 300 feet away from a dwelling, every habitable room of such dwelling shall contain at least two separate floor or wall-type electric convenience outlets or one such convenience outlet and one supplied ceiling-type electric light fixture; and every water closet compartment, bathroom, laundry room, furnace room and public hall shall contain at least one supplied ceiling or wall-type electric light fixture. Every such outlet and fixture shall be properly installed, shall be maintained in good and safe working condition, and shall be connected to the source of electric power in a safe manner. Ceiling and wall-type fixtures shall be properly switched.

Inspection by the Special Master of the old Lucas County Jail disclosed the presence of a supplied ceiling-type electric light fixture in each of the cells in that facility. In addition, fixtures had been installed in the dayroom areas, although a number of these had been destroyed by inmates and had not been replaced at the time of these inspections. No cell or dayroom area in the former facility contained a wall-type electric convenience outlet. Because of the imminence of the opening of the new Lucas County Correction Center at the time of the appointment of the Special Master, no effort was made to determine the degree of illumination provided by light fixtures installed in the cells or the dayroom areas.

Paragraph 3 of the Court's order constituted a clear mandate to planners to provide adequate lighting in the cell and dayroom areas of the new jail. The quoted Board of Health regulation required each such area to be designed to include at least one ceiling-type electric light fixture capable of providing sufficient illumination to permit normal reading activity and one wall-type electric convenience outlet. Each cell in the new facility is provided with at

least one electric light fixture. All cells on the first floor are provided with one ceiling-type fixture, while cells on the second through the fifth floors and ten cells on the sixth floor are provided with one ceiling-type fixture and one wall-type fixture. Forty-eight cells on the sixth floor are provided with one wall-type fixture. Thus it is apparent at the outset that the new structure fails to comply with the requirement that "every habitable room . . . contain at least . . . one supplied *ceiling-type* electric light fixture" (emphasis added). There are no convenience outlets in any of the cells in the new structure.

The light fixtures which have been installed in the cells are recessed and contain a three-part covering retarding illumination. The first of these covers is a sheet of transparent tempered glass. Over this glass has been installed a sheet of smoked lexan. Finally, the fixture is covered by a steel plate containing small holes through which the light is diffused. The result is that the cells, in the absence of natural light, are in a state of semi-darkness.

Light meter readings taken by a lighting consultant employed by the architects for the new Center disclosed an illumination level ranging from zero to occasionally as many as eight to ten footcandles. Because of the location and the limited area of diffusion of the fixtures, the illumination level is extremely uneven in all of the cells. Common experience makes it clear that the lighting is insufficient for the purpose specified in Paragraph 3 of the Court's order.

Section BB–59–28 of Chapter BB–59 of the Ohio Building Code provides that all cells in newly constructed correctional facilities must have "not less than 15 footcandles of artificial light". The Special Master has been told by the architects that the original lighting specifications for the building "implicitly required" fixtures which would provide this level of illumination. Accepted industry standards, however, require a substantially higher level of illumination. The Illuminating Engineering Society recommends that 30 footcandles of illumination be provided in jail cells.[9] That same level of illumination is recommended for the reading of books, magazines, and newspapers in other types of structures. A recent report of conditions in the Cook County Jail in Chicago, Illinois, prepared by two environmental health specialists for the United States Department of Justice, contained the following observation:

A minimum of 30 footcandles is necessary for maximum speed of seeing (for reading), for prevention of eye fatigue and eye strain. Higher levels of illumination are necessary for inmates with poor vision or eye defects, which are common health problems for those in lower socioeconomic classes. The majority of the incarcerated offenders are in this class.[10]

The parties entered into a stipulation regarding the provision of adequate lighting in the new facility, which stipulation was approved by the Court and filed on April 13, 1977. The pertinent portion of that stipulation reads as follows:

That lighting fixtures sufficient to provide an illumination level of 30 footcandles per cell will be obtained and installed as promptly as possible in the new Lucas County Correction Center.

On May 10, 1977, the architects issued Field Bulletin No. 9 listing contemplated changes in the lighting of cells, and on May 11, 1977, the architects informed counsel for the defendant County Commissioners that an appropriate fixture had been located. The proposed fixture has been evaluated by the architects and their lighting consultant and has been used with apparent success at other correctional facilities, including the Los Angeles County Jail and the Illinois Mental Health Center at Chester, Illinois. The proposed fixture, which will contain three 40 watt flourescent bulbs and a ⅝

**9.** Illuminating Engineering Society, *Lighting Handbook* at 9–86 (5th ed. 1972).

**10.** B. Walker & T. Gordon, *Report of Environmental Health Conditions at the Cook County*

*Jail* 12 (unpublished report in the files of the Special Master).

inch tempered lens with a diffuser to prevent glare, has been observed by the Special Master's assistant during a demonstration in the Lucas County Correction Center. These fixtures will be surface mounted on the ceiling of each cell and appear to provide 30 or more footcandles of illumination throughout most of the cell including the areas most likely to be used for reading. Illumination provided by these fixtures will be more even throughout the cell area, less heat will be produced by their use, and lower maintenance expenses will be incurred. As of the date of this report, however, no steps have been taken to install the new fixtures.

## FINDINGS RELATING TO COMPLIANCE

■ It is the finding of the Special Master that the artificial lighting system of the new Lucas County Correction Center is not in compliance with Paragraph 3 of the Court's order. When new lighting fixtures are installed in accordance with the stipulation agreed to by the parties and approved by the Court, each cell will contain a ceiling-type electric light fixture as required by § 7.04 of Regulation A1–68 of the Toledo District Board of Health, which fixture will provide sufficient footcandle illumination in each cell to permit the reading of a newspaper according to accepted standards. Replacement of fixtures in all cells must be expedited, however, in accordance with the terms of the parties' stipulation.

Because Paragraph 3 of the Court's order relates to "the lighting system of the jail," it is the finding of the Special Master that the Court's reference to § 7.04 of Regulation A1–68 of the Toledo District Board of Health does not require the installation of a wall-type electric convenience outlet as specified by that section. Such an outlet is not necessary in order to provide sufficient illumination in the cell and thus does not appear to be required in order to bring about a state of compliance with this provision of the Court's order.

## PARAGRAPH 4

IMMEDIATELY, TAKE STEPS TO INSURE THAT FOOD AND FOOD SERVICE AT THE JAIL MEET THE FOLLOWING CONDITIONS AND STANDARDS:

(a) MINIMUM NUTRITIONAL STANDARDS SHALL BE MAINTAINED AS DISCLOSED BY THE TESTIMONY OF MRS. M. DeOLIVEIRA AND THE EXHIBITS IN CONNECTION THEREWITH;

(b) FOODS SHALL BE SERVED AT THE PROPER TEMPERATURES, FRESH, AND IN REASONABLE VARIETY;

(c) SERVING METHODS SHALL MEET MINIMUM HEALTH AND SANITARY STANDARDS FOR FOOD SERVICE IN RESTAURANTS;

(d) KITCHEN, KITCHEN EQUIPMENT, FOOD STORAGE, AND SANITATION SHALL MEET MINIMUM STANDARDS FOR RESTAURANTS;

(e) ALL PERSONS, WHETHER PRISONERS OR EMPLOYEES, WORKING IN AND AROUND THE KITCHEN AND THE HANDLING AND SERVING OF FOOD IN THE JAIL SHALL MEET THE APPLICABLE RESTAURANT HEALTH REQUIREMENTS;

(f) THE JAIL KITCHEN AND FOOD SERVICE SHALL BE REGULARLY INSPECTED BY THE PUBLIC HEALTH AUTHORITIES ON THE SAME BASIS AS RESTAURANTS SERVING THE PUBLIC, AND THE RECOMMENDATIONS OR REQUIREMENTS MADE BY THE PUBLIC HEALTH AUTHORITIES AS THE RESULT OF SUCH INSPECTIONS SHALL BE IMPLEMENTED BY THE DEFENDANTS WITHIN THE TIME ALLOWED THEREFOR BY SAID PUBLIC HEALTH AUTHORITIES.

*Minimum Nutritional Standards.* On several occasions following the filing of the final order in this case, nutritionists employed by the City of Toledo Board of Health have visited the jail. What follows is a brief description of these visits and the evaluative comments contained in various reports submitted by the nutritionists. The first such visit occurred on April 18, 1972. While the nutritionist did discuss food service operation with the jail's food service supervisor, the report of that meeting states, "The nutritionist did not in any way evaluate the program."

A second visit by nutritionists occurred on June 27, 1972. On the occasion of this visit they met with the institution's Food Service Director and evaluated cycle menus for the months of July, August, and September. Based upon standards recommended by the National Research Council, the nutritionists made the following findings with respect to the adequacy of these menus:

| Nutrients | Food Value |
| --- | --- |
| Calories | Adequate |
| Protein | Adequate |
| Riboflavin | Adequate |
| Niacin | Adequate |
| Iron | Adequate |
| Calcium | Adequate |
| Thiamin | Adequate |
| Vitamin A | Probably adequate if fortified margarine is used |
| Vitamin C | Inadequate |

In explaining the finding of adequacy of calorie content in the menus which were evaluated, the nutritionists established a range of 2,400 to 3,000 calories needed by a male between the ages of 18 and 75 years of age depending upon age, height, and weight. The nutritionists' findings with respect to the adequacy of food value in these menus assumed males weighing between 130 and 154 pounds and standing between 67 and 69 inches in height. The evaluation assumed a needed calorie range of 1,700 and 2,300 for females between the ages of 18 and 75 depending upon age, height, and weight and was based upon the needs of females weighing between 119 and 128 pounds and standing between 62 and 64 inches in height.

In conclusion, the nutritionists made the following observation:

From this evaluation, it appears that the menus are nutritionally adequate, except for Vitamin C, *if the food items and size servings (as noted on menus) are served to the residents* (emphasis added).

With respect to the inadequate provision of Vitamin C, the nutritionists recommended the serving of one of the following food servings daily:

1 medium orange or ½ cup juice

1 grapefruit or ½ cup juice

2 medium tomatoes or 1 cup juice

½ large cantaloupe

1 cup strawberries

¾ cup broccoli

1½ cups cabbage, raw/shredded

Finally, the nutritionists recommended less frequent repetition of certain food items, greater consideration of color, textures, temperatures, consistencies, and combinations in planning menus, and serving of eggs three times per week. They pointed out that they would require additional information concerning the food service operation in order to make "a more complete evaluation."

The next evaluation of jail menus by nutritionists occurred on June 27, 1973. In a report of that meeting dated July 17, 1973, the nutritionists stated that they were unable to evaluate menus for Vitamin C content because they did not know the Vitamin C content of fruit drinks being served to inmates. They indicated that the menus were deficient in calcium content unless inmates were receiving two glasses of milk per day. The average daily calorie content of menus over a three week period was 1,973 and thus deficient. (In this report the nutritionists recommended a daily caloric intake of 2,400 to 2,800 calories for inactive men ranging in age from 18 to 55.)

On July 2, 1973, the nutritionists again visited the jail and their findings are re-

ported in the document dated July 17, 1973 and referred to above. On the occasion of this visit, the nutritionists actually observed the serving of food at the noon meal and were served the same meal which was provided to inmates. They found their meal to be "well prepared, tasty, and adequate as to amounts." In the course of their report of this visit, the nutritionists made the following recommendation:

A three or five week seasonal menu cycle would be beneficial for both ordering and preparing food. This should be submitted to the nutritionists for reviewing before menus are served.

The next instance of involvement by nutritionists with the jail's food service operation is reflected by a report of June 7, 1977, containing an evaluation of four menus submitted by the jail's Food Service Director. These menus are attached as Appendix A, page 170 *infra*. Based upon standards recommended by the National Research Council for adult males and females, ages 18 to 75 years, the nutritionists made the following findings with respect to these menus:

| Nutrients | Food Value |
| --- | --- |
| Calories (average approximate 2,550) | Adequate |
| Protein | Adequate |
| Riboflavin | Adequate |
| Niacin | Adequate |
| Iron | Adequate |
| Calcium | Adequate |
| Thiamin | Adequate |
| Vitamin A | Probably adequate if fortified margarine is used. It is also recommended that a dark yellow or dark green vegetable be served every other day. |
| Vitamin C | Inadequate |
| Roughage | Inadequate |

The nutritionists concluded their statement of findings with the following observation:

Thus, it appears that the menus are nutritionally adequate except for Vitamin C and roughage, *if the food items and size servings (as noted on menus) are served to the residents* (emphasis added).

In the course of this report, the nutritionists expressed concern about the temperature of the food which was served and about the size of portions actually served. They repeated their recommendation with respect to the serving of certain specified foods on a daily basis in order to provide adequate Vitamin C content. In order to meet the roughage requirement, they recommended the serving of raw fruits or vegetables on a daily basis. Finally, the nutritionists repeated their recommendation that "color, taste combination, and texture of foods be taken into consideration in meal planning."

The criticisms contained in these reports parallel closely the observations of Mrs. M. DeOliveira in the testimony which she gave in this case at a hearing held on February 10 and 11, 1971. Mrs. DeOliveira testified to a Vitamin C deficiency in menus which she evaluated (TR. 233). She testified as well that "calcium is low in these menus." (TR. 233). Her evaluation indicated that protein content in some menus was approximately 10 grams below normal (TR. 233) and that fruits and vegetables were served too infrequently (TR. 233, 234). Mrs. DeOliveira recommended an average daily calorie intake of between 2,400 and 2,500 calories for a sedentary young man of "average or more than average size." (TR. 253).

Useful as they are, all of these evaluations by nutritionists are of limited value in view of the fact that *none of them have been in a position to determine the actual quantity and quality of specific foods served to inmates.* Any finding of nutritional adequacy will require evaluation of meals and foods actually served as opposed to merely that of written menus.

*Temperature, Freshness, and Variety of Food.* In their report of July 17, 1973, the nutritionists who visited the jail expressed their concern that "electric carts that are at the blocks were not plugged in, and it appeared that they were not being used properly." They repeated their concern about

the temperature of food served in the jail in their report of June, 1977. (In an earlier report of July 26, 1972, the nutritionists indicated that they would need to know the temperature of foods when they reached the residents in order to "make a more complete evaluation.") With respect to variety of foods, the nutritionists made the following observation in their report of June 17, 1977:

The nutritionists have not commented on the menus as to food selection and acceptability. First, they have not observed the serving and consuming of these meals and second, they feel that Mr. Coleman (the institution's Food Service Director) is a better judge of his residents' likes and dislikes than they are.

Finally, at no time have the nutritionists reported on the freshness of food served in the jail.

As was the case in the old jail, the food service operation in the new Lucas County Correction Center makes it very difficult, if not impossible, for food to remain at proper temperatures when it reaches all inmates. Food which is prepared in the jail kitchen on the basement level is put into serving containers which then are placed in warming carts used for delivery of the food to the various housing floors. Although the Food Service Director attempts to maintain the practice of plugging in and thus warming up these units at least one hour before serving, the inside of the unit remains only mildly warm to the touch after the warm-up period. After they are filled with food, the carts are delivered by elevator to the various housing units. Because the elevator used for food delivery is used by numerous other staff members for other purposes, substantial delays are encountered sometimes in placing the food carts on the elevator.

Two such food carts service a given floor. When the carts arrive on the floor, they are taken by correctional officers who are responsible for dishing out and serving the meal. The Special Master observed this operation on the fourth floor of the institution at the time of the serving of the noon meal on June 13, 1977. The serving of the trays consumed a period of slightly more than 45 minutes. By the time the last inmate was served, the hot food remaining on the carts had cooled to a considerable extent, although it was still reasonably warm. The problem of food temperature control is exacerbated by the failure of correctional officers to plug in the warming units during serving. Although outlets exist for this purpose in the observation booths from which food is served, the Special Master has observed that the carts often are not connected to these outlets. Indeed, those instances in which the Special Master has observed that a cart has been plugged in have been exceptional.

All that has been said with respect to serving hot food applies with at least equal force to the serving of cold food. There is no chilling unit on the carts which are used for delivery of food and the temperature of cold foods will be affected by the delay in serving resulting from the current food delivery system.

The Food Service Director places a large food order every week, generally on Wednesday. Foodstuffs which are ordered generally arrive on the following Saturday or Monday. Thus fresh foods do not appear to be held in the jail for a period of more than one week and adequate facilities for refrigeration and freezing do exist. Canned vegetables and fruits are used, thus avoiding the problem of freshness which would result from use of unpreserved products.

In order to accomplish reasonable variety in the foods served to inmates, the Food Service Director has developed four cycle menus for three month periods during the year. These cycle menus are utilized as a starting point in creating weekly menus. The weekly menus which have been developed avoid the phenomenon of serving the same meals week after week as well as the

problem of particular foods appearing regularly on specific days of the week.

*Sanitary Conditions.* Sanitary standards with respect to the serving of food relate to requirements contained in Paragraph 18 of the Court's order concerning daily cleaning, mopping, scrubbing, and washing of the housing areas of the jail. This relationship results from the fact that food is served in the dayrooms adjoining the inmates' cells. Food trays prepared by correctional officers are passed through a slot in the wall separating each housing module from the observation booth where the officer prepares the trays. The food then is taken by inmates to tables in the dayroom area where it is consumed. As far as the Special Master is able to determine, inmates may take their trays to their individual cells. There does not appear to be any policy prohibiting this practice, and in any event correctional officers on the housing floors are sufficiently busy during the times of meal service that they realistically could not enforce such a policy. The serving of meals in prisoner housing areas creates extraordinary problems of sanitation and contravenes accepted standards of practice in correctional institutions. The 1970 Manual on Jail Administration published by the National Sheriffs' Association contains the following standard with respect to food services:

> The dining areas. A dining area should be provided outside the cells.

In a report submitted to the Special Master on May 7, 1977, Dr. F. Warren Benton, the Director of the Department of Correction of the State of Oklahoma, made the following observation concerning the food service procedure projected for the new jail:

> The lack of dining facilities will necessitate either feeding in the cells, which is inherently staff-intensive and filthy; or feeding in the dayrooms, which will create practically as many difficulties. Staff will have to be especially attentive to contraband passage, food games by the inmates, and housing unit sanitation.

The sanitation problems in the housing units will be severe.

Dr. Benton's prediction has been borne out by ample evidence which has accumulated since April 22, 1977, when the new facility was occupied. Remains of meals have been evident on the floors of a number of the dayroom areas and dirty trays have been left on the floors of dayroom areas until they could be retrieved by correctional officers. On June 13, 1977, inmates in one of the modules on the fourth floor threw their food trays into the vestibule area separating the dayroom from the center lobby. When asked, a correctional officer reported that it was not at all unusual for this to occur. On the sixth floor in particular, but in other areas as well, inmates have thrown food which has adhered to television cameras, walls, bars, and floors. Although some efforts have been made to clean up some of these areas, these efforts have by no means been altogether successful. In a report of an inspection made on May 24, 1977, officials of the Bureau of Consumer Health Protection of the Toledo Board of Health made the following observation:

> If the conditions of sanitation in the sixth floor (or other floors) cannot be controlled due to food being served and allowed in cell areas, we strongly suggest other methods of serving food be studied. One recommendation would be a centralized feeding area. Also, stricter regulations should be enforced on snacks and other food allowed in the cells, etc. It is our feeling that if existing conditions continue they will worsen to the extent that an unhealthy, unsafe and unallowable state will exist!

Other problems of sanitation exist with respect to the serving of food in the institution. The service elevator which is used to convey food carts from the kitchen to the various housing floors is often unclean. In the report of their inspection of May 24, 1977, representatives of the Toledo Board of Health instructed the defendants to "clean

floors, walls and ceiling surfaces in this elevator with 'detergent sanitizer'." Other problems affecting sanitation in the housing areas (and thus relating to food service in those areas) noted by the inspectors included the need to "remove the accumulation of garbage, dirt, food splatter, food, debris from walls, floors, bars, light fixtures throughout the sixth floor cellblocks." Finally, the inspectors noted that a number of plastic food trays used for food service were damaged badly by cigarette burns and scratches and needed to be removed from service.

The problem of food service sanitation is exacerbated by the fact that food is handled by a large number of correctional officers in the various housing areas. During routine inspections of the facility, the Special Master has noted that correctional officers do not wash their hands before beginning to serve a meal. Although a plastic glove is provided for use by the correctional officer, the Special Master has observed that such gloves are not used on all occasions. According to the Director of Administrative Services of the Sheriff's Department, correctional officers receive no health examination before or after they are hired to work in the jail.

An additional sanitation problem is created by the issuance to each inmate of a cup and spoon at the time of his admission to the institution. This cup and spoon are retained by the inmate and are the only utensils provided to him for use at meals. Various liquids are served to the inmate in his cup and no provisions are made for cleaning the cup and spoon apart from whatever efforts the inmate makes on his own behalf. The temperature of water provided in the housing areas is not sufficiently hot to permit sterilization of these implements.

All of these conditions make it clear that the sanitary standards for food service in the institution fall far below the standards required for service in restaurants. Such requirements are contained in regulations promulgated by the Ohio Department of Health. The basic requirement imposed by that Department is contained in Regulation HE–21–04–A.

*Structure, Cleanliness, and Repair.* Every food service operation and all parts thereof and places appurtenant to the food service operation shall be maintained in good repair and shall be kept thoroughly clean and free from any accumulation of filth, garbage, rubbish, or other waste.

Another regulation of the Ohio Department of Health which is relevant to the serving of food in the housing areas of the jail is Regulation HE–21–04–L which provides as follows:

All food shall be so . . . served as to be reasonably protected from dust, flies, vermin depredation, and pollution by rodents, poisonous insecticides, poisonous rodenticides, unnecessary handling, droplet infection, overhead leakage and other contaminations.

A third regulation of the Ohio Department of Health which has direct bearing upon the serving of food in the housing areas of the jail is Regulation HE–21–04–0 which contains the following provisions:

In food service operations hereafter constructed or extensively altered, there shall be no direct opening between rooms where food is stored or prepared or served to the public, and rooms used for living and sleeping quarters.

It is clear that food service sanitation in the new facility does not meet the requirements of these regulations. Unless corrective action is taken very quickly, the conditions of filth and vermin infestation which characterized the former jail and which played a large role in the determination to spend more than $12,000,000 on a new facility will be prevalent in the Correction Cen-

ter. In order to eliminate the practice of serving food in the dayroom areas, physical alteration of the facility will be required. Specific suggestions to this effect are contained in that portion of this report dealing with the visitation program required by subparagraph 17(h) of the Court's order.

Sanitation standards in the centralized kitchen area where food is stored and prepared can be maintained more easily. Inspections of the new facility were conducted by representatives of the Bureau of Consumer Health Protection of the Toledo Board of Health on February 15, 1977, May 17, 1977, and May 24, 1977. In the course of their reports, these officials have recommended a number of changes in the kitchen area and have commented upon the lack of cleanliness of toilet rooms off the kitchen. In general, however, it appears that the kitchen facility, kitchen equipment, and the food storage areas conform to the requirements of the Board of Health and a food service operation license was issued to the Center on May 17, 1977. According to the Food Service Director, the assignment of inadequate numbers of trusties to assist in kitchen operations has made the tasks of cleaning and of maintaining an orderly storeroom more difficult. Unfortunately, the problem of food storage sanitation was increased when quantities of food were moved from the old institution to the new Center in spite of warnings by public health authorities and others that such food was highly likely to be contaminated by vermin.

Additional problems with respect to sanitation in the kitchen and food storage areas include the placement of stock against walls and directly on the floor of the food storage room. This prevents the spraying of insecticides in areas where vermin are likely to develop. In addition, a crack exists between the wall and the ceiling above the baking section in the kitchen and this crack must be caulked in order to avoid insect infestation. The absence of a daily pickup of garbage and refuse contributes further to the insect problem. At the present time, the facility is serviced for insect control by an outside contractor. The kitchen area is serviced once per week and the other areas of the jail are serviced twice a month. The exterminator has already noted the presence of "a few" cockroaches in or about the kitchen area.

*Food Service Personnel.* The following regulations of the Ohio Department of Health relate to personnel working in and around the kitchen of the Correction Center:

Regulation HE–21–04–M, *Cleanliness of Employees.* All employees shall wear clean garments and shall keep their persons clean and neat at all times while engaged in handling food or utensils. No employee engaged in preparing or serving food shall use tobacco in any form.

Regulation HE–21–04–N, *Hair Control of Food Handlers.* All employees shall wear their hair clean and neat and under control at all times so that:

(1) There shall be no undue handling of hair.

(2) Hair shall not come into contact with food or food contact surfaces.

(3) Loose Hair shall be prevented from falling into food or onto food contact surfaces.

Regulation HE–21–06, *Health of Employees.*

A. Responsibility.

(1) No person affected with a disease in a communicable form, or who is a carrier of a communicable disease shall work in any food service operation.

(2) No operator shall employ any person knowing him to be suspected of having or knowing him to be a carrier of a communicable disease.

(3) The operator shall notify the Health Commissioner immediately, if he has reason to believe that any em-

ployee has a disease of a communicable form or has become a carrier of a communicable disease.

Because civilian and inmate employees work in and about the kitchen area of the new jail, these requirements apply with equal force to both categories of employee. At the present time, it does not appear that civilian kitchen employees submit to any regular health examinations. Although the Food Service Director indicated that such employees are required to undergo a post-hire physical checkup and regular re-examination every three years, he acknowledged that these procedures have not been followed on a regular basis. Inmate employees receive no special physical examination other than that which is administered at the time of their initial admission to the institution. Although the inmate employees do receive a daily change of clothing to be worn while working in the kitchen, a number of these trusties have reported to the Special Master that they are not able to shower regularly because their dormitory, a converted classroom, has no shower facilities. Kitchen personnel, both civilian and inmate, do not wear head coverings which may be necessary in order to meet the requirements of Regulation HE–21–04–N cited above.

*Inspection by Public Health Authorities.* According to records maintained by the Toledo Board of Health, city sanitation officials have made a number of inspections of the jail kitchen since 1972. Two such inspections occurred in 1973, two in 1974, four in 1975, and two in 1976. Records for 1977 indicate that two inspections of the former jail and three inspections of the new facility have occurred. At least one inspection per year is required by § 3732.05 of the Ohio Revised Code and it appears that this minimum standard has been met since the issuance of the Court's order in this case. This requirement for an annual inspection notwithstanding, officials of the Toledo Board of Health have recommended that the Lucas County Correction Center be inspected three times a year. In the opinion of the Special Master, even more frequent inspections during the first year of the operation of the new facility should be conducted in order to control problems of kitchen and general sanitation.

It appears that numerous orders by officials of the Board of Health to effectuate cleaning and fumigation programs were complied with throughout 1975 and 1976. Unfortunately, however, according to the exterminator presently employed by the defendants to control vermin in the jail, recent provisions of the Environmental Protection Act have rendered many of the more potent insecticides unusable. This factor, combined with the propensity of certain insects—particularly cockroaches—to adjust to chemicals contained in pesticide products, makes maintenance of the cleanest possible conditions even more critical. In the most recent two reports with respect to food sanitation conditions in the new facility, public health authorities ordered a number of actions which were not taken promptly. The following chart indicates the substance of such requirements, the date of the order, and the degree of compliance achieved by June 16, 1977:

| Nature of Action Required * | Date of Toledo Health Department Order | Degree of Compliance |
| --- | --- | --- |
| 1. Reseal the wall surface on center post (of kitchen) in back of G.E. grill to provide an impervious, cleanable surface. | 5–17–77 | None |
| 2. Seal the underside "lip" on hood over the cooking bank to provide a cleanable surface. | 5–17–77 | Complete |
| 3. Provide a "back" on the Blodgett Oven. | 5–17–77 | None |

| | | |
|---|---|---|
| 4. Provide a "doorstop" on the walk-in freezer door to prevent damage to the storm drainpipe. | 5–17–77 | None |
| 5. Provide off floor storage for all food items in storage room. | 5–17–77 | Partial |
| 6. Make arrangements that all food items are stored away from the wall. | 5–17–77 | Partial |
| 7. Suggest that food items be moved to opposite side of room and this area be partitioned. | 5–17–77 | None |
| 8. Remove the accumulation of garbage, dirt, food splatter, food, debris from walls, floors, bars, and light fixtures throughout the 6th floor cell blocks. | 5–24–77 | Partial |
| 9. Remove the hanging sheets from cell blocks; remove newspapers from inspection windows. | 5–24–77 | Complete |
| 10. Replace the burnt plastic light diffuser on the 6th floor. | 5–24–77 | None |
| 11. Inmate shower (north, NW module) out of service. | 5–24–77 | Complete |
| 12. Empty waste containers as frequently as necessary. | 5–24–77 | Complete |
| 13. Provide an adequate flow of hot water at all hand washing sinks on the 5th floor. | 5–24–77 | None |
| 14. Clean and maintain each trusties toilet room. | 5–24–77 | None |
| 15. Clean and maintain the toilet rooms off kitchen; suggest a designation of cleaning responsibilities. | 5–24–77 | None |
| 16. Plastic food trays badly damaged by cigaret burns and scratches are to be removed from service. Suggest tray racks for proper storage. | 5–24–77 | None |
| 17. Clean floors, walls, and ceiling surfaces in the food service elevator with "detergent sanitizer." | 5–24–77 | None |

* These items were taken directly from reports of the health officials.

---

## FINDINGS RELATING TO COMPLIANCE

■ It is the finding of the Special Master that meals served to inmates do not comply with minimal nutritional standards required by Paragraph 4 of the Court's order. In addition, improved efforts must be made to serve foods at proper temperatures and in reasonable variety. Based upon all the information which the Special Master has been able to obtain, foods served in the jail appear to be fresh.

It is the finding of the Special Master that serving methods do not meet minimum health and sanitary standards for food service in restaurants and that such standards cannot be achieved so long as food is served in the dayroom areas adjoining inmates' cells.

The Special Master finds that kitchen, kitchen equipment, food storage and sanitation standards in and about the kitchen fail to meet standards required by the public health authorities.

The Special Master further finds that kitchen employees, both civilian and inmate, fail to meet all applicable restaurant health department requirements relating to kitchen employees. In particular, the failure to administer routine health examinations before and during employment increases the likelihood that civilian employees and inmates who work in the kitchen may be infected by contagious disease. If correctional officers are to continue to serve food to inmates, they too should be examined before and during the course of employment.

Finally, the Special Master finds that while the jail kitchen and food service have been regularly inspected by public health authorities, increased numbers of inspections are necessary. Although some of the recommendations of these authorities have been implemented by the defendants, all such recommendations and requirements have not been followed or met.

### PARAGRAPH 5

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER SUBMIT PROPOSALS TO THIS COURT FOR IMPROVING THE PHYSICAL FACILITIES WITHIN THE JAIL RELATING TO MEDICAL ATTENTION TO PROVIDE, AS A MINIMUM, THE FOLLOWING:

(a) AMPLE AND ADEQUATE ROOMS AND EQUIPMENT FOR CONDUCTING PHYSICAL EXAMINATION OF INMATES AND ENTERING PRISONERS.

(b) AMPLE AND ADEQUATE ROOMS AND EQUIPMENT FOR TREATMENT OF MEDICAL EMERGENCIES, AND MINOR INJURIES AND ILLNESSES.

(c) QUARTERS FOR INMATES WHO ARE TOO ILL TO REMAIN SAFELY AS PART OF THE GENERAL POPULATION OF THE PRISON, BUT NOT SUFFICIENTLY ILL TO REQUIRE HOSPITALIZATION.

(d) ADEQUATE FACILITIES FOR DENTAL EXAMINATIONS AND TREATMENT, BOTH CURATIVE AND PREVENTIVE.

There is little to be gained from a detailed description of the inadequacy of rooms in the former Lucas County Jail for conducting physical examinations, treatment of medical emergencies, minor illnesses and injuries, and for dental examinations and treatment. One small examination/treatment room was provided on the third floor of that facility together with a small office for medical staff and a closet-size drug storage area. Two cells were available for isolation of inmates with medical problems. The general state of decay which characterized the entire facility was prominent in this small and inadequate medical service area. A dental treatment and examination room was located on the second floor.

With the construction of the new Correction Center, much more adequate examination, treatment, and housing facilities have been made available for use by the medical department. Separate and adequately sized rooms have been provided on the second floor of the facility for physical examinations, treatment, drug storage, and dental examination and treatment. In addition, a waiting room, administrative office, and nurses' station have been provided. The medical area contains 14 cells and a bathroom containing a bathtub. Small rooms are designated for x-ray, film development and supplies, although the former two apparently will be used for other purposes. The small area originally intended for x-ray equipment has been converted to a dayroom in order to permit patient/inmates to spend some limited time out of their cells.

Although facilities are generally adequate, several serious problems appear to have been built into the medical services area. One of these is the presence of a board containing call lights which are activated by inmates housed in the hospital cells and desiring aid. The location of the call board is both remote and isolated and cannot be monitored given the present level of medical staff employed in the jail. Thus,

inmates in need of assistance must shout or bang on their doors in order to attract the attention of medical personnel who are frequently far removed from the perimeter cell area.

According to the Medical Director, the supply room is too small to hold an adequate quantity of medical supplies, and the location of the drug dispensary is insecure due to its placement adjoining the treatment room. The absence of adequate day-room space prevents exercise and recreation for ambulatory inmates. Cell doors are constructed in such a way that neither food nor medication can be passed to an inmate without opening the door. Doors cannot be opened automatically, and security personnel must accompany nurses on their rounds to dispense medication. Other shortcomings include the failure to provide electrical outlets in all but one of the medical cells thus making more difficult certain lifesaving and other medical treatments. Cell doors are only 27 inches in width, and it is impossible to roll a hospital bed into or out of these cells. The result is that an inmate must be moved into and out of such cells on a stretcher unless he is ambulatory, and the configuration of the cell together with the narrow hallway outside the cell area make it difficult (although not quite impossible) to move an inmate into or out of a cell by stretcher without tipping it to a dangerous degree. The failure to install a shower in the bathroom which serves as many as fourteen inmates housed in the medical area creates a problem of sanitation.

These and other shortcomings described to the Special Master by medical personnel employed in the facility are the result of the failure on the part of the planners and designers of the Correction Center to solicit input from professionals who would be using these medical facilities and the refusal to accept suggestions from these sources when they were proffered. Unfortunately, many of these design defects cannot be corrected without major structural changes; others, while correctable, would require

substantial expense. Thus while the physical facilities are not entirely inadequate, they are in several respects and they do not reflect the degree of thoughtful planning which one would expect in a new facility costing more than $12,000,000.

The only other physical facility designated for medical treatment is a small room in the holding area on the first floor of the jail which is described as a first aid room. As of the time of the writing of this report, however, no clear policy has been established in the institution as to the responsibilities of regular medical personnel with respect to incoming inmates held on the first floor. Thus it remains to be seen whether the first aid room will be used for medical purposes.

In order to determine the adequacy of equipment available in the Correction Center for conducting physical examinations and treating medical emergencies, minor injuries, and minor illnesses, the Special Master obtained a copy of a recommended equipment list for medical services in the jail prepared by Mr. William Greene, Assistant to the President of the Medical College of Ohio. The following chart lists the equipment recommended by Mr. Greene and indicates whether or not such equipment is presently available in the Correction Center:

| Recommended Equipment | Presently on Hand |
| --- | --- |
| 14 hospital beds (manual with attachments for IV poles) | Yes |
| 14 hospital bed mattresses | Yes |
| Cabinets for laboratory, pharmacy, and supply storage room | Yes |
| Cabinets for X-ray room | No |
| Cabinets for dental treatment room | Yes |
| Cabinets for examination room | Yes |
| Cabinets for treatment room | Yes |
| Cabinets for first aid room (first floor) | No |
| X-ray machine (mobile unit) | No |
| EKG machine—portable—to be purchased with adequate stand or built-in legs | No |
| Centrifuge | Yes |
| Microscope | No * |

* In the opinion of the Center's Medical Director, this item is not required. The reason given by the Medical Director is that blood and urine samples as well as cultures are delivered to the Public Health Department or St. Vincent's Hospital laboratory for analysis.

| | |
|---|---|
| 2 refrigerators | Yes |
| 1 small sterilizer | No |
| 2 examination tables with wheels | Yes |
| 3 dressing/treatment cabinets | Yes |
| 1 portable dressing table | No ** |
| 1 examination lamp | Yes |
| 2 goose neck lamps | Yes |
| 1 infrared lamp | Yes |
| 1 medicine cart—portable for dispensing medications on all floors | Yes |
| 3 suction machines | Yes |
| 3 Mayo-type instrument stands | Yes |
| 1 Whirlpool tub on motor for use in permanent facility tub | No |
| 1 portable Sitz bath | Yes |
| 3 air spring stools | Yes |
| 2 large IV poles with wheels | Yes |
| 4 IV poles—hospital bed attachment type | Yes |
| 2 wheelchairs | Yes |
| 3 stretchers | Yes |
| 1 bed pan hopper | No |
| 1 linen cart | Yes |
| 12 sandbags—assorted sizes | Yes |
| 2 sets of traction equipment | No |
| 6 sets of bed boards | No |
| 24 sets/sizes of shock blocks | No |
| 6 sets of restraints | Yes |
| 2 vaporizers, cold air type | Yes |
| 24 bed pans, plastic disposable | Yes |
| 12 pitchers | Yes |
| 6 portable oxygen tanks | 8 purchased |
| 24 emesis basins | Yes |
| 24 plastic urinals | Yes |
| 24 plastic wash basins | Yes |
| 3 stethoscopes | Yes |
| 3 sphygmomanometers | Yes |
| 2 otoscopes | Yes |
| 1 ophthalmoscope | Yes |
| 1 portable emergency kit to include 1 laryngoscope with adequate sizes of interchangeable blades | Yes |
| 1 set of disposable endotracheal tubes—assortment of adult sizes | Yes |
| 2 ambu bags with assortment of mask sizes | Yes |
| 1 tracheotomy emergency kit | Yes |
| 1 supply of emergency drugs, tubing, bandage supplies | Yes |
| 6 disposable suture kits | Yes |
| 2 six inch stainless probes | Yes |
| 12 sponge bowls—⅜ quart size | Yes |
| 2 sponge bowls—1 quart size | Yes |
| 6 dressing jars—1 quart size | Yes |
| 6 catheter trays with lids | Yes |
| 2 forcep jars—4½ inch size | Yes |
| 2 forcep jars—7½ inch size | Yes |

In addition to these items of medical equipment, Mr. Greene recommended certain furniture for the waiting room and other items of office equipment. Virtually all of these furnishings and other items have been obtained. Mr. Greene recommended as well the purchase of one transcribing unit and three portable dictating units to be used by the medical staff. These have not been purchased and are needed by the medical staff. The only x-ray service available in the jail is provided by a person who comes into the jail twice a week to make x-rays on a portable machine. The machine which is used cannot make a picture of the complete spine and is not capable of taking chest x-rays. It can make a picture of broken ribs, arms, or legs. It is the opinion of the Medical Director as well as Mr. Greene that a more adequate x-ray machine should be installed in the facility.

In the opinion of the Medical Director, other items on Mr. Greene's list which have not been obtained are needed. In addition, there is no utility sink for filling pails with water for cleaning purposes, and the absence of any sink whatsoever in the drug room requires that large utensils used for measuring and dispensing medication be washed in the bathtub located in the inmate bathroom.

## FINDINGS RELATING TO COMPLIANCE

■ Although the rooms provided in the new jail for physical examination, treatment, and examination of inmates are much superior to the equivalent facilities in the former jail, serious deficiencies exist which should be corrected. Chief among these is the inaccessible and unmonitored location of the inmate call board. Other defects which can be remedied without substantial struc-

** In the opinion of the Center's Medical Director, this item is not required.

tural change are the absence of a shower in the inmate bathroom, the failure to provide a utility sink for cleaning purposes, and the lack of an adequate basin sink in the drug storage room. In addition, the Special Master recommends that a statement of other deficiencies described above be submitted to the architects in order for them to determine whether corrective action can be taken without undue expense.

It is the further finding of the Special Master that the defendants are in noncompliance with the requirement of Paragraph 5 that adequate equipment be purchased for the medical services area in their failure to obtain certain equipment recommended by Mr. Greene and regarded as necessary by the Medical Director.

## PARAGRAPH 6

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER SUBMIT A PLAN TO THIS COURT FOR GRANTING COMMUNICATION PRIVILEGES TO INMATES AWAITING TRIAL UNDER THE FOLLOWING TERMS AND CONDITIONS:

(a) THERE SHALL BE NO CENSORSHIP OF OUTGOING MAIL.

(b) THERE SHALL BE NO LIMITATION ON THE PERSONS TO WHOM OUTGOING MAIL MAY BE DIRECTED.

(c) THERE SHALL BE NO CENSORSHIP OF INCOMING LETTERS FROM THE PRISONER'S ATTORNEY, OR FROM ANY JUDGE OR ELECTED PUBLIC OFFICIAL.

(d) INCOMING PARCELS OR LETTERS MAY BE INSPECTED FOR CONTRABAND, BUT LETTERS MAY NOT BE READ.

(e) PROPER ARRANGEMENTS SHALL BE MADE TO INSURE THAT PRISONERS MAY FREELY OBTAIN WRITING MATERIALS AND POSTAGE.

(f) INDIGENT PRISONERS SHALL BE FURNISHED, AT PUBLIC EXPENSE, WRITING MATERIALS AND ORDINARY POSTAGE FOR THEIR PERSONAL USE IN DISPATCHING A MAXIMUM OF FIVE (5) LETTERS PER WEEK.

(g) PROVISIONS SHALL BE MADE FOR AS MANY TELEPHONE CALLS AS ARE NECESSARY FOR A PERSON WHO IS WITHOUT COUNSEL TO OBTAIN COUNSEL.

(h) PROVISIONS SHALL BE MADE FOR PRISONERS TO MAKE LOCAL TELEPHONE CALLS DURING REASONABLE HOURS ESTABLISHED BY THE DEFENDANTS.

(i) PRISONERS' TELEPHONE CALLS SHALL NOT BE MONITORED.

*Outgoing Mail.* Outgoing mail is collected by hand by correctional officers assigned to supervise the housing units throughout the institution. This mail is then delivered to the control booth located on the housing floor. From that point, the outgoing mail is collected by a member of the counseling staff and, if it has postage on it, delivered to the main control room on the first floor. Outgoing mail deposited in the main control room is given to the U. S. mail carrier at the time that incoming mail is delivered to the jail. In the event that the outgoing letter requires postage which must be provided under subparagraph 6(f), the Director of Inmate Services is responsible for taking the letter to the Lucas County Court House where it will be run through a postage meter. The Special Master has found no evidence indicating censorship of such outgoing mail.

According to the Correction Administrator, there are no limitations respecting the persons to whom outgoing mail may be sent and to the knowledge of the Special Master no outgoing letter has been intercepted because of the nature of the addressee. One statement in the newly drafted *Policies and Procedures Manual,*[11] however, raises some

11. This manual, to which reference is made throughout this report, purports to detail all policies and procedures applicable to the Lucas County Correction Center. Although the Manual is still in draft form, it represents the only effort to articulate policies and procedures affecting the everyday operation of the jail.

question about possible limitation on persons to whom outgoing mail may be directed. The *Manual* provides that

> Inmates will be permitted to correspond with professional personnel, officers of the courts, attorneys, and other officials participating in his (sic) defense. This will include all courts, and the Attorney General, Legal Aid, prosecuting attorney, and law enforcement agencies. No limitations are imposed as to the amount of letters that an inmate may write to professional personnel or officials. Sealed letters may be written to the Sheriff and Correction Administrator.

Such a policy should not be necessary if in fact there are no limitations on the persons to whom outgoing mail may be directed. Furthermore, the reference to "sealed letters" implies that there may be censorship of outgoing mail directed to persons other than those listed in the statement.

*Incoming Parcels and Letters.* According to the institution's policy on mail and correspondence

> No package will be . . . accepted for delivery to an inmate without prior approval of the Correction Administrator or his assignee. Inmates desiring to . . receive a package must submit a special request, specifying the items to be . . received, and forward the request to the Director of Inmate Services. Unauthorized packages addressed to inmates will be returned to the sender at the sender's expense. Packages received by the U. S. Mail or by other means will not be held for storage in the property area.

Thus it appears that the receipt of a package by an inmate is intended to be an extraordinary occurrence.

At the same time, the present practice in the Lucas County Correction Center is to permit individuals to bring certain items to inmates on designated days twice a month. Such "parcels" are inspected for contraband by a member of the counseling staff at the main control center on the first floor. According to an order issued by the Correction Administrator on May 25, 1977, the only items approved for male inmates are the following:

3 sets of underwear
3 T shirts
3 pairs of socks
1 wedding band
1 religious medal with chain (small)
1 rosary beads
1 soft plastic comb
1 soft plastic pic
1 dictionary and educational correspondence course textbooks (sic)
1 pair plastic or rubber thongs or 1 pair slippers
1 pair athletic sneakers
1 quiet game (Monopoly, Chess, Checkers, etc. —must be in sealed package as provided by the manufacturer)
1 small, pocket-size transistor radio (battery operated only with ear piece)
2 batteries for transistor radio
Family photographs (no metal, glass, or plastic frames allowed)

Additional items which may be received and kept in the property room for the use of inmates for court appearances include the following:

1 pair of pants
1 shirt
1 belt
1 tie
1 coat, jacket, or sweater

Items approved for female inmates are the following:

6 pair underpants
3 slips
3 bras
1 robe
1 pair pajamas
1 pair shoes, or plastic or rubber thongs or slippers or athletic sneakers
1 pair earrings (post type and modest only)
1 religious medal with chain
1 radio 3 x 6 or less (batteries only) (2 batteries for transistor radio)
2 Family photographs (no metal, glass or plastic frames allowed)

The following items are kept in the property room for court appearances by female inmates:

1 pair shoes
1 dress or slacks & blouse
1 jacket or coat or sweater
1 lipstick
1 wig or 1 hairpiece

Incoming letters are received by correctional officers in the first floor control room from the office of the Sheriff where the mail is first received. An employee in the Sheriff's office separates inmate from non-inmate correspondence and forwards the former to the main control room. At this point, a correctional officer sorts, identifies, and marks each letter with the housing unit of the inmate/addressee. At some point later in the day the incoming mail is picked up by a counselor or correctional officer and delivered to the floor control center on each housing floor. A counselor or a correctional officer then delivers the mail to individual inmates.

According to the policy of the Correction Center, only the floor counselor is authorized to open incoming mail addressed to inmates and then only in the presence of the inmate/addressee. According to correctional officers interviewed, however, the practice in fact is that such mail may be opened and inspected by a correctional officer in the first floor control room or by a correctional officer on the housing floor. While the Special Master has not obtained any evidence that such incoming mail is read by any person, the obvious intent of the institution's stated policy is to prevent such reading from occurring. Although the policies and procedures do not deal specifically with reading of mail, an order issued by the defendant Sheriff on May 3, 1976, reiterates the provision of the Court's order that "letters may be inspected for contraband but letters may not be read."

It appears that incoming letters from attorneys, judges, or other elected public officials are treated in the same manner as other incoming mail. That is to say, such mail will be opened and inspected for contraband at some point by a correctional officer or a counselor, but the policy of the institution is that such correspondence will not be read.

*Availability of Writing Materials and Postage.* Stationery, pens, pencils, and stamped envelopes are available for purchase in the commissary maintained for inmates in the Correction Center. Although these items do not appear on the list for approved items for either male or female inmates, they apparently are permitted. In addition, the policy of the institution is that "postage stamps received in the mail will be forwarded to the concerned inmate."

The Correction Center has adopted a policy that "indigent inmates shall be furnished, at public expense, writing materials and ordinary postage for their personal use in dispatching a maximum of 5 letters per week." Although it is the understanding of the Correction Administrator that these sheets of paper and envelopes, together with a pen or pencil, are contained in a package of materials furnished to indigent inmates, the practice of providing these items to inmates appears to be uneven at best. According to inmates interviewed by the Special Master, requests for these writing materials must be made to a counselor and substantial delays may be encountered before they are received. On at least one occasion an inmate reported that he was not permitted to have more than one sheet of paper at County expense. It does appear that free postage is provided for a maximum of 5 letters per week but this service too depends upon the availability of a counselor to deal with the inmate's request.

*Telephone Privileges.* Inmates received in the booking area are permitted one completed telephone call to reach an attorney or a family member. The telephone is located immediately adjacent to the control booth in that area. Inmates are allowed one evening telephone call during the time they are housed in the classification area on the second floor.

According to a policy promulgated by the Correction Administrator on June 1, 1977,

all inmates in the Correction Center other than those in the holding area are supposed to be permitted one half hour of phone time per day. Calls are placed on telephones located immediately outside the dayroom area in each living unit. According to a memorandum issued by the Director of Security on June 7, 1977, inmates in the second floor medical section use a telephone located in the classification area. Long distance calls are permitted on Monday and Tuesday evenings only. Such calls are made with the permission of the floor counselor and must be made on a collect basis. The inmate is permitted 30 minutes on the telephone for a long distance call and the call counts as his time for the day.

The limited and controlled telephone policy in operation in the new facility is in marked contrast with the system which prevailed in the old Lucas County Jail. In that facility telephones were located inside the dayroom area adjoining each cellblock. These telephones were operative from 9:00 a. m. to 11:00 p. m. and inmates were allowed to make as many calls as they wished. This system, while providing greater access to the telephone than is permitted in the new jail, created problems which the Correction Administrator wishes to avoid in the new jail. On some occasions powerful inmates coerced others to give up their telephone calls. In addition, the telephone was a source of dispute among inmates on many occasions and led to violent confrontations on others.

Under the system prevailing in the new facility, however, the telephone serving the 12 person housing modules will be used no more than six hours per day. Thus it appears that a more liberal telephone policy could be adopted without moving the telephones into the modules and permitting unsupervised use. It is clear that emerging standards with respect to telephone privileges, at least of pre-trial detainees, are substantially more liberal than those in operation in the new jail. For example, the

Nebraska State Bar Association Committee on Correctional Law and Practice has promulgated a standard which provides that "detainees shall be allowed to make any reasonable number of calls at any reasonable time." [12]

The Special Master has found no evidence that prisoners' telephone calls are monitored in any way. The location of the telephones in the vestibule area adjoining inmate housing modules makes simple audio monitoring by correctional officers in the vicinity unlikely because of the presence of a solid lexan door between the inmate speaking on the telephone and the correctional officer in the outside lobby area. According to officials of Ohio Bell Telephone Company contacted by the Special Master, these inmate telephones are not connected to any other instrument which could be utilized for monitoring.

## FINDINGS RELATING TO COMPLIANCE

■ It is the finding of the Special Master that the defendants are in basic compliance with subparagraphs 6(a) and 6(b) of the Court's order, but that the written policies of the Correction Center relating to mail and correspondence should be amended to make it clear that outgoing mail will not be opened under any circumstances and that there are no limitations on persons to whom such mail may be directed.

The Special Master finds that the defendants are in compliance with subparagraphs 6(c) and 6(d) of the Court's order, but that the institution's policy that only a counselor is authorized to open inmates' incoming mail in the presence of the inmate/addressee is not being followed. In order to assure continued compliance with the requirement that incoming mail be neither read nor censored, this policy must be enforced by the administration of the Correction Center. The Special Master finds that the institution's policy of permitting incoming packages to be delivered to the jail only twice

12. Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Standards* at 10–4 (1977).

per month does not contravene the provisions of paragraph 6(d); nor does the institution's policy which prohibits receipt of any package through the United States Mail without prior approval of the Correction Administrator or his designee.

The Special Master finds that the defendants are in compliance with subparagraph 6(e) in that writing materials and postage are freely available in the commissary which serves inmates. On the other hand, it is the finding of the Special Master that the defendants are in noncompliance with subparagraph 6(f) in that no regular and reliable procedure has been adopted which assures that indigent prisoners will be furnished writing materials and postage on a regular basis.

The Special Master finds that the defendants are in compliance with subparagraph 6(g), for inmates are allowed to complete a call to counsel or to family while in the booking area.

The Special Master finds that the defendants are in noncompliance with subparagraph 6(h) in that additional telephone time can be allowed without interfering with the legitimate interests of the administration of the institution. The Special Master does find, however, that the institution is in full compliance with subparagraph 6(i) in that inmates' telephone calls are not monitored in any way.

## PARAGRAPH 7

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER SUBMIT A PROPOSAL TO THIS COURT FOR GRANTING COMMUNICATION PRIVILEGES TO SENTENCED INMATES UNDER THE FOLLOWING TERMS AND CONDITIONS:

(a) THERE SHALL BE NO CENSORSHIP OF OUTGOING MAIL.

(b) THERE SHALL BE NO CENSORSHIP OF INCOMING LETTERS FROM THE PRISONER'S ATTORNEY, OR FROM ANY JUDGE OR ELECTED PUBLIC OFFICIAL.

(c) PROPER ARRANGEMENTS SHALL BE MADE TO INSURE THAT PRISONERS MAY FREELY OBTAIN WRITING MATERIALS AND POSTAGE.

(d) INDIGENT PRISONERS SHALL BE FURNISHED AT PUBLIC EXPENSE WRITING MATERIALS AND ORDINARY POSTAGE FOR THEIR PERSONAL USE IN DISPATCHING A MAXIMUM OF FIVE (5) LETTERS PER WEEK.

(e) REASONABLE LIMITATION MAY BE PLACED UPON THE NUMBER OF LETTERS DISPATCHED.

Paragraph 7 of the Court's order, applying only to sentenced inmates, appears to permit the defendants to limit the persons to whom outgoing mail may be directed, read incoming letters, and deny all telephone privileges to this class of inmate. In addition, it provides specifically that a reasonable limitation may be placed upon the number of letters dispatched by sentenced inmates. Otherwise, Paragraph 7 requires that sentenced inmates be given all of the privileges required by Paragraph 6 of the Court's order with respect to inmates awaiting trial.

The written policies and procedures of the Lucas County Correction Center, as well as the actual practices within the new jail, do not distinguish between sentenced and non-sentenced inmates respecting communication privileges. Thus all of the procedures described in the discussion of Paragraph 6, *supra*, are relevant to sentenced inmates. In adopting this attitude of equal treatment, the defendant Sheriff and the Correction Administrator are to be commended. While accepted correctional standards permit some distinction between sentenced and pre-trial inmates with respect to communication privileges, there is general agreement that there should be no limitation with respect to persons to whom outgoing mail may be directed by either class of inmates. For example, the Nebraska State Bar Association Committee on Correctional Law and Practice has adopted the following

standard with respect to *all* inmate mail: "An inmate may send mail to or receive mail from whomever he wishes."[13] The *Model Rules and Regulations on Prisoners' Rights and Responsibilities* prepared by the Center for Criminal Justice at Boston University School of Law provide that "inmates may send letters to any person, including inmates in other institutions."[14] The Joint Committee of the Criminal Justice Section of the American Bar Association has proposed the following standard with respect to outgoing inmate communications:

> There should be no restrictions on the length, language or content of letters, or on persons to whom a prisoner may write, except as provided in general laws.[15]

Likewise, correctional standards which have emerged in recent years provide that incoming inmate mail should not be read. The National Advisory Commission on Criminal Justice Standards and Goals has published the following standard which applies to sentenced as well as pre-trial inmates:

> Correctional authorities should have the right to inspect incoming and outgoing mail, but neither incoming nor outgoing mail should be read or censored.[16]

The same position is taken in the *Model Rules and Regulations on Prisoners' Rights and Responsibilities*:

> No incoming letters shall be read, even in the cases where they may be opened except upon showing of probable cause and obtaining of a warrant from a court of law.[17]

Finally, the Nebraska State Bar Association Committee on Correctional Law and Practice has proposed that

> Facility staff shall have the right to inspect incoming but not outgoing mail, and neither incoming nor outgoing mail shall be read or censored.[18]

Although the need for counsel may be less critical in the case of a sentenced inmate, an inmate without counsel wishing to pursue an appeal or to challenge the conditions of his incarceration should have telephone privileges which will permit him to obtain counsel. Likewise, at least some other local telephone privileges should be made available to sentenced inmates. The Nebraska State Bar Association Committee on Correctional Law and Practice, for example, has proposed the following standard:

> Convicted inmates may be subject to any reasonable rules on phone calls. At a minimum, however, such rules must permit the inmate to make at least two phone calls per week.[19]

Telephone privileges for sentenced inmates are also required by *Washington State Jail Standards* §§ 303–395 (calls at all reasonable times) and the *Model Rules and Regulations on Prisoners' Rights and Responsibilities* (two calls per week).[20]

Finally, current correctional standards prohibit limitations on the number of letters which may be dispatched by sentenced as well as unsentenced inmates. The Nebraska State Bar Association Committee on Correctional Law and Practice has proposed the following standard:

> Facility personnel shall not limit the volume of mail to or from an inmate.[21]

**13.** Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Standards* at 10–2 (1977).

**14.** F. Krantz, R. Bell, J. Brant, & M. Magruder, *Model Rules and Regulations on Prisoners' Rights and Responsibilities* 46 (1973).

**15.** Joint Committee of the Criminal Justice Section of the American Bar Association, *Tentative Draft of Standards Relating to the Legal Status of Prisoners*, 14 Am.Crim.Law Rev. 377, 493 (1977).

**16.** National Advisory Commission on Criminal Justice Standards and Goals, *Corrections* 66 (1973).

**17.** F. Krantz, R. Bell, J. Brant, & M. Magruder, *Model Rules and Regulations on Prisoners' Rights and Responsibilities* 46 (1973).

**18.** Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Standards* at 10–2 (1977).

**19.** *Id.* at 10–4.

**20.** F. Krantz, R. Bell, J. Brant, & M. Magruder, *Model Rules and Regulations on Prisoners' Rights and Responsibilities* 55 (1973).

**21.** Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Standards* at 10–2 (1977).

The *Model Rules and Regulations on Prisoners' Rights and Responsibilities* provide that

There shall be no restrictions upon the number of letters that may be written, the length of any letter, or the language in which the letter may be written.[22]

Finally, the National Advisory Commission on Criminal Justice Standards and Goals has adopted the following standard:

Correctional authorities should not limit the volume of mail to or from a person under supervision.[23]

## FINDINGS RELATING TO COMPLIANCE

The findings made by the Special Master in connection with Paragraph 6, pages 91–92, *supra*, apply with equal force to those provisions of that paragraph which reappear in Paragraph 7. In addition, the Special Master finds that no limitation is placed upon the number of letters which may be dispatched by sentenced inmates.

In view of the practice of the administration of the Lucas County Correction Center extending equal communication privileges to sentenced and pre-trial inmates, and in view of standards of correctional practice which have been cited above, it is the recommendation of the Special Master that Paragraph 7 be deleted from the Court's order and that the provisions of Paragraph 6 be amended by deleting the words "awaiting trial" in the introductory statement of the paragraph.

## PARAGRAPH 8

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER SUBMIT A PROPOSAL TO THIS COURT FOR PROVIDING PHYSICAL FACILITIES IN WHICH PRISONERS MAY CONSULT PRIVATELY WITH THEIR ATTORNEYS, AND WITH THEIR WITNESSES WHEN THE WITNESSES ARE ACCOMPANIED BY ATTORNEYS.

(a) SAID FACILITIES SHALL BE SUFFICIENT IN NUMBER TO ACCOMMODATE A MINIMUM OF THREE SEPARATE VISITATIONS AT ONE TIME.

(b) EACH SEPARATE VISITING AREA SHALL BE SUFFICIENTLY SOUNDPROOF SO THAT CONVERSATIONS THEREIN MAY NOT BE OVERHEARD, PROPERLY ILLUMINATED, PROPERLY VENTILATED, EQUIPPED WITH CHAIRS AND A WRITING DESK, OR TABLE AND SHALL BE SUFFICIENTLY LARGE TO ACCOMMODATE A MAXIMUM OF FOUR PERSONS.

This paragraph of the Court's order has been a source of substantial difficulty since April 22, 1977, when the first inmates were moved to the new Correction Center. In the former jail, a booth with an area of 64 square feet was provided on each of the three floors of the facility for private consultation between inmates and their attorneys. These visiting facilities were soundproof, illuminated, and equipped with at least some of the necessary furnishings. They were sufficiently large to accommodate four persons. Thus the defendants were in substantial compliance with this provision of the Court's order in the old facility.

Special attorney/client visiting booths have been provided on each of the regular housing floors of the new institution. All modules apart from the four person modules on the third, fourth, fifth, and sixth floors adjoin one of these booths. The booth contains two doors. One connects to the security vestibule between the dayroom area and the open lobby and is used by the inmate/client; the other opens onto the main lobby and is used by the attorney. The booth is divided by a wall which separates the inmate from his attorney. There is a small metal mesh screen through which

---

**22.** F. Krantz, R. Bell, J. Brant, & M. Magruder, *Model Rules and Regulations on Prisoners' Rights and Responsibilities* 55 (1973).

**23.** National Advisory Commission on Criminal Justice Standards and Goals, *Corrections* 66 (1973).

the inmate and his lawyer may speak to one another. Above this mesh screen is a small glass window through which visual contact can be made. A narrow writing ledge is affixed beneath the mesh screen on the attorney's side of the dividing wall. The attorney and his client sit on fixed metal stools which have no back. The amount of space available for each of the two parties is approximately 20 square feet. Both sides of the visiting booth are well lighted, but neither is ventilated. The room does not permit physical contact in any way between the lawyer and his client and will not accommodate a conference of four persons. The door which separates the attorney from the lobby area is not soundproof, and normal conversational tones can be heard without any difficulty by a person standing near the door. Likewise, the general noise level in the module area carries into the attorney's booth and makes conversation difficult.

Because of the obvious failure of the planners and designers of the Correction Center to provide attorney/client visiting facilities in compliance with the standards established by Paragraph 8 of the Court's order, the Special Master raised this question with the defendants at a meeting on March 24, 1977, at which discussions concerning the move to the new facility were held. At that time the Special Master suggested that the separating wall be removed from the attorney's booth and that a soundproof security door be installed between the attorney's booth and the outside lobby area. In response, the Special Master was told that multipurpose rooms located on each of the housing floors of the institution had been designed to permit contact visiting between an inmate and his lawyer and that these rooms would be available to all lawyers seeking a contact visit with clients. The Special Master agreed to this procedure as a temporary measure and requested that steps be taken to inform all attorneys coming into the new facility of their right to a contact visit.

Shortly after inmates were moved to the third floor of the new facility on April 22, 1977, the Special Master began to receive complaints both from inmates and attorneys about the attorney/client visiting facilities. On May 6, 1977, the Special Master requested the defendant Sheriff to post the following notice in all attorney/client booths:

Attorneys visiting clients in the Lucas County Correction Center are entitled to meet privately with their clients in multipurpose rooms designed to permit contact visiting. You and your client will be escorted to such a room unless you state a wish to meet with your client in a divided, non-contact visiting area. In order to preserve necessary records, you will be asked to sign a form indicating that you have requested non-contact visiting. If you experience any difficulty whatsoever in arranging a meeting with your client in a multipurpose room, please contact Professor Vincent M. Nathan, 2801 W. Bancroft St., Toledo, OH 43606 (537-4176), who has been appointed by Judge Don J. Young to serve as Special Master in the case of *Jones v. Wittenberg*.

At a meeting held on May 12, 1977, the Sheriff stated that he had not and would not post these notices but he did agree to post his own notice in the attorney's booth indicating that a multipurpose room would be available for attorney/client visits upon request by the attorney. During the course of numerous inspections, the Special Master found that these notices had not been posted in any of the attorney/client booths in the jail. In the course of an inspection which was held on Monday, June 13, 1977, however, the Special Master found the following notice posted in the attorney/client booths on the third floor of the facility:

There is a multipurpose room available for contact visits. Please notify the Correctional Officer if you desire a contact visit.

Thank you.

No such notices were posted on any other floor of the facility.

The current *policy* in the new facility is to place an attorney in one of the divided booths. If he asks for a contact visit, he is

to be allowed to go to a multipurpose room with his client if one is available. This has not always been the *practice*, however. On some occasions, attorneys who have specifically asked for a contact visit have been told that such a visit is not permitted. Because multipurpose rooms have been assigned as office space to the Director of Inmate Services, several counselors, and the sergeant in charge of the security staff in the jail, only one such room is available for attorney/client visits on the third and fourth floors. Two multipurpose rooms appear to be available on the fifth and sixth floors. Such rooms as are available, however, must accommodate a substantial amount of programming which is projected for the new facility. For example, both of the classrooms which were constructed on the fifth floor of the facility have been converted to office area for Work Release Program staff. Therefore all educational activities must take place in the multipurpose rooms on the housing floors. Likewise, regular religious services, group counseling sessions, and other program activities, will be held in these rooms. Thus, if the only acceptable facilities for attorney/client visits are these multipurpose rooms, it can be expected that attorneys will find it very difficult to meet with their clients and will experience significant delays. The use of these multipurpose rooms creates additional problems of inmate movement and consumes valuable time on the part of correctional officers who are required to transport the inmate to and from the multipurpose room. Finally, since the small attorney/client booths are not soundproof, and thus cannot properly be used without alteration, the exclusive utilization of the multipurpose rooms in place of these attorney/client booths will result in additional unused space in the facility.

The present attorney/client booths can be made usable by the removal of the dividing wall, the installation of soundproof doors, and the provision of adequate ventilation and required furnishings. In the absence of such renovation, there will be constant pressure to make use of these rooms as they presently exist, because, as programming develops in the new facility, the multipurpose rooms will become less and less available for attorney/client visits.

No specific facilities for attorney/client visits were constructed in the holding area on the first floor or in the medical or classification areas on the second floor of the facility. Attorneys wishing to visit their clients in the holding area are permitted to do so in a small office near the cells. On the second floor, on the other hand, the attorney and client confer in the open lobby area, separated by a security crash gate. Such an arrangement provides no privacy for attorney/client conferences. There is no multipurpose room on this floor of the jail.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in a state of noncompliance with the provisions of this paragraph of the Court's order. Given the specificity of the Court's language, the construction of attorney/client booths as described above (as well as the failure to provide facilities on the second floor) must be regarded as an act of deliberate noncompliance. In spite of repeated promises to the Special Master that the multipurpose rooms would be available for attorney/client visits on the request of the attorney, these facilities have not been made available routinely for this purpose. No effort has been made to inform attorneys of the availability of the multipurpose room with the exception of the notices which were placed in the attorney/client booths on the third floor. This failure on the part of the defendant Sheriff to make the availability of the multipurpose rooms known to attorneys constitutes an act of deliberate noncompliance with the requirements of the Court's order and with the instructions of the Special Master.

It is the further finding of the Special Master that attorney/client visiting facilities will not be available to attorneys and

inmates unless the structural modifications described above are made on the existing attorney/client booths. The mere existence of a policy allowing the use of multipurpose rooms for these visits will not be sufficient. Experience to date indicates that there will be frequent breakdowns with respect to the execution of this policy and that the multi-purpose rooms will not be available for attorney/client visits on a regular basis. Because the right of an inmate to visit privately and reasonably comfortably with his attorney is one of fundamental constitutional import, and because the facilities constructed for these visits were designed in complete disregard of the requirements of the Court's order, it is the recommendation of the Special Master that the structural changes outlined above be ordered to be completed forthwith.

## PARAGRAPH 9

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER PRESENT A PLAN TO THIS COURT WITH RESPECT TO ALTERATIONS AND REPAIRS TO THE PHYSICAL PLANT, WHICH PLAN SHALL MEET THE FOLLOWING STANDARDS:

(a) TO PROVIDE ILLUMINATION AS PREVIOUSLY ORDERED;

(b) TO PROVIDE ADEQUATE HEATING IN THE COLD SEASONS AND ADEQUATE VENTILATION AT ALL TIMES;

(c) TO PROVIDE HOT AND COLD WATER AT LEAST FOR BATHING, IN ACCORDANCE WITH THE BOARD OF HEALTH HOUSING REGULATION STANDARDS;

(d) TO PROVIDE AT ALL TIMES ADEQUATE, WORKING TOILETS;

(e) TO REPAIR ALL LEAKS IN PLUMBING IMMEDIATELY, EVEN THOUGH TO DO SO MAY REQUIRE AN INCREASE IN THE NUMBER OF PLUMBERS EMPLOYED FULL-TIME BY THE COUNTY;

(f) TO PROVIDE AN ADEQUATE AND SANITARY SUPPLY OF DRINKING WATER;

(g) TO CAUSE THE INTERIOR OF THE JAIL TO BE KEPT PAINTED WITH LIGHT–COLORED, WASHABLE, ENAMEL; FAILING THIS, THE DEFENDANT SHERIFF SHALL COMPLY WITH THE LETTER OF § 3401.04 OF THE OHIO REVISED CODE;

(h) IF THE PRESENT CELLS ARE NOT TO BE REPLACED WITH NEW CELLS AND OPEN DORMITORY HOUSING, THE CELL–LOCKING SYSTEM MUST BE PLACED IN GOOD WORKING ORDER;

(i) TO MEET THE SPECIAL REQUIREMENTS SET FORTH IN CONNECTION WITH ALL FOREGOING PORTIONS OF THIS ORDER;

(j) SAID PROPOSALS SHALL INCLUDE A TIME SCHEDULE FOR MEETING EACH PROBLEM AND SHALL BE CAPABLE OF COMPLETION WITHIN ONE (1) YEAR UNLESS GOOD CAUSE IS SHOWN FOR AN EXTENSION OF TIME.

At the time of the Court's order of July, 1971, the old Lucas County Jail was in a state of almost total disrepair. The provisions of this paragraph were designed to correct deficiencies disclosed by testimony heard by the Court at the hearing of February 10 and 11, 1971. When the old jail was evacuated on May 18, 1977, many of the same problems persisted. Ventilation in the old facility was never adequate. During inspections conducted by the Special Master inoperative toilets and leaking plumbing were observed. Jail officials were still having difficulty in obtaining repair services from County plumbers, and leaking pipes appeared to be the rule rather than the exception. The interior of the jail remained dirty and dingy. Apparently, however, the cell locking system was in reasonably good working order at that time.

Of more importance is the application of this paragraph to the new facility. Many of the problems which led the Court to require alterations and repairs to the physical plant of the old facility are beginning to appear in the new Correction Center after only a few weeks of occupancy.

The problem of illumination in inmates' cells has been discussed earlier in this report. It may be noted, however, that illumination is inadequate in other portions of the new building as well. For example, the hallways separating the large housing units on the sixth floor are so dark that it is virtually impossible for an officer located in the floor control center to observe correctional officers stationed in those halls. The result is that correctional officers assigned to duty on the sixth floor are justifiably concerned that they are in an insecure position.

The air conditioning system in the new facility has been a source of repetitive complaints by both inmates and staff. Part of this may reflect the usual need to balance a complicated system in a structure of this size. It appears to the Special Master, however, that the problem of temperature and ventilation in the cells themselves is a serious one. Even when the rest of the building is comfortable, these cells are stuffy and noticeably warmer than other areas. Because of the understandable policy prohibiting the opening of cell windows, this problem is one of substantial importance.

Officials from the Toledo Board of Health have pointed out that there is not an adequate supply of hot water in a sink provided in the area on the fifth floor occupied by trusties. The Special Master, however, has been unable to obtain hot water from any of the sink taps in the cell areas. This may result from the fact that water runs in these sinks for only a very brief period of time before it is automatically shut off. Whatever the nature of the problem, it requires correction. This is particularly true in light of the fact that this is the only supply of hot water for inmates for the washing of cups and spoons issued to them on a permanent basis. Water regulators in the housing area showers are malfunctioning, and the only way an inmate can maintain water pressure is by keeping his finger on the button which activates the water supply. Bathing under these circumstances is inconvenient at best. Fixed shower heads direct water out of the shower stall onto the floor of the bathroom. While this water can be swept back into the shower stall with some success, bathroom floors remain wet and dirty.

Although the interior of the new facility is painted with light-colored, washable enamel, it is obvious that steps will have to be taken to keep walls clean or that frequent repainting will be necessary. There has been some incidence of breakdown in toilet and shower fixtures, but these appear to be repaired on a relatively prompt basis. The same is not true of at least all malfunctioning locks and in some instances cell doors have been inoperable for a considerable period of time. It does appear that an adequate and sanitary supply of drinking water exists in the new facility.

On February 28, 1972, the Court issued an order amending the provisions of Paragraph 9 as follows:

And it is further ordered adjudged and decreed that the defendant Sheriff Metzger, his agents, employees, successors, assigns and all those acting in concert therewith are ENJOINED from incarcerating any person in a cell which does not have an operative toilet.

Two cells have been constructed on the first floor of the new facility which do not contain any toilet facilities. These cells (rooms 1074 and 1078) are designated on the architectural drawings as "psychiatric cells" and are located immediately adjacent to the receiving and booking station. These cells are padded to minimize the possibility that an inmate incarcerated therein will injure himself. The Special Master entertains substantial doubt that such cells represent current medical thinking about treatment of mentally ill persons. Whatever justification there may be for cells of this type,

however, it would appear that they should be placed in the medical area of the facility and under the control of medical personnel rather than in the receiving and booking area where correctional officers or their superiors are likely to be making decisions with regard to their use. An expert employed by the Toledo/Lucas County Criminal Justice Regional Planning Unit reached the same conclusion.[24] In any event, these cells are a direct and flagrant violation of the provision quoted above and represent another example of the failure of the planners and designers of the new facility to give appropriate consideration to the provisions of the Court's order.

### FINDINGS RELATING TO COMPLIANCE

■ It is the finding of the Special Master that the defendants were not in full compliance with the provisions of Paragraph 9 in the former Lucas County Jail and that the very conditions which led to this provision of the Court's order will arise in the new facility unless concerted efforts are made to maintain a state of cleanliness and good repair. The Special Master recommends that steps be taken at once to balance the air conditioning and heating system, provide adequate heating, cooling, and ventilation in all cells, and correct hot and cold water supplies and pressure throughout the facility.

■ It is the further finding of the Special Master that the two cells designated as "psychiatric" cells in the booking and holding area of the first floor constitute a violation of the Court's order. Because the Special Master assumes that the defendants would not have incurred the cost of building these cells without intending to incarcerate inmates in them at least from time to time, it is his recommendation that the defendants be required to install toilets and sinks in these cells or to remove the doors so as to render them unusable for occupancy by inmates.

24. Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the Lucas County Correction*

### PARAGRAPH 10

PROMPTLY PROVIDE ARRANGEMENTS FOR LIBRARY SERVICES TO PRISONERS.

(a) THERE SHALL BE NO CENSORSHIP OF BOOKS OR PERIODICALS SUPPLIED TO, PURCHASED BY, OR GIVEN TO PRISONERS, EXCEPT THAT THE DEFENDANT SHERIFF MAY, IN HIS DISCRETION, FORBID THE INTRODUCTION INTO THE JAIL OF BOOKS OR PERIODICALS WHICH WOULD COME CLEARLY WITHIN THE DEFINITION OF PORNOGRAPHY ESTABLISHED BY THE DECISIONS OF THE SUPREME COURT OF THE UNITED STATES.

*Library Services.* Following the Court's order of July 30, 1971, the defendants did not begin to provide library services to prisoners until approximately February, 1973, when an employee of the Toledo-Lucas County Library began to visit the jail every Friday in order to distribute books to inmates. On these occasions, the librarian brought between 400 and 500 books into the institution on a book cart which he took to the various cellblocks within the facility. An attempt was made to fill special requests received on earlier visits as well as to provide a reasonably broad range of books of interest to prisoners. On each of these visits between 300 and 350 books were actually circulated. This book cart service continued until April 18, 1977, when the County Library employee involved began to spend virtually all of his time preparing to implement an expanded library program in the new Lucas County Correction Center. Between April 18, 1977 and May 18, 1977, when the old jail was closed, the librarian visited that facility on a few occasions and distributed some books.

No library service was provided in the new Correction Center following the evacuation of the old facility (on May 18, 1977)

*Center* Appendix A (unpaginated, undated report from Mr. Robert J. Christensen to J. D. Henderson).

until June 10, 1977. Service in the new facility at the present time consists of the same book cart arrangement described above. Both in the old jail and in the new facility a second employee of the County Library has delivered books to female inmates and has met with female inmates once a week.

At the time of the planning of the new jail, a much more ambitious library program was envisioned. A large area containing 1,307 square feet has been designated for a jail library collection. The allocated space contains a reading room, work room and a toilet.

In order to develop a program in keeping with the improved physical facilities provided in the new Correction Center, the Toledo-Lucas County Library obtained a grant of $65,030 under the Library Services Construction Act to put the program in place and to maintain it for one year. In addition to the Correction Center, services will be provided to the Child Study Institute and the Toledo House of Correction. The grant application stated that $34,640 would be available in local matching funds. Of the latter amount, the defendant County Commissioners have agreed to provide 24 hours of trusty time per week, valued at $3.00 per hour for a total of $3,744 for the year. The total projected second year cost of the program is $59,850. While County Library staff are optimistic that federal funding will be forthcoming to meet some of these costs, no assurance of this has been received. The defendant County Commissioners have agreed on an informal basis to assume a portion of the financial cost of continuing the program but no specific dollar commitment has been made. The need for expanded library services is well stated in the application itself:

Funds have not been available to provide staff, materials, and equipment to meet the unique informational and leisure reading needs of the inmates of these facilities. The only books housed presently at the three sites are gift copies and discards from the Toledo-Lucas County Library. While these have been chosen as having some value to the potential inmate users, the lack of suitably appealing and relevant materials has been ever-present. Fragmentation of responsibility for direct service and inadequate time available for service have been equally, if not more of a problem.

As a result of this grant, the Toledo-Lucas County Library has created a Correctional Services Division of the Special Services Department. A qualified professional librarian with interest in working in such a program has been appointed. That person will spend four days per week in the library in the Lucas County Correction Center and will be assisted by a clerk-typist to handle clerical duties and to assist on a part-time basis at the Center. Monies from the grant will be used to purchase library materials, equipment, and furnishings. Cassette players and tapes as well as books will be provided. The goal of the project is the creation of a library of 4,000 volumes in the Correctional Center itself. The Correction Librarian has already sought and received assistance from the librarian of The University of Toledo College of Law in developing a list of needed legal materials. Because of the expense involved in purchasing materials necessary for an adequate law library, however, grant funds will not be sufficient for this purpose.

The newly appointed Correction Librarian (the same person who coordinated library services in the old jail) has informed the Special Master that the new library in the Correction Center will be in operation sometime between August 15 and September 1, 1977. At the end of the first year of operation, it will be necessary for the defendant County Commissioners to provide the necessary support for the continuation of what promises to be an outstanding correctional facility library service.

Whether in fact that promise is realized, however, depends upon the willingness of the Correction Center administration to provide the degree of cooperation which is needed if the program is to reach its full potential. The general problem of inmate movement described in the introduction to

this report directly affects the library services program for which funds have been obtained. On September 15, 1976, the Correction Librarian reported to the Assistant Director of the Toledo-Lucas County Public Library that

> The Jail Administration informed me that it is not feasible to have scheduled visits to the library for all the inmates. . . . their reason being that the movement of very large groups of inmates causes security problems.

As a result, the Correction Librarian indicated that services would have to be limited to the use of book carts, the practice in the old jail. That such limited service was not contemplated by the Toledo-Lucas County Library at the time of its grant application is demonstrated by the diagram of the library facility which was included in that application:

It is obvious that the originators of the grant anticipated that the bulk of the library itself would be devoted to a reading room. Indeed, the policies and procedures published by the Lucas County Correction Center make it clear that reading room service was anticipated:

> The librarian shall submit to the Director of Inmate Services a weekly schedule of library hours and services provided by the library. . . . The library staff shall make daily floor rounds providing the inmates with reader service, book cart, and special requests . . . The library staff shall make available the use of the library on a daily basis for the inmates.

The Correction Librarian has submitted to the Special Master his recommendations for the establishment and operation of the library at the Lucas County Correction Center. He recommends that the library be opened to inmates on the third, fourth, and fifth floors and that library service be provided by a book cart system on the maximum security sixth floor. He recommends 45 minute library calls on a weekly basis to each module on the third, fourth and fifth floors. This would permit ten minutes for transportation and 35 minutes in the library itself. The library would be open on Monday, Wednesday and Friday from 8:00 a. m. to 12:00 noon and from 1:00 p. m. to 4:30 p. m. With the assistance of trained trusties or interns, the Correction Librarian believes that the library could be open on additional days. Because it is not the purpose of this report to fully detail plans of compliance, other aspects of the Correction Librarian's recommendations will not be discussed. Suffice it to say, the Correction Librarian and the Toledo-Lucas County Library are prepared to do their part in providing the best possible library service to inmates in the Correction Center if the administration of the Center is willing to allow inmates to participate in the program.

*Censorship of Books and Periodicals.* Apart from the provision of library services to prisoners, Paragraph 10 proscribes censorship of books or periodicals except on the basis that such materials are pornographic within the definition of that term established by decisions of the Supreme Court of the United States. There is no evidence that the administration of the Correction Center has made any effort to censor books or periodicals distributed by book cart through the library services program, and the institution's *Policies and Procedures Manual* states that "the selection of library materials shall be the responsibility of the librarian." On the other hand, censorship does occur with respect to books and periodicals supplied or given to prisoners by persons other than the Correction Librarian. According to the Correction Administrator and the published policies and procedures of

the Center, no books or magazines may be received by a prisoner, either by mail or from visitors. If this were in fact the practice, it would constitute total censorship in violation of the Court's order. The policy notwithstanding, however, the Special Master has observed on two occasions visitors bringing books or periodicals into the jail for inmates. In both instances these materials were screened cursorily by the Acting Director of Inmate Services. On one occasion that official permitted some of the material to be given to the prisoner but refused other publications because "this goes too far." The quoted reference was to the sexual orientation of the particular printed matter. On the other occasion, the printed materials were approved by the Acting Director of Inmate Services. If this is in fact the general practice in the institution, it is clear that the process of evaluation falls short of the requirements of the Court's order.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the limited library service provided by the book cart program in the former Lucas County Jail constituted a good faith effort to comply with the requirements of Paragraph 10 of the Court's order. It may be observed, however, that the inauguration of such service in February, 1973, fell short of the standard of "promptness" required by the order. Given the provision of commodious library quarters in the new Correction Center, however, it is the finding of the Special Master that the mere continuation of such a book cart service in the new facility will not constitute compliance. Having constructed adequate library facilities, the administration of the Correction Center must develop policies and procedures *and institute practices* which will permit the library to be used by inmates. Twenty-four hours of trusty or intern time must be provided each week in accordance with the agreement between the defendant County Commissioners and the Toledo-Lucas County Library. If interns rather than trusties

are used, the County Commissioners must provide the Toledo-Lucas County Library with $3,744 in accordance with that agreement in order to pay these interns. The Special Master finds that it will be necessary for the defendant County Commissioners to enter into negotiations with the Toledo-Lucas County Library in order to finalize an agreement to continue the library services program upon the expiration of federal funding.

It is the finding of the Special Master that the funds available to develop an adequate library program in the new facility will not permit the purchase of legal materials meeting reasonable standards of adequacy for a law library in a correctional facility. If the Court intends the provision of library services to include development of an adequate collection of legal materials, the defendants are not in compliance with such a requirement and the defendant County Commissioners will be required to appropriate sufficient funds to develop a collection.

It is the finding of the Special Master that the defendants are in a state of noncompliance with that portion of Paragraph 10 which proscribes censorship of incoming books or periodicals. Whether all books and periodicals are refused admission or a casual process of censorship occurs, the policies and practices of the institution are clearly outside the scope of the exception permitting exclusion of pornographic materials.

### PARAGRAPH 11

APPROPRIATE AS PROMPTLY AS POSSIBLE SUCH SUMS AS ARE NECESSARY TO ENABLE A QUALIFIED ORGANIZATION TO OPERATE A PRE-TRIAL BAIL RELEASE PROGRAM, TO INCREASE THE NUMBER OF PERSONS PLACED ON BAIL PENDING TRIAL.

On July 6, 1973, the Court amended Paragraph 11 of its original order by requiring the defendant County Commissioners to provide "funds for the operation of a bail bond program in the amount of not less

than $14,000 per year continuing until further order of the Court."

Records provided to the Special Master by the director of the Pre-Trial Release Program, which operates as a division of the Toledo Legal Aid Society, indicate that the following levels of support have been made available by the defendant County Commissioners to the Pre-Trial Release Program since 1973:

*1973:* $11,980 were appropriated by the County Commissioners and received through the Toledo Legal Aid Society. $2,020 was subsequently appropriated in 1973 to produce the $14,000 required by the Court's supplemental order of July 6 of that year. This money was not received by the Pre-Trial Release Program in 1973.

*1974:* $28,567 were requested from the County Commissioners by the Pre-Trial Release Program for 1974. Of this amount, $26,547 constituted the regular allocation request for that year; $2,020 represented the amount appropriated in 1973 but not received. Of the total ($28,-567) which was appropriated; the Toledo Legal Aid Society requisitioned only $23,-002, leaving a balance of $5,565 in funds which were appropriated by the County Commissioners but not received by the Pre-Trial Release Program.

*1975:* In this year, the Toledo Legal Aid Society requested from the County Commissioners the $5,565 previously allocated but not received by the Pre-Trial Release Program. Apparently no additional funds were requested. $5,565 was received by the Pre-Trial Release Program on April 10, 1975, but no additional funds were received from the County Commissioners that year.

*1976:* In this year the present director of the Pre-Trial Release Program assumed his position. $28,390 were requested from the County Commissioners; $14,000 were allocated and received.

*1977:* $29,040 were requested from the County Commissioners; $14,000 were allocated.

Some confusion exists with respect to the 1975 allocation to the Pre-Trial Release Program. When the current director assumed his responsibilities in 1976, he requested an additional allocation from the County Commissioners for that year representing the difference between the $14,000 to which he was "entitled" and the sum of $5,565 which was actually received in 1975. This request was refused by the County Commissioners because they had appropriated a total of $22,000 for the Toledo Legal Aid Society in 1975, and it was the position of the County Commissioners that the Toledo Legal Aid Society should have made $14,000 of that money available to the Pre-Trial Release Program. It appears that the failure of the Pre-Trial Release Program to receive at least $14,000 in 1975 resulted from the actions of the Toledo Legal Aid Society. In a letter dated April 8, 1975, to the then President of the Lucas County Commissioners, an Administrative Assistant employed by the Toledo Legal Aid Society requested payment of the year's allocation of $22,000 in the following manner:

Having been notified that the County of Lucas has allocated $22,000 to the Toledo Legal Aid Society, we request that full payment be made in the following manner:

$5,565 to the Pre-Trial Release Program, and

$16,435 to the Public Defender Program .

Since these programs are separately funded this procedure will greatly simplify our bookkeeping. Thank you for your cooperation.

Wherever the breakdown occurred, however, the fact remains that the Pre-Trial Release Program received only $5,565 in 1975.

The Pre-Trial Release Program receives funds from sources other than the County Commissioners. According to budget records supplied to the Special Master, the

following funds were available to the Pre-Trial Release Program beginning in 1973:

| 1973: | $11,980 | Received from County Commissioners |
| | 10,000 | Received from Model Cities |
| | $21,980 | |
| 1974: | $23,002 | Received from County Commissioners through Toledo Legal Aid Society |
| | 30,000 | Law Enforcement Assistance Administration (LEAA) |
| | 1,667 | State Buy-in to match LEAA Grant |
| | $54,669 | |
| 1975: | $ 5,565 | Received from County Commissioners through Toledo Legal Aid Society |
| | 60,000 | Law Enforcement Assistance Administration |
| | 1,500 | State Buy-in to match LEAA Grant |
| | 5,158 | 1974 LEAA surplus |
| | $72,223 | |
| 1976: | $14,000 | Received from County Commissioners through Toledo Legal Aid Society |
| | 55,432 | Law Enforcement Assistance Administration |
| | 3,078 | State Buy-in to match LEAA Grant |
| | 17,265 | 1975 LEAA Balance |
| | $89,775 | |
| 1977: | $14,000 | Allocated by County Commissioners |
| | 48,450 | Law Enforcement Assistance Administration |
| | 1,788 | State Buy-in to match LEAA Grant |
| | 1,500 | 1976 State Buy-in to match LEAA Grant (not received in 1976) |
| | 22,000 | City of Toledo |
| | $87,736 | |

The grant which the Pre-Trial Release Program received from the Law Enforcement Assistance Administration is a declining fund grant which will expire at the end of the 1978 fiscal year. Thus the program faces a financial crisis unless steps are taken by the defendant County Commissioners and/or the City of Toledo to meet the financial needs of the agency.

The total budget request submitted for 1977 by the Pre-Trial Release Program totaled $102,778, representing an increase of $13,003 over the amount actually received in 1976. While the Special Master is not in a position to speak to the question of the validity of all portions of the request made for 1977, it does appear that some reasonable increase in the amount of funds provided by the County Commissioners would be expected in response to inflationary pressures and normal program expansion requirements.

At the present time, the total staff of the Pre-Trial Release Program consists of a director, a clerical person, an operations supervisor, a full-time investigator, and eight part-time (law student) investigators. This staff is responsible for interviewing all persons admitted to the Lucas County Correction Center who are accused of felonies. Until the City of Toledo prisoners are housed in the Correction Center, the Pre-Trial Release Program staff will continue to be responsible for interviewing persons accused of felonies who are incarcerated in the City of Toledo jail as well. In 1976, a total of 2,160 persons were interviewed by Pre-Trial Release Program staff. Of this number, 825 were recommended for release. Interview contacts for 1977 are running somewhat above the 1976 figure. As of May 31, 1976, 877 persons had been interviewed; as of May 31, 1977, 931 persons have been interviewed. This represents an increase of something in excess of 6%. Had the agency's full request to the defendant County Commissioners for 1977 been honored, a service coordinator would have been added to the staff. This person would have been responsible for assisting persons released on their own recognizance in continuing or obtaining employment in the community. In addition, he would have developed a counseling internship in conjunction with The University of Toledo to provide counseling services to persons released on their own recognizance.

The Pre-Trial Release Program has compiled an impressive record of success with respect to its recommendations. Of 422 persons released on their own recognizance on the recommendation of the Pre-Trial Release Program in 1976, only 22 or 5% failed to appear for trial. (An additional 5% were "technical no shows," persons who were late for court, did not receive a notice to appear, etc.) At the same time, it should be noted that of 825 persons recommended for release on their own cognizance, only

422 or 51% were actually so released by Municipal Court and Common Pleas judges. A total of 1,335 persons were not recommended for release on their own recognizance, but 377 or 28% of these individuals were so released on their own recognizance against the recommendation of the Pre-Trial Release Program. Twenty-six or 7% failed to appear and an additional 8% were "technical no shows."

Apart from funding difficulties, the Pre-Trial Release Program has encountered several difficulties in attempting to operate in the new Lucas County Correction Center. Women to be interviewed are held on the third floor where special facilities have been designated for female classification. Male inmates are interviewed on the first floor of the facility in the holding area. This separation of prisoners, while justifiable on other grounds, has made it somewhat more difficult for Pre-Trial Release Program interviewers to operate within the jail. Because of the location of interview rooms away from the cell area on the first floor and the absence of adequate staff to provide inmate transportation, interviews with male inmates have been conducted through the small openings in the cell doors. This is an entirely unsatisfactory setting for an interview upon which the freedom of the accused person may depend. In addition, the Pre-Trial Release Program interviewers have not been provided with telephones which are needed for verification of information provided in the interview; none of the three interview rooms is equipped with a telephone.

## FINDINGS RELATING TO COMPLIANCE

If the modification of July 6, 1973, requiring the appropriation of $14,000 per year is taken as an operational definition of the original requirement that the defendants appropriate "such sums as are necessary to enable a qualified organization to operate a Pre-Trial Bail Release Program, to increase the number of persons placed on bail pending trial," it is the finding of the Special Master that the defendants are presently in compliance in that $14,000 have been appropriated for the 1977 fiscal year. On the other hand, it is the opinion of the Special Master that it was not the intention of the Court to establish this figure as an outer limit on the obligation of the defendants. Rather it appears to the Special Master that emphasis should be placed upon provision of such sums "as are necessary" to support a viable and expanding program. If the Special Master is correct in his understanding of this paragraph of the order, then it is his finding that the defendants are in noncompliance in their failure to make additional funds available to cover budget increases required as a result of inflationary pressures and normal program expansion.

Although Paragraph 11 speaks directly to the requirement that sufficient funds be appropriated, it appears to the Special Master that the Court intended that the defendants should take other necessary steps to facilitate the operation of such a program and that, at a minimum, they should not interfere in any way with the operation of a Pre-Trial Release Program. If the Special Master is correct in this interpretation, then it is his finding that the defendants are in noncompliance in their failure to provide sufficient correctional officer staff to facilitate transportation of inmates in the holding area from their cells to interview rooms utilized by Pre-Trial Release Program interviewers and in their failure to provide three telephones for the purpose of verifying information obtained by these interviewers in the course of their meetings with inmates.

In view of the observations and findings of the Special Master in connection with Paragraph 1 of the Court's order relating to overcrowding, it is the opinion of the Special Master that the development of the most extensive Pre-Trial Release Program which is possible is a matter of critical importance to the future of the Lucas County Correction Center and the ability of the defendants to comply with other provisions of the Court's order. A jail which is

overcrowded is by definition a dirtier, more restrictive, and less program-oriented facility. While the defendants are not in a position to control a spiraling arrest rate or an increased rate of incarceration, they can, by providing adequate funds and support for a Pre-Trial Release Program, divert a larger number of people from the Correction Center itself. It is the finding of the Special Master that the failure to develop the Pre-Trial Release Program to its fullest potential will jeopardize compliance with numerous other provisions of the Court's order relating to physical conditions, programming, and jail services.

## PARAGRAPH 12

WITHIN TEN (10) DAYS FROM THE ENTRY OF THIS ORDER DETERMINE WHETHER TO PERMIT ALL FOOD PURCHASES FOR THE JAIL TO BE HANDLED DIRECTLY BY THE COOK IN CHARGE OF THE JAIL KITCHEN OR TO ORDER THE COUNTY PURCHASE DEPARTMENT TO MAKE ALL CHANGES IN THE HANDLING OF THE PURCHASES OF FOOD FOR THE JAIL NECESSARY TO INSURE THAT FOOD WILL BE PURCHASED AND DELIVERED TO THE JAIL ON SCHEDULES ESTABLISHED BY THE COOK IN CHARGE OF THE JAIL KITCHEN AND CAUSE A STATEMENT OF THAT DECISION TO BE FILED WITH THIS COURT.

(a) IF SAID DEFENDANTS ELECT TO TAKE THE LATTER COURSE OUTLINED IN PARAGRAPH 12 ABOVE, THIS COURT WILL RETAIN JURISDICTION TO IMPOSE APPROPRIATE SANCTIONS AGAINST ANY EMPLOYEE OF THE COUNTY PURCHASE DEPARTMENT SHOWN TO BE RESPONSIBLE FOR ANY DELAY IN THE PURCHASE OR DELIVERY OF FOODSTUFFS, PERISHABLE OR OTHERWISE, TO THE JAIL.

Jail food continues to be purchased through the County Purchase Department. The process of food ordering commences with a handwritten food order prepared every Wednesday by the Center's Food Service Director. That order is typed on a County purchase requisition form by an employee in the Sheriff's Department and is sent to the County Purchase Department on the same day. The County Purchase Department takes bids on items, selects the lowest price, and orders the food. According to the institution's Food Service Director, orders are generally received on the following Saturday or Monday, and this delivery schedule is acceptable to him.

The Special Master has examined purchase requisitions from March 16 through June 1, 1977. As a general rule all foodstuffs on the list submitted by the Food Service Director are in fact ordered by the County Purchase Department. On some occasions there is an indication on the purchase requisition that no bids could be obtained. In other cases, items listed on the purchase requisition prepared in the Sheriff's Department are simply crossed out indicating that no bids may have been sought. Such instances, however, are highly exceptional. It was a matter of some surprise to the Special Master to learn that the Food Service Director, although charged with the responsibility of ordering large quantities of food for the jail, has not been given any budget figure to guide his purchases. During 1975 the total cost per inmate for three meals per day averaged $2.13 per day. The figure for 1976 was $2.44. Thus far in 1977 the figures have been $2.77 for January, $2.42 for February, and $2.89 for March. Whether these figures are higher or lower than they should be, nobody knows. At any rate, if there is concern about the cost, the Food Service Director should be given a budget. Cost control should not be established by officials in the County Purchase Department by refusing or failing to order food requested by the institution's Director of Food Services.

In almost all cases, the purchase requisitions indicate that the food which was ordered was in fact delivered. There are

indications of some delays in delivery caused by the food purveyor and there are other instances when the food ordered by the County Purchase Department either did not arrive or was returned as unsuitable. The extent of this phenomenon, however, does not appear to be unusual in view of the extremely large quantities of food utilized in the jail.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in substantial compliance with the provisions of Paragraph 12 of the Court's order but that continued compliance requires that the County Purchase Department obtain bids for and order all foodstuff items listed on purchase requisitions prepared by the Food Service Director.

## PARAGRAPH 13

WITHIN A REASONABLE TIME, NOT TO EXCEED NINETY (90) DAYS FROM THE ENTRY OF THIS ORDER, REPORT TO THIS COURT IN WRITING THE ACTIONS WHICH HAVE BEEN TAKEN TO IMPLEMENT THE FOLLOWING STANDARDS FOR MEDICAL SERVICES TO INMATES:

(a) A PHYSICIAN MUST BE AVAILABLE ON CALL AT ALL TIMES.

(b) EVERY ENTERING PRISONER MUST RECEIVE A MEDICAL EXAMINATION BEFORE BEING ASSIGNED TO A REGULAR CELL.

(c) THERE MUST BE A DAILY SICK CALL ATTENDED BY A LICENSED PHYSICIAN.

(d) ARRANGEMENTS MUST BE MADE TO MEET THE NEEDS OF INMATES WITH SPECIAL MEDICAL PROBLEMS.

(e) THE JAIL NURSE MUST NOT BE PERMITTED TO PRESCRIBE MEDICATION OF ANY KIND.

(f) THE PART–TIME SERVICES OF A DENTIST MUST BE MADE AVAILABLE ON CALL.

On December 29, 1971, the provisions of Paragraph 13 were amended to require that

The daily sick call is in fact conducted at a regular time, seven days a week, and for a sufficient length of time to care for the medical needs of the inmates in accordance with the medical standards generally accepted and followed in the community, and that every incoming prisoner is held apart from the general population until the physician has given a physical examination in accordance with the standards followed by the medical community in giving an examination to an individual who desires to become a regular patient on the occasion of his first visit to the doctor, and that such examinations are to be conducted at least once every day on which the jail receives new inmates.

This amendment was directed specifically at both the Sheriff and the County Commissioners.

The present jail physician, Bohdan Masyk, M.D., was employed by the defendant County Commissioners in August, 1972. Subsequently, in June, 1977, the Commissioners employed Gilbert S. Bucholz, D.O. to assist Dr. Masyk. Dr. Bucholz' duties include providing medical services in the jail on Saturday as well as being on call on Sunday. In addition, Dr. Bucholz covers for Dr. Masyk during the latter's absence. Until Dr. Bucholz was employed, Dr. Masyk made a regular practice of coming to the jail six days a week to conduct sick call and to perform physical examinations. He came to the jail on Sunday only in the event of an emergency. According to the Medical Director and all medical personnel interviewed by the Special Master, there has never been any difficulty in reaching Dr. Masyk although he generally limits his response to giving directions by telephone.

When a male inmate is booked into the jail, he is held in a first floor holding cell for a period of approximately 12 hours. At the end of that period, he is transferred to a classification cell on the second floor. Before being assigned to a regular cell, the prisoner will receive a medical examination

performed partly by a nurse and partly by the doctor.

When a female prisoner is booked, she is taken directly to the third floor. While it is the policy of the institution to isolate such an inmate from the general female population until the classification process (including a medical examination) is complete, this policy—like many in the jail—sometimes fails to be reflected by actual practice. In some instances, the new female inmate will be placed in a cell in the regular female housing module but will be locked up and thus prevented from mingling with other inmates until she has received her physical examination. In other instances, female inmates apparently are permitted to have normal dayroom privileges in the female module prior to receiving a physical examination. The correctional officer log maintained by officers supervising female inmates contains the following entry for May 27, 1977:

> As of this time inmates . . . have not had physicals by the nurse, but have been placed in the population. This was done before second shift. Nurse Lehey has been notified.

The policy of performing physical examinations on all newly booked inmates is not applied to those persons entering the jail who were booked and who received physical exams during an earlier period of incarceration within a period of six to eight months. In such a case, the inmate will be seen briefly by the nurse in order to bring the medical records up to date. In addition, the Medical Director has reported to the Special Master that inmates housed in the Work Release area are not always examined. The difficulty appears to be one of scheduling these inmates for physical examinations while the doctor is available since most of these prisoners are working during the day.

The physical examination itself begins with the "nurse's physical" which includes evaluation of vital signs (blood pressure, temperature, respiration, and pulse), notations of obvious skin problems, and the tak-

ing of a medical history. This history consists of inquiry into prior back problems, the wearing of dentures, hemorrhoid conditions, major illnesses of family members, health of children, chronic illnesses, and history of psychiatric care. The nurse asks the inmate whether he is presently taking or has ever taken drugs, uses or has ever used alcohol, has any allergies, or is under medication of any kind. The nurse observes the mental state of the inmate and requests information about any present medical complaints. Following the nurse's physical, the inmate will see the doctor. According to the physical examination form which is utilized in the institution, the doctor's examination covers the heart, lungs, throat, nose, eyes, ears, abdomen, extremeties, and genitalia. In addition, the form provides a space for notation of any neurological symptoms. In the case of females, the form provides a space for notation of a vaginal examination, a pap smear, and any history of pregnancy. Laboratory tests indicated include one for venereal disease, one for a blood analysis, one for a TB Tine test, and a fourth for a urinalysis. Space is provided for notation of special tests and for the doctor's general observation. All medical personnel interviewed by the Special Master, including Dr. Masyk himself, agree that the standards followed in connection with these physical examinations are not "in accordance with the standards followed by the medical community in giving an examination to an individual who desires to become a regular patient on the occasion of his first visit to the doctor." Dr. Masyk informed the Special Master that a physical examination which he would conduct on a private patient on the occasion of the latter's first visit would consume approximately 30 minutes and would include, in addition to all of the elements listed above, examination for prostate problems, a chest x-ray, determination of cholesterol level, determination of blood sugar level, a complete rectal examination, an electrocardiogram, and a complete blood battery.

The cursory nature of the physical examination which is in fact conducted is substan-

tiated by numerous reports from inmates as well as by regular records maintained in the Medical Department. A number of inmates have reported to the Special Master that the physical examination which they received from Dr. Masyk consumed no more than a couple of minutes. In order to determine the accuracy of these statements, the Special Master obtained Nurse's Record Sheets for the period commencing June 18, 1977 and ending July 2, 1977. The following chart reflects the information disclosed by those records:

| DATE | DOCTOR | NUMBER OF PHYSICAL EXAMINATIONS | NUMBER OF SICK CALL PATIENTS | MINUTES SPENT IN MEDICAL AREA | AVERAGE MINUTES PER PATIENT |
|------|--------|----|----|----|----|
| 6–18 | Masyk | 5 | 4 | 55 | 6.11 |
| 6–19 | No doctor | | | | |
| 6–20 | Masyk | 1 | 3 | 45 | 11.25 |
| 6–21 | Masyk | 3 | 3 | 45 | 7.50 |
| 6–22 | Masyk | 4 | 4 | 42 | 5.25 |
| 6–23 | Masyk | 5 | 10 | 120 | 8.00 |
| 6–24 | Masyk | 5 | 6 | 48 | 4.36 |
| 6–25 | Bucholz | 4 | 5 | 80 | 8.89 |
| 6–26 | No doctor | | | | |
| 6–27 | Masyk | 5 | 4 | 55 | 6.11 |
| 6–28 | Masyk | 1 | 4 | 45 | 9.00 |
| 6–29 | Masyk | 7 | 6 | 85 | 6.54 |
| 6–30 | Masyk | 8 | 6 | 75 | 5.36 |
| 7–1 | Masyk | 2 | 5 | 75 | 10.71 |
| 7–2 | Bucholz | 3 | 5 | 65 | 8.13 |

During these two weeks, the doctor spent an average of slightly more than one hour in the medical area on the days a physician was on duty. The average time available per inmate/patient was 7.08 minutes. This figure is inflated, however, by the fact that a substantial portion of the doctor's time was spent waiting for inmates to be transported from their housing units to the medical area. According to both the Medical Director and Dr. Masyk, at least half of the doctor's time was consumed by delays in prisoner transportation. This indicates that the average amount of time spent with an inmate is approximately 3.5 minutes. Thus, these records and the statements of the Medical Director and Dr. Masyk tend to confirm the statements made by inmates to the Special Master.

The Special Master reviewed physical examination records maintained on all inmates incarcerated in the jail as of June 13, 1977. As might be expected, the doctor's portion of the physical examination form indicates no exceptional findings in virtually all cases. Of those findings by the doctor which are indicated on the form, many simply repeat the nurse's statement with respect to findings made by her during the nurse's physical or the inmate's statement of his "present complaints." In only a handful of cases does it appear that the doctor discovered any medical symptom or condition in the course of his own examination of inmates. Nurses who are present in the doctor's office at the time of the inmate's physical examination have confirmed that the examination is an extremely superficial one. They have reported that the inmate remains fully clothed and sitting up during the doctor's examination of the abdominal area and that no examination is made to determine whether or not the inmate is suffering from a hernia. Dr. Masyk acknowledged to the Special Master that he makes no rectal examination although the medical examination form contains a space for recording the results of such an examination. No vaginal examination is conducted on female inmates and, until June, 1977, there was no practice of

taking a pap smear. No physical examination of female inmates is made to discover the presence of gonorrhea.

The physical examination procedures utilized in the Lucas County Jail may be compared to the standards established for entrance examinations in correctional institutions prepared by the Jails and Prisons Task Force Program Development Board of the American Public Health Association, published in May, 1976. These standards may be found in Appendix B, page 172 *infra.*

The practice in the former Lucas County Jail was to hold a sick call each morning on Monday through Saturday, at which time the jail physician would be in attendance. An afternoon sick call, supervised by a nurse, was held six days per week. Any inmate could be placed on the daily doctor's sick call list after being screened by a nurse.

With the move to the new facility, this procedure was changed. The physician's sick call is held five mornings a week on Monday through Friday. One day a week is assigned to each housing floor and a fifth day is assigned for female sick call. Thus, unlike procedure in the old jail, an inmate can report to sick call only on one designated day of the week. Only if an inmate's situation is regarded as an emergency by a member of the medical staff will he be permitted to see the doctor on any day other than the single day assigned for sick call for the inmate's floor. Nurse's sick call is held in the new facility in the afternoon five days a week.* Again, however, only one floor is handled per day. The average amount of time spent by the doctor with a patient on sick call is indicated by the chart on page 110 *supra.*

A number of inmates with medical needs which cannot be met within the confines of the jail are sent to St. Vincent's Hospital for diagnosis and/or treatment. Because there is no secure wing in that hospital, and because inmates who remain there are not kept in an isolated area, the practice of referring inmates to the hospital has created serious staffing problems for the defendant Sheriff. Twenty-four hour surveillance by a guard is required for each inmate so hospitalized. This means that five guards must be employed to provide surveillance 24 hours a day seven days a week. Inmates with special medical needs which can be dealt with in the absence of hospitalization now are able to be isolated in the medical area in the new facility. This represents a substantial improvement over the situation which existed in the old jail. A serious problem exists, however, with respect to the provision of special diets to prisoners who require such diets because of medical conditions including diabetes and ulcers. Inmates who have been ordered to be placed on bland diets receive the regular meal served to other prisoners, and the jail kitchen has no scale for weighing portions to be served to diabetics. In the opinion of the Medical Director, the failure to provide these special diets constitutes a serious problem within the jail.

Prisoners with psychiatric medical needs receive little if any assistance within the jail. The jail does not employ a psychiatrist and has not yet hired a clinical psychologist, although the staff projected for the new facility includes such a position. Dr. Masyk regularly prescribes tranquilizers and mood altering drugs for such inmates. Efforts to admit mentally disturbed inmates to the Toledo Mental Health Center have been unsuccessful. According to the jail's Medical Director, the Health Center takes the position that these inmates are not "treatable" because of the security required to house them; on this basis, such inmates have been refused admission routinely by the Toledo Mental Health Center.

All medication which is dispensed in the jail is prescribed by a physician. These orders are issued on the doctor's order sheet. In the past, the practice has been

* An additional nurse's sick call is held on Saturday for emergency cases.

for the doctor to issue a number of standing orders for treatment of certain conditions. These standing orders have included the following:

| Condition | Standing Orders |
| --- | --- |
| Colds | Aspirin, cough medicine, decongestant |
| Drug withdrawal | Mellaril, Thorazine |
| Pain | Aspirin, Darvon, Tylenol, Cafragot |
| Gastric Distress | Maalox |
| Ulcer or abdominal pain | Donnatal |
| Constipation with no abdominal pain | Milk of Magnesia or Senokot |
| Asthma/allergy | Elixophillin, Broncho dialator |
| First or second degree burns | Furacin or Nupercainal ointment |
| Epilepsy (proven history) | Dilantin with phenobarbitol |
| Minor cuts | Merthiolate |
| Major cuts | Hydrogen peroxide, Furacin, Icthymol |
| Deep laceration | Butterfly suture |
| Puncture wound | Tetanus shot |

A recent change of policy requires a special order by the doctor for any prescription drug formerly covered by standing orders.

By all accounts, including that of Dr. Masyk, inmates are generally allowed to have medication when they ask for it. The result of this practice is reflected by the following chart indicating the number of inmates incarcerated in the jail and the number and percentage of inmates receiving medication on random dates selected by the Medical Director:

| DATE | NUMBER OF INMATES INCARCERATED | NUMBER OF INMATES RECEIVING MEDICATION ON EVENING PILL CALL | PERCENTAGE OF INMATES RECEIVING MEDICATION |
| --- | --- | --- | --- |
| 2–21–77 | 177 | 72 | 40.7 |
| 2–28–77 | 171 | 81 | 47.4 |
| 3– 7–77 | 170 | 85 | 50.0 |
| 3– 8–77 | 171 | 85 | 49.7 |
| 3–17–77 | 168 | 70 | 41.7 |
| 3–19–77 | 175 | 68 | 38.9 |
| 3–20–77 | 174 | 63 | 36.2 |
| 3–21–77 | 171 | 62 | 36.3 |
| 4– 1–77 | 183 | 92 | 50.3 |
| 4–18–77 | 177 | 92 | 51.9 |
| 4–25–77 | 180 | 90 | 50.0 |
| 5–11–77 | 172 | 61 | 35.5 |

A number of inmates included above received medication more than once a day. Thus the total number of medications dispensed on April 1, 1977, for example, was 219, or 36 more than the total number of inmates incarcerated on that day. These data do not support Dr. Masyk's statement to the Special Master that the inmates in the Lucas County Jail are drawn from the healthiest segment of the general population. Dr. Masyk stated to the Special Master that he prescribes medication "in order to keep the inmates happy," and that he prescribes tranquilizers to large numbers of inmates because he feels that he has a duty to "help keep the jail under control."

A licensed dentist comes to the jail two mornings a week from approximately 8:30 a. m. to 11:30 a. m. The dentist provides his own nurse, equipment, and supplies.

All reports received by the Special Master agree that the dentist maintains a regular schedule in the jail and that he performs substantial dental services for inmates. Most of these services consist of extraction and construction of partial and full plates. In addition, the dentist provides toothpaste and toothbrushes to inmates who see him in his office. An inmate may arrange to see the dentist by sending an Inmate Request Slip to the medical department. In the past the dentist has expressed a wish to move throughout the institution in order to perform preliminary examinations and provide information on the subject of preventive dental hygiene. His request for access to the various housing units throughout the institution has been denied, however, and he has not been able to institute this program.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that a physician is on call at all times to deal with medical problems arising in the jail. Apart from the hours spent in the jail to handle physical examinations and regular sick call, the physician generally does not return to the jail to see an inmate, but he does prescribe and give instructions by telephone. The Special Master finds that all entering prisoners do not receive physical examinations before being assigned to a regular cell although this is the practice in the majority of cases. The physical examination which is administered does not meet the requirements of the Court's order as amended on December 29, 1971, and does not reflect the standards established for entrance examinations by the American Public Health Association. The institution is in noncompliance with subparagraph 13(c) in that there is not a daily sick call which any inmate can attend on other than an emergency basis. In addition, the average amount of time spent by a doctor with an inmate on sick call appears to fail to meet the requirements of "suffficient length of time" mandated by the Court's order of December 29, 1971. Although a number of

special medical needs are met by sending inmates to a local hospital or by providing special medical services within the institution, the needs of inmates requiring special diets for medical conditions are not being met. It is the finding of the Special Master that medication is prescribed only by the jail physician although substantial amounts of medication have been available as a result of the doctor's practice of leaving standing orders. Finally, the institution is in compliance with subparagraph 13(f) which requires that the part-time services of a dentist be made available.

## PARAGRAPH 14

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER PROVIDE A SUFFICIENT NUMBER OF GUARDS SO THAT AT ALL TIMES THERE WILL BE NOT LESS THAN TWO GUARDS ON DUTY ON EACH FLOOR, AT LEAST ONE OF WHOM SHALL AT ALL TIMES BE ON PATROL OF THE CELLBLOCKS, AND PROVIDING A SUFFICIENT NUMBER OF SUPERVISORY AND RELIEF PERSONNEL TO INSURE THAT THE REQUIRED NUMBER OF GUARDS ARE ON DUTY AND THAT THEIR PATROLLING ACTIVITIES ARE CARRIED OUT.

As the introduction to this report indicates, a very substantial amount of time was consumed by negotiations on the subject of adequate correctional officer staffing in the old Lucas County Jail as well as in the new Correction Center. These negotiations resulted in an agreement which was reflected in a stipulation entered into among the parties, approved by the Court, and filed on May 19, 1977, one day after the complete evacuation of the old facility. In spite of this agreement, the following portion of this report comments in some detail upon the process by which the agreement was reached and the data upon which it was based. The purpose of such a detailed discussion is three-fold. In the first place, some explanation is needed to make it clear why the resolution of the troublesome problem of proper correctional officer staffing levels required such a substantial expendi-

ture of time and effort on the part of the Special Master, his assistant, and the parties to this litigation. Second, it is the opinion of the Special Master that the provision of adequate surveillance of inmates constitutes the fundamental issue in this litigation. That such is the case is demonstrated by the testimony taken on this issue in the hearings which were held February, 1976, and which resulted in the appointment of the Special Master. In addition, the Court's language in its opinion of December 17, 1976, makes it clear that many of the problems which remained unresolved at that time related directly to the phenomenon of understaffing. Finally, although the issue has been resolved for the present, it is fair to say that both the Special Master and the parties are not altogether sanguine about the staffing level which has been agreed to. Thus, as the language of the stipulation makes clear, this issue is one which may arise in the future; this possibility makes it all the more important that a full and complete record be made in this report.

Paragraph 14 was modified on May 8, 1974, by a consent order which required particular posting of the two correctional officers stationed on each floor. That modification was abandoned and the original provision was restored by a memorandum and order issued by the Court on February 9, 1976.

The Court's opinion of July 30, 1971, stated, "Control of many of the problems in the jail is dependent upon having an adequate number of properly trained guards on duty in the jail at all times." *Jones v. Wittenberg,* 330 F.Supp. 707, 715 (N.D.Ohio 1971). In the order of December 17, 1976, the Court defined the basic intent and purpose of the original order by stating,

What the order of July 30, 1971, provided was that the prisoners were to be guarded constantly. The reason for this is that if they are not, the strong ones will prey upon the weak, the suicidal will kill themselves, and the seriously ill or disturbed will become worse. . . . The same risks to prisoners will be present in the new jail as are present in the old one unless the prisoners are constantly watched."

The Special Master has considered the language of the December 17, 1976, order to be controlling in assessing the defendant's compliance with this paragraph.

At the time of the appointment of a Special Master, it was apparent that the inadequacy of surveillance had reached a crisis stage; indeed the day of that appointment was marked by a sexual assault in the jail. During the first month of the Special Master's investigation, there were 24 incidents of violence and dangerous physical confrontation. The problem underscored by these incidents was two-fold. On the one hand the old jail, which would be holding prisoners for an unknown period of time was understaffed; at the same time the projected staffing pattern for the new facility appeared to be insufficient to reverse the trend of violence present in the old jail.

*The Old Jail.* On February 14, 1977, the Special Master met with the defendant Sheriff and the Correction Administrator and raised for the first time the problem of guard surveillance in the old jail. Agreement was reached on a number of points and confirmed in a letter from the Special Master dated February 21, 1977. Pursuant to this agreement the Sheriff was to station one correctional officer at the front of each cellblock in such a position that he could observe inmate activity. This correctional officer was to remain at his post except at the times when he would be on patrol on the perimeter catwalks, and such rounds were to be made every 15 minutes. Further provision was made to cut holes in or to remove heavy mesh screens in front of the cellblocks, thus allowing the officer stationed there to see the area. In addition there was to be one floating officer on each floor, one officer stationed in the juvenile area, and one officer posted in the medical area. This degree of surveillance was achievable within the then existing staffing level.

At the same time, the Sheriff agreed to commence hiring additional staff needed to reach the level projected for the new facility. This staff complement was to be hired and trained within 30 days and to be on duty in the old jail if the move did not occur before March 14, 1977. Although the defendant Sheriff was anticipating an imminent move into the new facility, he had not begun to augment his correctional officer staff to meet the staffing level already budgeted.

On March 15, 1977, the day after the newly hired personnel were to be on duty in the old jail (the move to the new jail having failed to occur), the defendant Sheriff informed the Special Master that the newly hired officers could not be on duty prior to April 4, 1977. Upon being informed of this development, the Court issued an order on March 22, 1976, requiring that

> The defendant Sheriff shall increase the surveillance at the old jail on or before April 4, 1977, by assigning at least thirty (30) additional correctional officers to the positions designated in the Special Master's letter of February 21, 1977.

The effect of this order was to require the addition of one officer to each of the eight male housing areas in the old facility for the day and evening shifts and to continue prior staffing levels on the night shift. This staffing level required a daily contingent of 58 officers. This figure must be multiplied by a factor of 1.75 in order to provide seven day per week coverage and to take account of illness, vacations, etc. Thus 102 correctional officers were required to meet that staffing level. The Correction Administrator informed the Special Master on April 1, 1977, that 109 correctional officers were available for that purpose.

For the period of eight days following the scheduled assignment of the newly hired officers, from April 4 through April 11, 1977, the Lucas County Jail Daily Floor Watch Reports indicated there was an average daily correctional contingent of 51 officers, 7 short of that required by the March 22 order. Furthermore, monitoring conducted by the Special Master's assistant showed an average of 15 officers on duty for the day and evening shifts on the dates April 7 through April 13, 1977. Thus, on the average, the jail staff was 7 officers short *per shift* when only those officers observed at their posts were counted.

With 109 correctional officers on staff the defendant Sheriff could have deployed sufficient personnel to come into compliance with the order of March 22. Instead, he chose to reassign 12 correctional officers to other duties and took no action to replace eight officers who resigned. No effort was made to call in needed guards on an overtime basis to replace persons who failed to report. For these reasons the defendant Sheriff remained out of compliance with the Court's order of March 22, 1977. That this noncompliance was not justified by impossibility is reflected by the following statement in a letter of May 2, 1977, from the defendant Sheriff to the Special Master:

> Although I have steadfastly stated staffing requirements of the Court's order were unrealistic and unnecessary, I have never stated they were impossible.

On April 13, 1977, a stipulation was approved by the Court which eliminated the necessity for a second correctional officer in the male housing areas and allowed the defendant Sheriff to deploy his staff in the new facility for the purpose of training in anticipation of a move onto one floor of the Correction Center. That move occurred on April 22, 1977.

During the period that the partial occupation of the new jail coincided with continued use of the old jail, the defendant Sheriff was required to assign one officer to each cellblock, one floating officer per floor, one officer to the medical area, and another to the juvenile area. This amounted to a total of 14 officers on duty per shift in the old jail. Lucas County Jail Daily Floor Watch Reports indicate that for the 15 days following the partial occupation of the new facility, April 22 through May 6, 1977, the defendant Sheriff maintained an average of 12.3 officers per shift—a deviation of nearly

2 officers per shift. Furthermore, monitoring conducted by the Special Master and his assistant showed that on the average 10.6 correctional officers were at their posts at the time of observation. This monitoring indicated that in many instances fewer guards were on duty at their posted positions than appear to have been available according to the Daily Floor Watch Reports. In general, however, the monitoring confirmed the state of noncompliance with the April 13, 1977 order reflected by the Daily Floor Watch Reports. This trend continued until the move to the new jail was completed.

*The Lucas County Correction Center.* The attempt to provide an adequate number of correctional officers for the old jail was only part of the problem posed by the provisions of this paragraph. The construction of the new facility did not assure the Court there would be adequate surveillance of prisoners to insure internal security. In its order of February 9, 1976, the Court stated:

> The Court holds that the substituting of a new jail building for the old one will not moot this case, nor render inapplicable the basic requirements of even more than a very few specific provisions of the Court's order of July 30, 1971.

To understand the evaluation of the staffing level projected for the new facility, it is important to be aware of the physical configuration of the housing floors. On the third, fourth, fifth, and sixth floors of the Correction Center inmates are housed in 27 discrete housing areas. The third and fourth floors have four 12 person modules, one 6 person module and one 4 person module. The fifth floor has a dormitory for trusties in place of a 6 person module, but is otherwise similar to the third and fourth floors. Observation of the 6 and 12 person modules on the third, fourth, and fifth floors can be achieved only through observation booths which have three lexan windows or through a door leading into a security vestibule which is separated from the cell area by a second barred door. The 4

person modules on these floors can be observed only through a similar vestibule door or, to a lesser extent, through a window in the floor control center. A single officer cannot physically observe two modules at the same time.

The sixth floor has a 6 person and a 4 person module similar to those on the other floors. In addition there is a maximum security area consisting of four 5 person and four 7 person units. These maximum security units have an adjoining guard corridor with small lexan windows for observation and a catwalk around the perimeter of the cells. The windows can be (and have been) covered by inmates with soap, wet newspaper, and other materials. A guard on one of the catwalks cannot observe more than one unit at a time. All living areas on all housing floors can be viewed through the closed circuit television system monitored in the floor control center and in the main control center on the first floor.

To deal with this physical configuration the defendant Sheriff originally intended to station three officers on each housing floor. On the third, fourth, and fifth floors each of two officers would have been responsible for two 12 person modules and would have assisted the other in observing the 6 person module. On the sixth floor, one correctional officer would have been responsible for four maximum security units and he would have assisted his counterpart in observation of the 6 person module. On each of the housing floors one correctional officer would have been posted in a central control booth and from that position would have controlled the gates dividing the large open lobbies on each floor, operated the gates into the security vestibules, directed the traffic on the floor, communicated with the rest of the jail, kept records of activity, observed the one 4 person module, and—if he had a free moment—observe activity in the living areas on his video monitors.

The staffing proposal outlined above was prepared for the defendant Sheriff by the Toledo/Lucas County Criminal Justice Re-

gional Planning Unit.[25] The RPU report compares the cost of operating both the old city jail and the old Lucas County Jail with the cost of operating the new Lucas County Correction Center. While the combined operations of the two old jails required 85 correctional officers, RPU projected the use of 84 correctional officers for the new facility, even though the latter has a substantially higher rated capacity than that of the two smaller jails in combination.

This staffing projection raised a number of serious concerns in the mind of the Special Master. First of all it must be noted that

> Surveillance involves both observation and response capability. It is obvious that surveillance alone is meaningless if there is no opportunity for effective intervention.[26]

Effective intervention thus involves both an adequate number of correctional personnel and the ability of those persons to respond quickly to an emergency. Had the Regional Planning Unit's recommendation of three correctional officers per floor per shift been effectuated, response time in the new facility would have been longer than that experienced in the old jail. On a number of occasions correctional officers stated to the Special Master that they would not attempt to intervene in an inmate fight unaccompanied by other guards. This attitude is consistent with the policy set forth in the institution's then existing draft Policy Manual that

> At no time shall an officer enter a module alone without a standby.[27]

Thus, two of the three guards stationed on the floor would have been required to be available to enter the module. This, in turn, would have been virtually impossible to accomplish.

An officer observing an incident of violence in a module would have been required to shout for assistance from the other officer on the floor who, in all probability would have been a considerable distance away and separated by two crash gates dividing the central lobby area. These crash gates can be opened only by an officer stationed in the floor control center. Once the second officer arrived at the scene of the incident, the vestibule door separating the lobby from the security vestibule adjoining the module would have had to be opened by the officer in the control booth. At that point, one officer could have entered the security vestibule but the second officer would have been required to remain in the observation booth to open a second door between the security vestibule and the dayroom/cell area. This second door could not be opened until the door separating the security vestibule from the lobby was closed, unless the officer in the observation booth deactivated the interlock mechanism.[28] Once the vestibule door was closed, and the door into the dayroom/cell area was open, the officer in the security vestibule could have entered the module and intervened. However, the two remaining officers on the floor would not have been able to enter the module to assist the officer inside, because two officers are required to operate the complicated locking system.

Therefore, with only three guards posted on a given floor, in order to obtain the assistance which would be necessary to permit two guards to enter the module without deactivating the interlock mechanism, addi-

---

**25.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Cost Analysis of the Lucas County Correction Center* (1976).

**26.** F. W. Benton & R. Obenland, *Prison and Jail Security* 40 (1973).

**27.** *Lucas County Sheriff's Department Correction Policy Manual* § .08(D 11) (Undated Draft).

**28.** The Special Master is aware that if the interlock is turned off both doors could be left open and both of the officers could then enter the module. However, he assumes that during a violent incident correctional officers would hesitate to open both doors, giving inmates access to the floor's lobby area.

tional staff would have had to be summoned (through an intercom system) from other floors and those guards would have had to arrive by an elevator controlled by an officer in the first floor control room. In the opinion of the Special Master, this cumbersome procedure for guard intervention would have precluded effective surveillance and security in the new jail. While guards might have been in a position to observe a violent incident, it does not appear that they would have been in a position to provide effective intervention.

The second concern raised by the Regional Planning Unit projection resulted from the fact that the daily contingent of guards was multiplied by a factor of 1.5 to produce the total number of staff needed. Correctional officers at the Lucas County Jail work on a schedule of four days on and two days off. The factor of 1.5 accounts for this work schedule; this factor, however, did not take into account illness, vacation, or other absences. If a correctional officer were unable to come to work, then the projected staffing level could not be met.

The third concern was that the staffing pattern would eliminate to a very large extent staff-inmate contact except in crisis situations. In other facilities it has been found that

> The separation of correctional officers from the prisoner population created a situation where officers could watch dangerous and destructive behavior, but their ability to intervene was severely limited. It was often impossible to detect which individuals in a group were involved in an assault, coercive disruption, or deviant behavior. Thus, living areas became breeding grounds for destructive, anti-social, and criminal behavior.[29]

Under the RPU plan inmates would be likely to encounter a guard only if he entered their module to enforce a policy or break up a fight. Inmate and staff communication would occur only through an intercom or a food tray slot. It is the conviction of the Special Master that this lack of physical contact between the staff and inmate not only endangers the inmates but also creates a dangerous situation for staff in those instances when they must enter the module.

Fourth, the new facility like the old jail was designed for inmates to eat in their living areas. In the old jail, however, the food was served by trusties. This task in the new facility has been assumed by the correctional officers. In other institutions, the latter approach has been abandoned because "it was impossible to feed inmates in their cells because of the large staff needed."[30]

Finally, the new jail staffing was based upon the assumption that the extensive video monitoring system would add to the security of the inmates. A single camera, or a pair of cameras yielding a single split-vision image, was installed in each of the dayrooms. The National Clearinghouse for Criminal Justice Planning and Architecture published a study on the uses of closed circuit television. The section of that study describing the use of video monitoring of dayrooms contains the following observation:

> CCTV surveillance has not been effective, and is therefore not recommended. CCTV does detect overt physical behavior, but only staff supervision and interaction can enable discrimination of less obvious dangerous behavior. . . . In order to provide protection for inmates who wish to resist assault and pressuring by other inmate groups, staff members must respond and understand residents as individuals. This capability requires interaction with residents.[31]

The problems discussed above result in part from the fact that the architects were

---

**29.** F. W. Benton & R. Obenland, *Prison and Jail Security* 42 (1973).

**30.** *Id.*

**31.** Id. at 95.

not instructed to design the facility on the basis of a certain and predetermined staff level.

> In the planning of kitchens, of shops, of housing buildings, of recreation areas, or any other function or part of the institution, the manner in which the facility is to be supervised, and the numbers of personnel required for it, should be studied at the same time the architectural planning is done.[32]

A staffing level equivalent to the combined totals of the old County and City jails was imposed on a new Lucas County Correction Center (for budgetary reasons) *after it was built and not before it was designed.*

For all of these reasons, the Special Master believed that it was necessary to reevaluate the staffing level necessary to provide internal security in the new jail. The staffing projected by RPU was described as minimal in its own report. Certainly the Court's order requires something greater than minimal surveillance. Thus, on February 21, 1977, the Special Master wrote to the defendant Sheriff, stating an intention to seek such a reevaluation. On the same day the Special Master requested RPU to reevaluate its earlier recommendations. On March 1, 1977, RPU agreed to such a reevaluation, and on March 3, 1977, the defendant County Commissioners agreed as well.

This reevaluation was to consist of a number of elements. First, the Special Master would seek the aid of the correctional staff of the Sheriff's Department. Second RPU would make a follow-up study, reassessing its former projections in light of the Court's order. Third, experts in corrections would be brought to Toledo to view the facility and to report their findings to the parties. The plaintiffs' counsel brought in one expert, RPU sought assistance from

three, and the Special Master employed two.

*The RPU Reevaluation.* The RPU reevaluation was reported in a lengthy document which dealt with other aspects of the jail operation as well as staffing requirements. In the reevaluation report it was disclosed that

> The original "cost analysis" and personnel projections were prepared for elected officials for the purpose of contract negotiations for joint occupancy of the new jail by both the County and City of Toledo. The elected officials were concerned about the related cost and personnel requirements of such a joint venture. They were not concerned about how personnel were to be posted or their post orders.[33]

In order to meet the requirements of *Jones v. Wittenberg,* the RPU developed a new projection which it described as "the ideal for a local, county jail" and "the best possible staffing compliment [sic] for the effective operation of the new Lucas County Jail." [34]

The RPU reevaluation projected the addition of one officer per shift for the third floor, one officer for two shifts on the fourth floor, one officer for one shift on the fifth floor, and one officer for two shifts on the sixth floor. Each floor would have had four officers on duty for the first shift. On the second shift, the third and fourth floors would have had four officers and the fifth and sixth floors would have had three officers. On the third shift, when prisoners are locked in their cells for the majority of the time, the third and sixth floors would have had three officers on duty while the fourth and fifth floors would have had two.

This new projection increased the daily housing area contingent to 40 from the previous level of 32. This could be accom-

---

**32.** American Correctional Association, *Manual of Correctional Standards* 344 (1966).

**33.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements*

*and Analysis of the Lucas County Correction Center* at VII–2 (1977).

**34.** Id.

plished without hiring additional staff because staffing was reduced in other areas such as booking (where the daily contingent was reduced from ten to six) and internal transportation (where the daily contingent was reduced from nine to two). Indeed in the RPU reevaluation, the total number of correctional officers required was slightly reduced for the facility as a whole.

The new RPU projection failed to deal adequately with the problems which led to the Special Master's request for a reevaluation. With respect to the response capability of the staff, it is improved considerably when four men are posted on the floor, for two men can enter a module to assist an inmate in trouble or to break up a fight while the other two are operating the complicated locking mechanism. However, there are only three guards on duty on the fifth and sixth floors during the second shift. On the third shift, there are three guards on duty on the third and sixth floors and two guards on duty on the fourth and fifth floors.[35] During the majority of the third shift the residents are locked in their cells. Between 6:30 a. m. and the 8:00 a. m. shift change, however, the doors to the cells are open. If a fight were to occur during the 7:00 a. m. breakfast on the fourth or fifth floor, and if it were detected, there would be only one officer to open the outer vestibule door from the control booth, and one officer to open the module door from the observation booth. *There would be no one to intervene.* Again, this assumes the undesirability of deactivating of the interlock mechanism controlling the two doors separating the lobby from the housing module proper and thus allowing all of the inmates to leave the module.

The RPU projection increased the factor used to determine the number of officers needed on staff to supply the daily contingent seven days a week when vacations, sick leave, holidays and regular days-off are taken into account. The reevaluation used a factor of approximately 1.6. This factor was obtained by the dividing of 365 days in the year by 235 (the 243 days a year that a correctional officer would be scheduled to work minus the eight days representing vacation, holidays, and average sick days). This factoring system is not borne out by experience, for the Special Master was informed by the defendant Sheriff that during the period of April 1 through April 24, 1977, between three and nine men were sick each day. The Correction Administrator and the Director of Security informed the Special Master that in their opinion a factor of 1.6 would not be adequate to insure that the required number of officers would be on duty daily.

The RPU staffing reevaluation did not address the problems created by feeding inmates in one module and simultaneously having no staff for surveillance in the others. The report is deficient insofar as it fails to deal with this problem; indeed, as pointed out above, the level of staffing proposed by RPU would exacerbate the problem on two floors during the breakfast hour.

The RPU reevaluation dealt with the problem of lack of inmate-staff contact and tested the assumption of the effectiveness of the closed circuit television system in a section of the report written by Dr. James A. King, Associate Professor of Sociology at The University of Toledo. Dr. King began his discussion with a statement that he considered a level of contact between inmates and guards consisting of direct surveillance at least once every hour to be "quite high." This opinion notwithstanding, the Special Master cannot agree that this level of direct surveillance meets the requirements of Paragraph 14 of the Court's order. Dr. King offered his opinion that placing a guard in the living module would be an "invasion" of "inmate territory." His report did not argue that the inmates would

---

**35.** RPU explains this staffing level in writing under the rubric Posting Duties. It differs from two charts provided by RPU which are themselves inconsistent with one another. See Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the Lucas County Correction Center* at VII–14, 15.

be hostile to the guards; rather, "placing guards, especially those with authoritarian attitudes and tendencies, within the modules will most likely create an adversary situation." Dr. King states that this is because

> . . . power is exhilarating and intoxicating; under such an influence, one's self-image is very much enhanced. However, under these conditions, the possibilities of abuse are great, especially when the guard sees his role in terms of discipline and control.[36]

It would seem that one cannot place guards where they could protect the inmates from each other because to do so would put them in danger from the guards. Dr. King apparently sees no potential for a professional staff at the Correction Center and his recommendations appear to be based on this premise:

> The inferior status and dehumanizing effect of jail on inmates has the potential for bringing out the worst in guards.[37]

The Special Master cannot accept the proposition of "inmate territory" nor can he agree that guards placed in physical contact with inmates will necessarily become brutes. The Special Master can agree with Dr. King's observation concerning the usefulness of education and training of guards:

> If the guards learn to respond with empathy, respect and genuineness, there is a decrease in inmate anxiety and belligerency. Education and in-service training has [sic] been found to facilitate the guards' ability to deal in such a manner with inmates. (References omitted).[38]

While Dr. King is correct on this point, one wonders how a guard can acquire the quali-

ties of empathy, respect and genuineness while shouting to inmates through malfunctioning intercoms or viewing them through lexan shields. With respect to training, the Court's order in this case recognized the utility of such a program and mandated an effective training program to that end.

Dr. King reported as well on the closed circuit television system in the jail. His report was critical of a study considered authoritative in the field.[39] Dr. King's criticisms dealt with the methodology of the study and its findings concerning the psychological impact of the cameras upon guards. Even if one were to accept this criticism, it totally overlooks the central issue posed by the Special Master to RPU. A closed circuit television system cannot prevent, much less break up a fight; for this reason there is need for a sufficient number of trained guards on the floor who can accomplish this. Dr. King stated that CCTV "also can remove the staff from being in a position to respond immediately to an altercation."[40] This is precisely the point. Dr. King explained that "there is only one major concern with the CCTV system and that is that guards will begin to employ it as a first line of prisoner control and not as a backup."[41] The report did not explain how this could be prevented, but recommended that it be done. Dr. King also failed to indicate the number of staff needed to observe effectively the CCTV system, a central question raised by the use of such a system.

A number of other observations made by Dr. King with respect to the CCTV system are noteworthy. He stated that

> While CCTV does not decrease the number of staff personnel, it does allow for staff relocation. That is, more staff can be placed in areas so as to interact more with the inmates; fewer men are needed

---

**36.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the Lucas County Correction Center* VI, Appendix I, 13–14 (1977).

**37.** *Id.* at VI, Part B, 5.

**38.** *Id.* at VI, Part B, 4.

**39.** F. W. Benton & R. Obenland, *Prison and Jail Security* (1973).

**40.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the Lucas County Correction Center* at VI, Part A, 2–3.

**41.** *Id.* at VI, Part A, 5.

to monitor the perimeter. Both Solomon (1974) and Schwartz (1973) indicate that this interaction can be beneficial in terms of rehabilitation.[42]

If CCTV does lead to more negative perceptions of staff, this could be remedied by placing staff nearer to the prisoner by increasing the frequency of contact.[43]

Recommendation: Steps be taken to insure that guards continue to use CCTV as a back-up and that it does not contribute to a reduction in human contact.[44]

The Special Master is unable to reconcile these statements with Dr. King's later statement that

> Based on the best available research data and our own personal professional expertise in the area, it is recommended that separation of guards and prisoners be maintained.[45]

Another aspect of the RPU reevaluation requires comment. The RPU report quotes the National Advisory Commission on Criminal Justice Standards and Goals with respect to a ratio of correctional workers on staff per inmate.

> At least one correctional worker should be on staff for every six inmates in the average daily population.[46]

However, the use of a standard staff to inmate ratio fails to take into account the physical configuration of the new Correction Center. The physical configuration and design of the new facility make it impossible for a correctional officer to physically observe more than 12 inmates at a time. Whereas a total staff to inmate ratio of 1:6 may be useful in evaluating facilities in which a guard can observe a large number of inmates, the Special Master does not find such a ratio to be helpful in assessing the staffing requirements of the new Lucas County Correction Center.

Finally, the new RPU staffing projection placed undue reliance upon the presence of a counselor "who will also be a trained correction officer" on each of the housing floors during the first shift. While the Special Master believes that it is important that the counselors receive the same training given to correctional officers, and realizes that counselors may serve an important security function by reducing inmate anxiety and belligerency, he believes that a counselor should not be regarded as a full equivalent to "a trained correction officer" for the purpose of projecting security staffing. All of the counselors presently on staff have informed the Special Master that they consider physical involvement in a violent incident to be inconsistent with their roles as counselors and damaging to their credibility. While a combination of counselors and correction officers may provide optimal security in the housing area, the Special Master believes that confusion concerning the role of the counselor will decrease the latter's effectiveness and will result in ineffective utilization of these persons. Professor Hans Mattick, a consultant employed by the Special Master, made the same point in the report which he submitted:

> (W)hile Counselors should not be blind to security problems and Corrections Officers should not be heedless of the diagnostic and treatment functions of the Counselors, . . . there is a difference in the functions being carried out by each. If they are simply interchangeable, why the difference in title?

*The Staffing Consultants.* Counsel for the plaintiffs secured the assistance of William G. Nagel from the Institute of Corrections of the American Foundation Inc. Mr. Nagel, who spent 11 years as an administrator in the New Jersey Correctional System, was a consultant to the President's Crime Commission and a member of the Task

---

42. Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements and Analysis of the Lucas County Correction Center* at VI, Part A, 2.

43. *Id.* at VI, Part A, 5.

44. *Id.* at VI, Part A, 6.

45. *Id.* at VI, Part B, 6.

46. *Id.* at III–4.

Force on Corrections of the National Advisory Commission on Criminal Justice Standards and Goals. In his report concerning the Lucas County Correction Center, he characterized the building as having been designed with "over emphasis on steel and electronic devices." With respect to the facility's need for staff, Mr. Nagel stated

I am distressed by the architectural plan as well as the anticipated staffing plan for the third, fourth, and fifth levels. The living modules varying in size from 6 person to 12 person, are designed in such a way that observation is via panels in a small observation booth that juts into the living module. Thus the officer, theoretically, will be able to observe what is going on in the living module without being physically in contact with the person within the module. It would be my recommendation that an officer be assigned inside each of these living modules if that is at all possible, but within two modules at the very least. I recognize that bringing officers into physical contact with inmates has its problems, but they are ever so much less than the problems that result when an officer is not in personal contact with the inmates.

Mr. Nagel expressed doubts about the closed circuit television system:

I believe that the planners of the Lucas County Jail have been taken for a ride by the hardware and electronic salesmen.

He noticed that officers manning the control booths rarely had time to look up at the panel of video monitors. The CCTV substitutes "the impersonalness of this electronic device for the only positive thing a jail has going for it—interpersonal relationships."

On the basis of a mistaken assumption that four security personnel and two counselors had been projected for each floor, Mr. Nagel recommended the addition of two additional correctional officers or counselors for the housing floors during the first and second shifts. Total staffing per floor would consist of a combination of eight counselors and guards for the first two shifts and not less than two guards on the third shift.

On the advice of the American Correctional Association, the Regional Planning Unit sought the assistance of Wayne K. Patterson who is the Director of Correction for the City and County of Denver. Mr. Patterson found the new facility to be

an excellent example of jail architecture which combines the security and supervision necessary for safe custody of prisoners and control of the institution. . .

To staff the facility, Mr. Patterson recommended the daily contingent of 40 officers which was adopted subsequently by RPU. (See pages 119–120, *supra*.) To arrive at a total staff figure, Mr. Patterson used a factor of 1.573 based on each officer's work year of 235 days. Again, while this figure may be mathematically logical, it has not been validated by experience in the Lucas County Jail.

Mr. Patterson arrived at his per shift figures after considering the functions and duties of correctional officers. One factor he considered was the following:

Service of food will require close supervision during mealtimes. . . . 6:30 a. m.—8:00 a. m.; 11:00 a. m.—12:30 p. m.; 4:00 p. m.—6:30 p. m.

This raises serious difficulties, for on the fifth and sixth floors, while the two patroling officers are each serving the 4:00 p. m. meal to one cellblock, the other housing areas would be left unsupervised under Mr. Patterson's staffing plan. The same problem would occur during breakfast on the third and sixth floors, which would have only two patroling officers, and on the fourth and fifth floors, where only one patroling officer would be posted at that time. Mr. Patterson also considered that officers may need to "respond to emergencies where areas must be opened up requiring more than one person." It is difficult to see how this level of staffing can be justified in view of the problems encountered in entering the housing modules described earlier. This difficulty becomes more acute in view of Mr. Patterson's recommendation that

The officers supervising the living module should not be able to override the

interlock mechanism . . . both doors could be left open at the same time which is an unsound security practice.

With respect to the closed circuit television system installed in the jail, Mr. Patterson stated

I have not seen a correctional center or jail in the United States which has the sophisticated system for closed circuit TV and supervision by sight and sound that is assembled for use in this facility.

Mr. Patterson was not unaware of the problems associated with the use of CCTV, however, and stated that

The viewing of an assault or suicide attempt by the TV and sound system without officer personnel to dispatch to the scene would not prevent or control the act.

Still, Mr. Patterson believed that the appropriate use of the CCTV would reduce staffing by a minimum of 25%. Without the electronic systems,

It would take a minimum security of 6 security officers per floor when daytime activities are occurring.

With respect to the sound system referred to by Mr. Patterson, the fact is that it is almost never used. When it is turned on, the officer in the floor control booth hears a cacophony coming from as many as ten living areas, and this interferes with the officer's use of other intercoms with which he communicates with staff.

Another aspect of Mr. Patterson's report which is disturbing is the recommendation that the projected counseling staff be reduced from a level of ten counselors to serve six floors of the institution to that of only five. Because most of the inmates are awaiting trial, Mr. Patterson stated that

(T)hey do not need and do not want extensive counseling after the original crisis created by arrest and detention has passed.

All too often this original crisis does not pass. In addition, Mr. Patterson's suggestion fails to take account of the roles other than clinical counseling assigned to these staff persons—roles which are directly related to prevention of violence among the inmate population.

The Regional Planning Unit also solicited a report from Mr. Anthony S. Kuharich of the National Institute of Corrections. Although Mr. Kuharich did not explain the interrelation of the design of the facility and the numbers he proposed, he recommended a staffing level corresponding to that approved by Mr. Patterson in all respects save one. Mr. Kuharich recommended that the staffing on the sixth floor be reduced from four to three during the first two shifts of the day. This is especially troubling to the Special Master because the sixth floor appears to require a larger number of staff than any other floor. If only one officer is assigned to each wing on that floor, he is out of contact with other staff members. He can barely, if at all, be seen from the control room and he can communicate with the officer stationed in the floor control booth only through an intercom. Mr. Kuharich stated that

With the guard corridor fronting the dayrooms and the cells, the Correctional Officer assigned to each wing will be able to provide constant surveillance of the individuals detained. In the event of an emergency, the Floor Supervisor can provide immediate backup assistance.

Mr. Kuharich did not have the advantage of seeing the jail occupied, but if he had, he would have observed that this is not the case. The officer in the guard corridor too often has not been able to provide any surveillance at all because the small viewing windows have been covered by the inmates. The closed circuit TV units have been rendered useless by the inmates who have thrown feces at the camera housing and destroyed cameras with burning newspapers. Therefore, the only way the inmates can be observed in many instances is by a guard on the catwalk. A guard in this area is totally out of touch with the control booth except for an audio monitor activated in the floor control booth. The Special Master and his assistant have made many visits to the sixth floor control booth and have found that these monitors are not

activated and thus are useless. Mr. Kuharich's statement that the floor supervisor can back up a guard in each wing not only presumes that the two can communicate with one another but overlooks the fact that the two officers are separated by a pair of interlocking gates which can be opened only from the control booth.

During the initial weeks of occupancy the sixth floor has been manned by four or five officers during the first two shifts in spite of the fact that the south wing is not occupied. This has not been sufficient to prevent damage, an escape attempt, and a number of fires set by inmates. The administration of the Center apparently agrees with the Special Master that the sixth floor requires more than three officers for safe operation.

Mr. Kuharich did not address himself to such problems as the lack of staff-inmate contact, staff requirements for food service on the floor, the response capability of staff, or the effectiveness of CCTV. Mr. Kuharich, like Mr. Patterson, arrived at a position to staff factor of 1.57.

The Regional Planning Unit also sought technical assistance from the Federal Bureau of Prisons. The Director of the Bureau was contacted and he provided two representatives, Robert Christensen and John Sullivan. Their report contained a basic description of the facility with a staffing projection and thirty suggestions for recommended changes. Because of the absence of specific post orders and procedures, they based their recommendations on "standards and practices applied in Bureau of Prisons facilities." The relevance of these standards and practices to the architectural configuration of the Lucas County Correction Center was not discussed. The staffing recommendations for the housing floors were based upon an elaborate five shift scheme and consisted of a daily contingent of 38, two lower than that ultimately recommended by RPU. The report did not disclose the design considerations leading to these recommendations in terms of the number of inmates who could be observed by a single officer, the effectiveness of CCTV, the staffing problems associated with the serving of food on the floors, or the response capabilities of the officers. They did note that

> The emphasis on the floor plan is to provide as little physical contact between staff and prisoners as possible.

The Special Master obtained the assistance of Hans W. Mattick. Professor Mattick served as Assistant Warden of the Cook County Jail and is presently Professor and Director of the Center of Research in Criminal Justice at the University of Illinois at Chicago Circle. Professor Mattick is also co-author of *The Illinois Jails Survey*[47] and the author of *The Contemporary Jails of the United States: An Unknown and Neglected Area of Justice.*[48]

In his report Professor Mattick first expressed his concern with what he regarded to be insufficient staff training, a simplistic classification system, a lack of well developed policies and procedures, and the problem of supervision in an eight level building. He found that these factors all influence a staffing level.

Professor Mattick stated that the 4 person modules on each floor could not be observed adequately.

> The surveillance and supervision of these rooms is too difficult and indirect to ever be acceptable.

Professor Mattick also concluded that unless there are architectural changes in the jail, it will be necessary to have officers stationed inside the large modules on the third, fourth, and fifth floors. The number of staff required could be decreased if the walls dividing the two large modules in each wing were removed. Without this change, however, seven officers would be needed on those floors for the first shift and six for the second shift. On the sixth floor, Professor Mattick found that seven

47. H. Mattick & R. Sweet, *The Illinois Jails Survey* (1969).

48. *Handbook of Criminology*, D. Glasser, ed., 777–848 (1974).

officers would be needed on the first shift and six on the second shift because of "the relative reduction of visibility on that floor." This would provide for two officers in each wing, one of whom could patrol the catwalks, while the other remained in the guard corridor. Two additional officers on the first shift and one on the second shift would watch the four and six person modules and provide back-up, while one officer remained in the control booth.

Professor Mattick's recommendations, if implemented, would result in a daily staff contingent of 64 for the four housing floors assuming no architectural changes. He used a factor of 1.75 to reach the total number of staff. Professor Mattick expressed his reservations concerning the effectiveness of the video monitoring system. His recommendations are based on increasing contact on the third, fourth and fifth floors of the jail, and his projections provide back-up in case of an emergency. With respect to the serving of food in the cell areas, Professor Mattick has written that such a practice means that "more staff must be assigned to supervise feeding" unless inmates serve the food.[49]

Finally, Professor Mattick found that reasonable security meeting the requirements of the Court's order would require an adequate number of counselors

> to lessen the amount of anti-social behavior in the institution and thus make the institution an easier place to supervise.

He recommended one counselor on each of the housing floors on the first and second shift, and one for the entire jail on the third shift.

The Special Master also received advice from Dr. F. Warren Benton, the Director of the Oklahoma Department of Correction. Dr. Benton was associated with The National Clearinghouse for Criminal Justice Planning and Architecture before assuming his position in Oklahoma. He is regarded as an expert on the use of closed circuit television

in correctional facilities and is co-author of a book on the subject.[50]

In his report to the Special Master, Dr. Benton discussed his general concern about the design of the facility:

> First, the designer has chosen to split the population into small groups from four to twelve. This is a laudable design feature, but it has been done in a manner which is at the expense of staffing efficiency. Sometimes these living units are separated by walls, which could permit observation of two areas from one post, other times these are located at either end of a large lobby or hallway area. It is impossible for one person to work both units simultaneously. An additional problem is created by the configuration of the control stations in the units, in that the total area of the unit is not visible. This could be corrected by increasing the glass area of the station, and positioning the windows several inches out beyond the wall so that it is possible to look sideways from the station. This is especially important with regard to a view of the shower area.

Dr. Benton discussed the closed circuit television system in his report at great length. Apart from the question of whether or not the system is efficient or desirable because of the effect of CCTV on staff and inmates, Dr. Benton evaluated its effect on the staffing needed for the housing areas.

> In these areas, normal staffing will still be necessary because most of the duties of the staff go beyond surveillance to include functions such as: gate and door operation, observation of inmates in cells and showers where the CCTV does not view, supervision of feeding and sanitation activities, and emergency response to incidents. A CCTV camera cannot perform these functions.

If CCTV is installed, used, and relied upon by the staff, it must be manned in an adequate manner to justify that reliance.

---

**49.** *Handbook of Criminology,* D. Glasser, ed., 777, 814 (1974).

**50.** F. W. Benton & R. Obenland, *Prison and Jail Security* (1973).

According to Dr. Benton, the total number of personnel required is not decreased, because the camera cannot perform the function of an officer; rather the number of personnel must be *increased* to provide adequate monitoring at the control points as well as normal direct surveillance. Dr. Benton found that if the CCTV system were not installed at all or were not relied upon for other than casual surveillance, the daily officer contingent on the housing floors would be 59, an increase of 19 over the RPU estimate. If the monitors were manned effectively, than 65 officers would be required for the housing floors on a daily basis.

Dr. Benton's study, based upon the design of the facility and the duties of the officers without intensive monitoring of the CCTV system, projected the following staffing pattern. The third floor would require six officers on the first shift, five on the second shift, and three on the third. Although there would not be any officers actually stationed within the modules themselves, Dr. Benton suggested that

> Since certain areas cannot be seen from outside, relatively frequent intermittent tours through the unit are necessary to protect the population.

One of the reasons for this number on the third floor is the combination of male and female inmates, which prevents one "floating" officer from serving the floor. The fourth floor would require five officers on the first shift, four on the second, and three on the third. This staffing would be the same as that on the third floor except that only one officer would be needed to make the "intermittent tours" in the modules because the fourth floor houses only male prisoners. On the assumption that the fifth floor is meant to hold inmates considered a higher security risk, Dr. Benton recommended an additional officer to be added to allow two officers to conduct tours inside the modules. The sixth floor would require seven officers on the first shift, six on the second shift, and five on the third shift. This would place two officers in each wing

during the first two shifts, and one on the night shift. There always would be one officer in the control booth and one in the lobby for back-up and for surveillance of the 4 and the 6 person modules. An additional floating officer would be assigned on the first shift when the elevator traffic is the heaviest.

To reach a total staff level, Dr. Benton adjusted the total number of work periods in a year (365) to reflect the fact that guards work four days and are off duty two days. After subtracting paid vacations and sick leave days, he determined that staff would actually work only 218 days per year. The factor which emerges is 1.62, which explicitly assumes a low rate of turnover and unauthorized leave.

The staffing level recommended by Dr. Benton would provide sufficient personnel for excellent response capability in the event of an emergency. Although there would be no officers stationed in the modules themselves on the third, fourth and fifth floors, correctional officers would be entering the modules to insure that inmates are exposed to staff on a regular basis, thus reducing any sense of inmate territoriality. Dr. Benton's staffing level recognized that the serving of food in the living areas is inherently staff-intensive, and he adjusted his figures accordingly.

*Occupancy of the Lucas County Correction Center.* Before the staffing reevaluation could be completed, the defendant Sheriff sought to move all women and a number of male first offenders onto the third floor of the new facility. Considering the high level of violence in the old jail, and wishing to avoid the creation of a similar atmosphere in the new facility, the Special Master believed that a move into the new jail at the level *initially recommended* by RPU would be inconsistent with the Court's requirement that "an adequate number of properly trained guards be on duty in the jail at all times." The Special Master did not believe that this requirement could be met if officers were not stationed in such a way that each module could be physically observed at all times during the day and evening shifts. Therefore, he required the

defendant Sheriff to post an officer at each of the 12 person modules and at the 6 person module. The 4 person module would be observed by the officer in the control booth with assistance from the officer responsible for the 6 person module. On April 7, 1977, the defendant Sheriff agreed to this arrangement, and on April 13, 1977, a stipulation was approved by the Court establishing a "temporary staffing level of six (6) corrections officers per floor on the day and evening shifts and three (3) corrections officers per floor on the night shift." This *temporary* level was to be maintained until the permanent staffing level was agreed upon.

In developing a permanent staffing level the Special Master was aware of the financial burden that the County would bear if this temporary staffing level continued to be required for all four housing floors of the jail. At the same time, he was concerned that a staffing contingent of less than six per floor might not meet the requirement of the Court's order and prevent excessive violence in the new jail. The experts' reports recommending a level of three correctional officers for the day and evening shifts and two for the night/breakfast shift were unpersuasive for the reasons discussed above. In particular, such a level would be totally inadequate for providing sufficient response capability in the event of an emergency. In addition, the Special Master remained unimpressed by the value of the closed circuit television monitoring system and accepted Dr. Benton's analysis that effective use of the system would require even more guards than would be needed to maintain security in the absence of CCTV.

Although the Special Master was persuaded by arguments for higher staffing levels made by Professor Mattick and by Dr. Benton, he sought a solution which would be less costly. Special attention was given to Professor Mattick's observation that the presence of effective counseling staff tends "to lessen the amount of anti-social behavior in the institution and thus makes the institution easier to supervise." In the absence of an effective counseling staff, a staffing projection of less than six correctional officers per floor would be inadequate; a combination of correctional officers and counselors, however, offers the promise of providing the surveillance and the personal staff/inmate contact necessary to reduce the level of violence in the institution to a minimum. Accordingly, the Special Master proposed a staffing level of four correctional officers and one counselor per floor for the day and evening shifts and three correctional officers per floor and one counselor for the entire facility for the night shift. This proposal was agreed to by the parties on May 12, 1977, and a stipulation requiring that staffing level was approved by the Court on May 19, 1977. The Sheriff had moved into the new Lucas County Correction Center on May 18, 1977.

When the stipulation was signed there were sufficient correctional officers on staff, but too few counselors to provide four correctional officers and a counselor on each housing floor during the day and evening shifts. In order to insure a staffing level of at least five persons on the housing that at the outset, the stipulation stated

> (P)ending the recruitment, hiring, training, and placing on duty of sufficient counselors . . . the defendant Sheriff may utilize correctional officers in place of counselors.

The stipulation required a combination of 20 counselors and correctional officers on duty during the day and evening shift and 13 during the night shift, assuming the housing floors were fully occupied. Because the sixth floor's south wing was unoccupied, the day and evening shift contingent was reduced temporarily to 19.

The Lucas County Correction Center's daily detail sheets received by the Special Master covering May 18 to June 9, 1977, reflect an average contingent of 18.36 correctional officers on the day shift, 17.57 correctional officers on the evening shift, and 13.25 personnel on the night shift. When combined with the records of counselors on duty for the same period, the total is

19.7 personnel on the day shift, 18.7 personnel on the evening shift, and 13.25 personnel on the night shift. Monitoring by the Special Master and his assistant during the day and evening shifts found an average of 18 correctional officers on duty on the housing floors. This confirms the data contained in the daily detail sheets. Thus the defendant Sheriff complied substantially with the terms of the stipulation to which he agreed.[51]

### FINDINGS RELATING TO COMPLIANCE

The importance of Paragraph 14 to compliance with numerous other provisions of the Court's order cannot be overstated. As the Court itself pointed out in its opinion of December 17, 1977,

> Nearly all of the difficulties which were established at the hearing are related in greater or less degree to the failure to comply with Paragraph 14 of the order.

Classification, programming, services, and sanitation—as well as individual safety of guards and inmates alike—depend upon adequate surveillance throughout the housing areas of the new jail.

It is the finding of the Special Master that the staffing level to which the parties stipulated and which the Court approved on May 19, 1977, constitutes a reasonable effort to provide the level of surveillance necessary to reduce violence in the jail to a minimum. Whether this number of guards and counselors will in fact be sufficient to accomplish this goal will be determined by actual events in the jail.

One thing, however, is clear. Unless both guards and counselors are carefully selected and thoroughly trained to cope with the stresses of their work, there is a high degree of likelihood that the pattern of violence and terror which characterized the former jail will become rooted in the new facility as well. As later portions of this report make clear, deficiencies exist at the present time both in the selection and in the training of staff.

In addition, effective classification and adequate programming will be necessary in order to permit effective surveillance of troublesome prisoners, to meet the reasonable needs of prisoners, and to reduce the element of boredom which otherwise will find its outlet in violence and destruction. Again, subsequent portions of this report indicate that much remains to be .done in both of these areas. Thus an adequate number of guards and counselors, while essential to the overall adequacy of surveillance, is but a part of the solution to the task of creating an institutional environment which is reasonably free of violence and danger.

In view of the failure of the defendant Sheriff to maintain staffing levels to which he agreed in connection with the former Lucas County Jail, the Special Master must stress that his finding of compliance with Paragraph 14 of the Court's order assumes that the staffing level agreed to will continue to be met in fact. Absenteeism must be controlled and officers who resign or are terminated must be replaced promptly. If necessary, staff members must be paid to work overtime or on their off-duty days in order to maintain the necessary contingent. Finally, supervisory personnel must be provided who will insure that correctional officers remain in the areas to which they are posted. Until this pattern is established in the daily routine of the institution, the Correction Administrator and the Director of Security themselves must make a constant effort to monitor staff posts throughout the jail and to discipline staff members, including supervisory personnel, who fail to discharge their responsibilities.

### ORDER OF MAY 8, 1974

THE COURT HAVING FOUND, WITH THE CONSENT OF ALL PARTIES,

---

**51.** In order to provide the staffing required by the May 19 order, the defendant Sheriff ordered that officers be recalled to work overtime or on their days off in the event of unexpected absences. From May 8 to June 18, 1977, the defendant Sheriff recalled officers 223 times, and these officers worked 1,467 hours of overtime.

THAT MODIFICATION OF THIS COURT'S ORDER OF JULY 30, 1971, IS NECESSARY TO PROVIDE SECURITY, SAFETY AND FREEDOM FROM PHYSICAL ABUSE FOR THE INMATES OF LUCAS COUNTY JAIL, THIS COURT'S ORDER IS MODIFIED IN THE FOLLOWING RESPECTS:

DEFENDANT CALLANAN SHALL, WITH ALL DELIBERATE SPEED, IMPLEMENT THE FOLLOWING PROCEDURE FOR REPORTING, RECORDING AND REDRESSING OFFENSES AGAINST INMATES OF THE LUCAS COUNTY JAIL:

(a) ALL INMATES SHALL BE ADVISED OF THEIR RIGHTS TO FILE GENERAL OFFENSE REPORTS, AND SHALL RECEIVE WHATEVER ASSISTANCE NECESSARY BY JAIL PERSONNEL TO COMPLETE SUCH REPORTS.

(b) DEFENDANT CALLANAN SHALL HAVE PRINTED A FORM TO BE APPROVED BY COUNSEL FOR THE PLAINTIFFS UPON WHICH ANY INMATE MAY DESIGNATE THE PERSON OR PERSONS COMMITTING THE OFFENSE AND FULLY DETAIL THE FACTS OF ANY OCCURRENCE. THIS FORM SHALL BE FREELY PROVIDED UPON THE REQUEST OF ANY INMATE.

(c) THE OFFENSE REPORT SHALL BE COMPLETED BY THE INMATE IN HIS OWN HANDWRITING IF HE IS CAPABLE, OR WITH THE HELP OF ANOTHER PERSON OF THE INMATE'S CHOOSING, IF HE IS NOT CAPABLE. WHERE THE COMPLAINT INVOLVES ALLEGATIONS OF PHYSICAL ABUSE AGAINST AN INMATE, HE SHALL UPON HIS REQUEST, BE SEGREGATED FROM THE OTHER INMATES INVOLVED IN THE INCIDENT FOR THE PURPOSE OF PREPARING THE OFFENSE REPORT.

(d) NO SIGNATURE OF ANY PERSON OTHER THAN THE INMATE SHALL BE REQUIRED TO MAKE AN OFFICIAL OFFENSE REPORT.

(e) THE FORMS UPON WHICH SUCH REPORT CAN BE MADE SHALL BE SO CONSTRUCTED AS TO ALLOW THE INMATE TO RETAIN ONE (1) COPY OF THE REPORT, AND UPON HIS REQUEST, HE SHALL BE PROVIDED WITH A STAMPED ENVELOPE FOR THE PURPOSE OF MAILING A COPY TO HIS ATTORNEY. ONE (1) COPY SHALL BE FILED WITH THE SHERIFF, AND ONE (1) WITH THE JAIL WARDEN.

(f) ANY INMATE FILING AN OFFENSE REPORT ALLEGING FACTS, WHICH IF TRUE, WOULD CONSTITUTE A CRIMINAL OFFENSE, SHALL BE ADVISED OF HIS RIGHT TO FILE CRIMINAL CHARGES AGAINST THE OFFENDING PARTY, AND UPON REQUEST, SHALL BE ESCORTED TO THE OFFICE OF THE PROSECUTING ATTORNEY AT THE EARLIEST POSSIBLE OPPORTUNITY, BUT IN ANY EVENT, NO LATER THAN 9:00 A.M. OF THE MORNING OF THE NEXT BUSINESS DAY. NEITHER DEFENDANT CALLANAN, NOR ANY OF HIS AGENTS, SHALL IN ANY WAY ATTEMPT TO DELAY OR DISCOURAGE THE FILING OF CHARGES WITH THE PROSECUTING ATTORNEY BY AN INMATE WHO FREELY DESIRES TO DO SO.

(g) ALL OFFENSE REPORTS SHALL BE PROMPTLY INVESTIGATED BY THE SHERIFF OR THE WARDEN. WHERE THE ALLEGATION INVOLVES A CLAIM OF PHYSICAL OR SEXUAL ABUSE, THE CLAIMANT SHALL BE EXAMINED BY THE DOCTOR OR

NURSE ON DUTY, AND WHERE THERE IS ANY REASONABLE EVIDENCE TO SUBSTANTIATE AN ALLEGATION OF SEXUAL ABUSE, THE INMATE SHALL IMMEDIATELY BE EXAMINED BY A DOCTOR, OR TRANSPORTED TO THE MEDICAL COLLEGE OF OHIO OR OTHER HOSPITAL FOR EXAMINATION.

(h) UPON FILING OF THE ORDER BASED ON THIS CONSENT DEGREE, THE FOREGOING PROVISIONS RELATING TO REPORTING OF OFFENSES BY INMATES (PARAGRAPH 3a–h) SHALL BE INCORPORATED INTO THE LUCAS COUNTY JAIL MANUAL; SHALL BE DISTRIBUTED TO EACH GUARD, DEPUTY, TURNKEY, MATRON, OR OTHER AGENT OR EMPLOYEE OF THE SHERIFF; AND SHALL BE DISTRIBUTED TO EACH INMATE CURRENTLY IN THE LUCAS COUNTY JAIL. EACH NEW INMATE SHALL ALSO RECEIVE A COPY OF, AND HAVE EXPLAINED TO HIM, THESE PROVISIONS.

On May 8, 1974, the Court modified its order of July 30, 1971, in two major respects. The first modification required specific posting of correctional officers on each floor of the former Lucas County Jail. This portion of the modification was rescinded by the Court in an order filed on February 9, 1976, restoring the original provision of Paragraph 14 of the order of July 30, 1971. The second modification contained in the order of May 8, 1974, was that quoted above.

As a result of this order, a form denominated "Inmate Offense Report" was developed for use by inmates in reporting offenses committed against them. A copy of this form is attached as Appendix C, page 175 *infra*. According to the classification officer, all inmates are advised of the purpose and the availability of this form during the classification interview. The form itself meets the requirements of subparagraphs (b), (d) and (e) of the modification. If the complaining inmate is not capable of filling out the form himself, he may seek the assistance of a fellow inmate. If requested, a counselor will provide this assistance. The complaining inmate is segregated from other inmates as required by subparagraph (c).

On the other hand, all reports both from inmates and from staff indicate that the inmate is not provided with a stamped envelope for the purpose of mailing a copy of the inmate offense report to his attorney. While the form itself indicates that one copy is to be received by the Sheriff and another by the Correction Administrator, on some occasions the latter fails to receive his copy. In at least one instance, the Special Master's assistant was shown an inmate's copy of an offense report which the Correction Administrator acknowledged subsequently he had never seen. On several other occasions, the Special Master has seen or received inmate copies of offense reports although copies of these reports were not forwarded to him by the Correction Administrator in spite of a standing request that all inmate offense reports be forwarded on a weekly basis. Needless to say, the Correction Administrator cannot investigate an inmate complaint if he fails to receive a copy of the inmate offense report.

The only means by which an inmate can obtain an inmate offense report is by contacting a counselor and requesting that the form be provided. As a result the Special Master has received numerous complaints from inmates concerning lengthy delays encountered in obtaining these forms. The attitude of the correctional staff may be summarized by the statement of the guard who informed the Special Master's assistant that he did not assist inmates in obtaining these forms because "I don't want to." The difficulty encountered by inmates in obtaining these forms may explain the statement of the Correction Administrator to the Spe-

cial Master that the former had received no more than five such forms since May 19, 1976, when he was appointed to his present position. Although the Special Master requested the Correction Administrator to forward all inmate offense reports *ever filed*, only seven such reports have been received.

An inmate who files a complaint alleging criminal action on the part of another inmate appears to have no difficulty in being taken to the prosecuting attorney to file criminal charges. Indeed, one incident which occurred on the date of the Special Master's appointment has already resulted in a jury trial. One inmate who wished to file criminal charges against a guard reported to the Special Master that his request to be taken to the City Prosecutor's office was denied by officials in the jail. Another inmate encountered substantial delay when he attempted to file criminal charges against a guard. This delay, however, resulted at least in part from the policy of the Municipal Prosecutor's office which refuses to entertain such complaints until the charges have been investigated by the Detective Bureau of the Sheriff's Department. The Detective Bureau in turn reports its findings to the Internal Affairs Department in the Sheriff's office. Internal Affairs then conducts its own investigation. Apparently, unless the in-house investigation results in a finding that the officer was guilty of the alleged conduct, the Municipal Prosecutor will not pursue the case.

Catch 22 is the investigation which is conducted by the Internal Affairs Department. If an inmate alleges physical assault by an officer, a report is made to the Detective Bureau. That Bureau investigates and forwards its findings to Internal Affairs which then conducts its own investigation. Following that investigation, the charges are heard by a Hearing Board consisting of a lieutenant and two command officers chosen by that lieutenant. The Hearing Board then makes its recommendation to the Sheriff who is responsible for discipline in the event of a finding that the charges are sustained. It appears, however, that there have been only six such investigations and *all of these have resulted in findings that the charges were not sustained.*

A few examples, culled from the files maintained by Internal Affairs demonstrate the nature of the process. In one instance the detective who made the investigation reported, "I think the officer overreacted. The subject should be found guilty as charged." Immediately below this statement, the Director of Internal Affairs wrote, "Leave your opinion out thank you!" One inmate's allegation charged that he was beaten by a group of officers on two occasions following an initial altercation with a guard. The officers who were charged were exonerated because the inmate's witness could not testify that he knew "who threw the first punch." In view of the fact that the two alleged beatings occurred some time after the initial fight, the question of who threw the first punch is of little if any relevance. In another instance, the inmate alleged that he was held by one officer and beaten by another. The file reflects that the officers were exonerated because all testified that the inmate complainant "was in fact the aggressor in this matter."

In another case, a correctional officer testified to hearing unmistakably a number of officers at a briefing session state that they intended to lure an inmate into the shower and beat him up that night. On the night in question an inmate was allegedly lured into the shower and beaten by three officers using heavy metal flashlights. A nurse reported that she saw the beating and positively identified the three officers. The Medical Director stated that the nurse asked to be allowed to help the inmate but was refused permission to do so. In a subsequent physical examination, the inmate was found to have visible bruises on his forehead and below his eye. Another officer who testified in the hearing stated that there were "thuds and vibrations" and that the nurse told the correctional officer, "I have seen too much." Yet another correctional officer testified that one of the accused officers stated that the sergeant did

not know that he and "three or four other officers were going in to jump an inmate."

On November 26, 1976, the Correction Administrator recommended that five correctional officers and one sergeant be suspended from duty pending a complete investigation of complaints which had been made against them. This recommendation was supported by the Director of Security who conducted the initial investigation in the jail. According to the Correction Administrator, his recommendation was not accepted and the subsequent investigation by Internal Affairs resulted in exoneration of the officers.

The picture which emerges from a reading of the records of the Internal Affairs Division is one of simple cover up. Whatever the state of guilt or innocence of the officers who were the subjects of these investigations, the reasons put forward for exoneration are entirely unpersuasive. That this investigation serves as the basis for the decision by the Municipal Prosecutor with respect to prosecution of criminal charges against correctional officers serves to frustrate the objectives of the Court's order.

Of the seven inmate offense reports submitted to the Special Master by the Correction Administrator, none was accompanied by any written record of investigation by any member of the jail staff. (The Special Master requested all such records.) Since Internal Affairs investigates only complaints alleging excessive or improper use of force, inmate offense reports relating to mail procedures and the absence of religious diets, for example, appear not to be investigated by anyone.

As the modification requires, when an inmate alleges physical or sexual assault, he is examined by whatever medical personnel are on duty in the jail at the time. In the case of alleged sexual assault, the inmate is sent to a hospital where a semen test is conducted.

Although the general nature of the inmate offense report may be described to inmates in the classification interview, the only reference to the procedure in written materials distributed to inmates is the following:

1. If and when an inmate feels he/she has been unjustly treated, that inmate has the right to file a grievance report.
2. The inmate should request from any staff member the Inmate Offense Report form.
3. The form indicates how it is to be filled out and to whom copies go.

A number of inmates have reported to the Special Master that they have not received copies of the materials in which this statement appears. In addition, the provisions of the Court's order relating to the reporting of offenses against inmates are not distributed to all employees of the Sheriff's Department.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in compliance with that portion of subparagraph (b) of the modification which requires the defendants to print a form for use by inmates in reporting offenses as well as with subparagraphs (c) and (d). Although the form indicates that a copy of the report shall be provided to the Correction Administrator, it is the finding of the Special Master that such reports are not forwarded to that person on a regular basis. The defendants are in further noncompliance with the requirement that a complaining inmate be provided with a stamped envelope for the purpose of mailing a copy of the offense report to his attorney.

The Special Master finds that inmate offense report forms are not freely provided to an inmate. In addition, the investigative processes described above fails to comply with the requirement of subparagraph (g) mandating prompt investigation. The process reflected by files developed by the Internal Affairs Department cannot be dignified by the term "investigation." In addition, reliance by the Municipal Prosecutor

upon the Internal Affairs investigation renders any report to the Prosecuting Attorney useless when such report involves an allegation against a correctional officer.

The Special Master finds that the defendants are in compliance with that portion of subparagraph (g) of the modification which requires prompt physical examination of any inmate claiming physical or sexual abuse. The defendants are in noncompliance, however, with all the provisions of subparagraph (h).

### PARAGRAPH 15

IMMEDIATELY REQUIRE ALL JAIL PERSONNEL TO COMMENCE THE NEW PROGRAMMED INSTRUCTION COURSE PREPARED BY THE UNITED STATES BUREAU OF PRISONS FOR JAIL OFFICERS AND JAIL ADMINISTRATORS. SUCCESSFUL COMPLETION OF THIS COURSE SHALL BE A REQUIREMENT FOR EMPLOYMENT OR CONTINUED EMPLOYMENT IN THE JAIL.

When the Special Master inquired about the practice of administering the required courses in programmed instruction to jail personnel, he was assured by the Correction Administrator that all correctional officers had completed successfully either the Jail Operations Course or the Jail Administration Course prepared by the United States Bureau of Prisons, and that records to this effect would be found in personnel files maintained by the Sheriff's Department. Unfortunately these files do not contain such records in a great many cases. In addition comprehensive records are not available from the Criminal Justice Training and Education Center which was established in 1973. In order to determine the state of the defendants' compliance with Paragraph 15, the Special Master obtained from the Sheriff's Department a list of all jail employees as of June 17, 1977, and submitted that list to the National Institute of Corrections which maintains records of participation in these courses commencing January, 1975. In addition, the Special Master utilized such records as were available in the Sheriff's Department and in the Criminal Justice Training and Education Center.

Of the 148 persons employed in the jail as of June 17, 1977, whose names were submitted to the National Institute of Corrections, records maintained by that agency, the Sheriff's Department, and the Criminal Justice Training and Education Center indicate that 118 have taken tests in connection with the Jail Administration Course or the Jail Operations Course. The following chart indicates the year of original employment and the position of 30 persons who have not taken either test according to all of the records obtained by the Special Master:

| Year of Original Employment | Number | Position |
| --- | --- | --- |
| 1977 | 1 | Administrative Assistant to Correction Administrator |
| 1977 | 1 | Director, Women Offender's Service Bureau |
| 1977 | 1 | Counselor |
| 1977 | 2 | Women Offender's Service Bureau staff |
| 1977 | 9 | Correctional Officer |
| 1976 | 1 | Correction Administrator |
| 1976 | 7 | Correctional Officer |
| 1975 | 1 | Counselor |
| 1975 | 2 | Correctional Officer |
| 1973 | 2 | Sergeant |
| 1973 | 3 | Correctional Officer |

While it is possible that some of these persons who were employed prior to 1975 may have completed one of the Bureau of Prisons courses of programmed instruction, the Special Master has been unable to locate any records substantiating successful completion in these cases.

According to the records of the National Institute of Corrections, three correctional officers and one sergeant presently employed in the jail failed the final examination given in connection with the Jail Operations Course. In addition, records maintained by the Criminal Justice Training and

Education Center indicate that another correctional officer, employed in March, 1976, failed the Jail Operations examination. That officer, too, continues to be employed in the jail.

### FINDINGS RELATING TO COMPLIANCE

█ It is the finding of the Special Master that the defendants are in noncompliance with Paragraph 15 of the Court's order in that they have failed to administer the Jail Operations Course or the Jail Administration Course to all jail personnel. For the purpose of this paragraph, the Special Master recommends that the term "all jail personnel" be interpreted to mean all correctional officers, supervisory correctional personnel, counselors, and others whose jobs bring them into relatively frequent contact with inmates. In addition, the defendants are in a state of noncompliance by continuing to employ five persons who failed to pass the examination given in connection with the Jail Operations Course.

### PARAGRAPH 16

WITHIN NINETY (90) DAYS FROM THE ENTRY OF THIS ORDER SUBMIT TO THIS COURT A COMPREHENSIVE PLAN FOR THE SELECTION AND IN-SERVICE TRAINING OF JAIL PERSONNEL, WHICH SHALL INCLUDE AS A MINIMUM, IN ADDITION TO THE TRAINING HEREINBEFORE REQUIRED, PSYCHOLOGICAL EXAMINATIONS DESIGNED TO DISCLOSE ANY GROSS PERSONALITY DEFECTS WHICH WOULD INTERFERE WITH PROPER FUNCTIONING AS A JAILOR, ARRANGEMENTS FOR TAKING ANY JOB-RELATED COURSES IN COMMUNITY INSTITUTIONS AT COUNTY EXPENSE, AND SMALL SALARY INCREASES UPON THE SUCCESSFUL COMPLETION OF OFF-DUTY TRAINING WHICH WILL SIGNIFICANTLY CONTRIBUTE TO THE EMPLOYEE'S ABILITY TO HANDLE PEOPLE AND IMPROVE HIS JOB PERFORMANCE.

SAID PLAN SHALL INCLUDE COST ESTIMATES FOR TUITION AND SALARY INCREASES.

The Special Master has been unable to locate any comprehensive plan for the selection and in-service training of jail personnel prepared by the defendants in response to this paragraph of the Court's order. What follows is a description of the selection process said to be utilized in choosing correctional officers for the jail. No written policies exist.

While positions funded by the federal government are advertised, correctional officer positions are not. Rather, through word of mouth and other means, persons wishing to be considered for these jobs file applications for employment with the Affirmative Action Officer employed by the Sheriff's Department. No acknowledgement is made of the receipt of the application, but it is placed on file. At the present time, according to the Affirmative Action Officer, some 300 to 400 applications for correctional officer positions are on file. At the time that the application is received it is not analyzed to determine whether or not the individual meets the basic threshold qualifications which consist of the following: (a) attainment of the age of 21; (b) a high school diploma; (c) verbal ability (as demonstrated by the application); and (d) relevant past work experience.

When openings for correctional officer positions occur, the Affirmative Action Officer selects a number of files on hand and submits them to the Chief Deputy in the Sheriff's Office whose responsibilities include all operations of the Sheriff's Department other than the jail itself. Some number of these files (usually about half, according to the Affirmative Action Officer) are selected by the Chief Deputy. At that point in the process, those persons who have been approved by the Chief Deputy are called by telephone by the Affirmative Action Officer to determine their availability. Persons who express an interest in being interviewed are sent a card stating the time and place of the interview.

The interview panel which the applicant meets consists of the Affirmative Action Officer, another individual who serves in the capacity of an administrative assistant to the Sheriff, and a third person whose responsibilities include supervision of the booking process, courtroom security, and external transportation of inmates. On some occasions the Chief Deputy sits on the interview panel. None of these persons has offices in the jail proper; rather, they are located in the area assigned to administrative personnel in the Sheriff's Department. The interview itself consumes some 15 to 20 minutes. Each member of the interview panel completes an evaluation form and these completed forms, together with the application itself, are forwarded to the Sheriff. The Sheriff himself makes the final selection and apparently interviews all applicants personally. The Sheriff then notifies the Chief of Administrative Services that a person is to be added to the payroll.

The most notable feature of this selection process is the complete lack of involvement on the part of the Correction Administrator who is the chief supervisory officer of the Correction Center. Neither he nor any of his staff have any input, direct or otherwise, in the hiring process.

At some point in the selection process, a check is made with the Toledo Bureau of Identification to determine whether the applicant has any local police record. The Ohio Bureau of Criminal Investigation is contacted to determine whether the applicant has any state criminal record. Finally, the Federal Bureau of Investigation is contacted to determine whether the applicant has any criminal record in that office. In the past, these record checks have been made just prior to the applicant's being hired by the Sheriff. With respect to the last class of correctional officers, however, the record check was made before the job interview was held.

Newly hired correctional officers do not submit to any health examination. Three references listed on the application itself are checked by telephone after the panel interview, but before the Sheriff actually hires the individual. The statements of these references generally are relayed to the Sheriff only if they are negative.

Before commencing training, the newly hired employee is supposed to undergo psychological testing. The first week of employment, at least in most cases, is consumed by a 40 hour training course which is more fully described below. The employee occupies probationary status for a period of 90 days, during which period the Sheriff may terminate employment. There are no routine procedures whereby the Correction Administrator evaluates and makes recommendations to the Sheriff during this probationary period; apparently, however, the Correction Administrator may on occasion recommend that an individual be dismissed during this probationary period. In the event that a person is so terminated, the Affirmative Action Officer will be informed and he maintains records of the termination for affirmative action purposes.

A program for pre-service training of all incoming correctional officers has been designed by the Criminal Justice Training and Education Center. A description of this program is attached as Appendix D, page 176 *infra*. The training program consists of 80 hours, of which 40 are devoted to individual study of the programmed materials constituting the United States Bureau of Prisons Jail Operations Course and 40 are devoted to classroom instruction dealing with the specific policies and procedures of the Lucas County Correction Center. The Criminal Justice Training and Education Center has moved recently to quarters in the new Correction Center where it will be located on a permanent basis.

Only occasional in-service training activities are available for correctional officers employed in the jail, and there is no evidence that large numbers of such officers attend these courses. For example, on April 20, 1977, the Criminal Justice Training and Education Center sponsored a workshop in crisis intervention training for institutional correctional personnel. According to the corrections component leader of the Center, only one correctional officer

from the jail attended. The training center is now in the process of planning six audio/visual tapes which can be utilized for in-service training in the jail itself.

All persons interviewed by the Special Master, including the Chief of Administrative Services of the Sheriff's Department, acknowledged that there is no procedure whereby a correctional officer can take job-related courses in community institutions at County expense. These persons also agreed that no salary increases are made available to persons successfully completing off-duty training of any kind.

Finally, the defendants did not begin to administer psychological examinations to incoming correctional officers until February, 1976, when a proposal prepared by Dr. Albert Palmer of The University of Toledo Department of Psychology was accepted by the Sheriff's Department. The psychological evaluation consists of the administration of the Minnesota Multiphasic Personality Inventory to single individuals or to small groups of persons followed by an interview conducted by Dr. Palmer as personnel are available. Twenty-two officers already employed at the time the program began were evaluated. Subsequently, 28 officers in a class of May, 1976, were evaluated as were 20 officers in a class of July, 1976. As to all of these 70 officers, Dr. Palmer reported that it was his opinion that the employee did not "have psychological problems that would interfere with his/her functioning as a corrections officer at the present time."

In addition to these 70 persons, 17 persons had been tested and interviewed as of May 18, 1977, but results had not been reported to the Sheriff. Eight officers had been tested but not interviewed and two had been interviewed but not tested. Of course, no results with respect to these ten persons have been reported to the Sheriff.

In a letter to the Special Master dated May 18, 1977, Dr. Palmer made the following observation about the testing program:

> To date no officer has been screened out for psychological problems. That finding does not mean that (1) none of the officers has problems, or (2) that they all will

make satisfactory corrections officers. What it does mean is that none of those screened demonstrated pathology which could be directly related to inability to function as a corrections officer.

It should be noted that Dr. Palmer does not make a recommendation that a person be hired or rejected. He simply reports his observations and conclusions with respect to the applicant's psychological make-up to the Sheriff to be considered by him in making his final decision. No persons employed since July, 1976, have been subjected to this psychological screening process although at least three new classes of officers have been hired since that time. Thus there are a number of correctional officers in the jail at the present time who have not been screened. Apparently it is the intention of the defendants to develop an in-house screening procedure making use of a clinical psychologist who will be employed in the Medical Services Department. At the moment, however, no such person is employed by the Sheriff's Department.

Since the summer of 1976, the Special Master has been working closely with psychologists employed by Personnel Decisions Research Institute, a psychological consulting firm located in Minneapolis, Minnesota. Personnel Decisions Research Institute has developed a psychological screening battery which is being employed at Marion Correctional Institution to identify applicants for correctional officer positions who exhibit

> emotional instability, inability to take effective action under stress, likelihood of inappropriate use of force, excessive authoritarian attitudes, or tendency to engage in unjustified differential treatment toward inmates based upon race or national origin, with the objective of assessing propensity for racism, sadism, or brutality and to assist in selecting candidates most likely to have a helpful, client-service orientation.

The objective of the battery employed at Marion, therefore, is considerably more specific than the mandate of Paragraph 16 which requires examination to disclose "any gross personality defects which would interfere with proper functioning as a jailor."

In the course of the development of the battery, however, Personnel Decisions Research Institute developed a *tentative* screening battery to disclose gross personality defects pending the final completion of the more sophisticated mechanism. This temporary screening battery consists of the Minnesota Multiphasic Personality Inventory, the Employee Aptitude Survey-Verbal Comprehension, the Differential Aptitude Test—Abstract Reasoning, and Gough's Adjective Checklist. The MMPI and Adjective Checklist are designed to measure the personality of applicants. The Employee Aptitude Survey-Verbal Comprehension and the Differential Aptitude Test—Abstract Reasoning are being utilized to measure intelligence to aid in interpreting the personality measures. This screening battery has resulted in the exclusion of six persons out of a total of 63 who have been evaluated. These persons were applicants for correctional officer positions at a medium security prison for men operated by Ohio's Department of Rehabilitation and Correction.

It is the understanding of the Special Master that the use of the Minnesota Multiphasic Personality Inventory combined with a clinical interview can be sufficient to disclose gross personality defects among persons tested. There may well be some point to including the Employee Aptitude Survey-Verbal Comprehension to gain some understanding of the intelligence of the applicant, since this is useful in interpreting the results of the Minnesota Multiphasic Personality Inventory. Thus while the approach taken by Dr. Palmer appears to be one which is recognized and approved by other psychologists, the Special Master must admit to some surprise that the screening procedure has not resulted in the exclusion of any job applicant. The failure of the psychological screening process to eliminate any prospective correctional officers is all the more a matter of concern to the Special Master in view of the statement to him by the Correction Administrator that the latter could identify a number of persons on the correctional officer staff who, in the opinion of the Correction Administrator, are not psychologically suited for such

employment. In conversations with the Special Master, Dr. Palmer has indicated that a more extensive screening mechanism can be developed to assess the personality of incoming correctional officers if such a screening program is necessary.

The process of selection of jail personnel other than correctional officers is considerably less well defined. For example, several counselor's positions have been filled by transferring existing correctional officers to those positions. Sometimes these positions are posted for bid; in at least one recent case, however, this does not appear to have been done. As best the Special Master can understand, such a transfer is controlled to a very large extent by the Correction Administrator. In one very recent case, however, a counselor was hired from outside the Sheriff's Department although that person had not been interviewed for the position by the Correction Administrator. In any event, the Affirmative Action Office which plays a substantial role in the selection of correctional officers appears to have little if any role in the selection of counselors. To the knowledge of the Special Master, no personnel other than correctional officers participate in the pre-service training program described above. Counselors have received in-service training on a weekly basis since October, 1976, from personnel employed by the Court Diagnostic and Training Center. Staff members from the Court Diagnostic and Treatment Center have indicated to the Special Master that they are less than satisfied by the in-service training which they have been able to provide to counselors. This dissatisfaction results primarily from the fact that the counselors are so overwhelmed and frustrated by the situation in which they find themselves as to make effective training very difficult. At least on some occasions, training sessions have accomplished little more than an opportunity for the counselors to ventilate these frustrations. The training which has been provided is supported by grant funds which will expire in October, 1977. No employees other than correctional officers receive psychological examinations.

FINDING RELATING TO COMPLIANCE

██ It is the finding of the Special Master that the defendants, having failed to submit a comprehensive plan for the selection and in-service training of jail personnel, are in noncompliance with Paragraph 16 of the Court's order. Present procedures for the selection of new correctional officers are inadequate to the extent that they exclude input from the Correction Administrator or any other person on his staff. With respect to counselors, it is the finding of the Special Master that there is no regular procedure for the selection of such persons and that such a procedure is necessary in order to attract highly qualified applicants.

The Special Master finds the defendants are in a state of noncompliance in their failure to administer psychological examinations to incoming correctional officers employed after July, 1976. Whether or not the psychological screening procedures which have been employed are adequate to accomplish the objectives of Paragraph 16 of the Court's order is a matter which must be considered carefully in developing a plan of compliance. The Special Master further finds that the defendants are in noncompliance by failing to administer such psychological examinations to counselors and other jail personnel who will have significant personal contact with inmates.

The Special Master finds that the defendants are in a state of noncompliance by their failure to provide significant in-service training to correctional officers. Arrangements must be made to continue in-service training of counselors and to expand this program if necessary as the size of the counseling staff increases. Finally, the Special Master finds that the defendants are in noncompliance with provisions of Paragraph 16 requiring that arrangements be made for employees to take job-related courses in community institutions at County expense and that small salary increases be made available to persons completing such off-duty training.

PARAGRAPH 17

WITHIN THIRTY (30) DAYS FROM THE ENTRY OF THIS ORDER SUBMIT PROPOSALS TO THIS COURT FOR CLASSIFICATION OF PRISONERS AND INMATE PROGRAMS INCLUDING AN ESTIMATE OF THE NUMBER AND KINDS OF ADDITIONAL QUALIFIED PERSONNEL REQUIRED TO DIRECT AND CARRY OUT SUCH PROGRAMS, ESTIMATES OF THE COSTS THEREOF, AND THE NECESSITY OF ADDITIONAL FUNDS BEYOND THE AMOUNT OF THE SHERIFF'S PRESENT BUDGET TO MEET SUCH COST. THE SAID PROPOSALS SHALL CONTAIN, AS A MINIMUM, THE FOLLOWING MATTERS:

(a) *CLASSIFICATION AND DIAGNOSTIC PROCEDURES FOR EACH PRISONER AT INTAKE.* SINCE THE RIGHTS OF THE TWO CLASSES OF PARTIES PLAINTIFF, PRISONERS AWAITING TRIAL AND PRISONERS SERVING SENTENCE, ARE IN LAW DIFFERENT, PROPOSALS MAY PROVIDE FOR A TOTAL AND COMPLETE SEPARATION OF THESE TWO CLASSES. HOWEVER, IN THE EVENT SUCH SEPARATION IS ESTABLISHED, THE SAME INTAKE AND DIAGNOSTIC PROCEDURES SHALL BE USED TO DETERMINE THE FOLLOWING INDIVIDUAL NEEDS:

1. CUSTODY
2. HOUSING IN DIFFERENT GROUPS
3. CRISIS INTERVENTION NEEDS
4. GROUP OR INDIVIDUAL COUNSELLING
5. EDUCATIONAL OR VOCATIONAL TRAINING NEEDS, OR BOTH
6. EMPLOYMENT NEEDS
7. RELIGIOUS NEEDS
8. FAMILY NEEDS

(b) *ESTABLISHMENT OF WORK OR STUDY RELEASE PROGRAMS, PARTICULARLY FOR PRISONERS SERVING SENTENCES.* NO

PLAN WILL BE APPROVED BY THIS COURT THAT DOES NOT PROVIDE FOR A PROGRAM OF THIS TYPE FOR PRISONERS SERVING SENTENCES.

(c) *ESTABLISHMENT OF GROUP AND INDIVIDUAL COUNSELLING PROGRAMS.*

(d) *ESTABLISHMENT OF BASIC AND REMEDIAL EDUCATIONAL PROGRAMS.*

(e) *ESTABLISHMENT OF A RECREATION PROGRAM,* INCLUDING ESPECIALLY OUTDOOR AND INDOOR EXERCISE PROGRAMS.

(f) *EXPANSION OF EXISTING RELIGIOUS PROGRAMS.*

(g) *ESTABLISHMENT OF A CONSTRUCTIVE WORK PROGRAM,* WHICH SHALL INCLUDE, FOR INMATES NOT PRESENTING SECURITY RISKS, MAINTENANCE AND OTHER INTERIOR WORK IN OR ABOUT OTHER COUNTY FACILITIES UNDER THE DIRECTION OF COUNTY EMPLOYEES OTHER THAN THE JAIL STAFF.

(h) *ESTABLISHMENT . OF VISITING PROGRAMS,* WHICH SHALL INCLUDE DAILY VISITING HOURS, BOTH IN THE DAYTIME AND IN THE EVENING, AND ESPECIALLY UPON HOLIDAYS AND WEEKENDS; THE PROVISION OF MUCH MORE ADEQUATE PHYSICAL FACILITIES FOR VISITATION; REMOVAL OF THE LIMITATION ON VISITS BY CHILDREN AND BY PERSONS NOT MEMBERS OF THE INMATE'S IMMEDIATE FAMILY; AND PROVISIONS FOR LIMITATION OR REMOVAL OF VISITING PRIVILEGES FOR DISCIPLINARY PURPOSES, OR FOR ABUSE OF VISITING PRIVILEGES.

*Classification and Diagnostic Procedures.* Classification and diagnostic procedures employed at the time of a prisoner's initial admission to the former Lucas County Jail were rudimentary at best. Apart from trusty status, which was available to a limited number of sentenced inmates, no effort could be made in the old jail to implement custody classification. The entire facility was maximum security. In addition, facilities were inadequate to permit effective housing classification. Of the nine inmate housing areas in that jail, one was utilized for female inmates, another for newly arrived unclassified prisoners, and a third for male trusties. Thus, only six cellblocks were available for general assignment for men. The most that could be accomplished was the separation of known enemies and co-defendants; even this, in the case of females, was impossible. One somewhat larger room on the second floor served as a juvenile holding area and two cells were located in the medical area on the third floor.

Any crisis intervention needs of incoming inmates were determined by observation by the classification officer during the interview which preceded the inmate's transfer to the general population. These observations could be supplemented by those of the medical staff at the time of the inmate's physical examination. There was little point in the old jail to determining an inmate's educational, vocational training, or employment needs in view of the inability of the institution to respond to any of these needs. Beyond informing the inmate of the services of the Jail Chaplaincy Committee, no special effort was made to determine particular religious needs which an inmate might have. In addition, whatever difficulties the inmate's family might be experiencing as a result of the prisoner's incarceration, there was no program operating in the jail to meet those needs.

Thus the classification system in the old jail can be described as being at best a crude sorting system, there being little that the institution could do to minister to the needs of individual inmates. The classification process was used almost exclusively to determine the inmate's housing assignment and because of the extremely overcrowded conditions existing in cellblocks holding male inmates and the availability of only a single cellblock to house female inmates,

even the effort to make rational housing assignments often was frustrated.

While physical conditions in the old jail created enormous difficulties which impeded the development of adequate programming, the construction of the new Correction Center makes it possible to establish the programs enumerated in Paragraph 17. These programs in turn require the development of a much more sophisticated system of classification and intake diagnosis. Thus the implementation of those provisions of the Court's order which relate to programming creates the need for the kind of classification procedure outlined in subparagraph 17(a). Current practices in the new facility, however, fall far short of the goals outlined in that portion of the Court's order.

When a prisoner first enters the new jail, he is taken to the booking desk on the first floor of the facility. After he has been booked, he is placed in a small holding cell on that floor or, in some cases, in a 15 person holding area. The goal of the Center's administration is to limit the length of an inmate's incarceration in the holding area to no more than 12 hours, although this limit has already been exceeded in a number of cases. During the time that an inmate is in the holding area, he may be interviewed by a Pre-Trial Release Program interviewer, and the Center projects the hiring of an intake counselor who will be present in the holding area. (As of the date of this report, this position has not been filled.) Unless the inmate is released from jail while he is in the holding area, he will be transferred to a classification cell on the second floor of the facility. Female inmates are taken directly to special cells on the third floor after booking. Female classification as well as housing cells are located on that floor. The goal which the institution has set for itself is a maximum period of 24 hours in classification. During this time, the inmate receives a physical examination and is interviewed by the classification officer. Only one classification officer is employed for this purpose. During the course of the classification interview, the classification officer completes classification forms 08C1 and 08C1–A, which are attached as Appendix E, pages 186–188 *infra*. Information will be obtained from the inmate himself and from any prior records if he has been incarcerated in the Lucas County Jail at another time. At the end of the interview, the classification officer assigns the inmate to a particular housing area and this and other information are recorded on what is known as a Continuity Sheet.

Of the four housing floors in the new facility, the sixth floor has been designated as "maximum security." As far as the Special Master can determine, however, the only difference between the sixth floor and the other housing floors is that all cells on the sixth floor are interior cells without windows. The "maximum security" cells are somewhat smaller than others in the building, as are the adjoining dayrooms. These features, however, have nothing whatsoever to do with custody classification. Because no entering inmate is permitted to assume trusty status, the open dormitory area on the fifth floor which has been assigned to trusties is not available to new prisoners. Thus, while persons entering the jail may indeed have differing custody needs, there is little realistic ability to meet those needs. In the opinion of the Special Master, as well as a number of outside experts who have viewed the new facility, the entire Lucas County Correction Center (apart from the Work Release and trusty dormitories) is a maximum security institution. All that can be said about the sixth floor is that it is more unpleasant than the other housing floors. Thus the court's mandate for custody classification has not been implemented.

On the other hand, the new facility does provide a maximum degree of flexibility with respect to housing inmates in different maximum security groups. Twenty-seven separate housing areas are available in addition to the trusty dormitory on the fifth floor and the Work Release dormitories on the second floor. This flexibility may explain why the entire focus of the current classification procedure is upon the determination of the housing module to which the

inmate will be assigned. According to the *Policies and Procedures Manual* the following classification designations have been assigned to the various housing modules throughout the jail:

3rd Floor

| Modular number | Type of Inmate |
|---|---|
| # 3088 S.E. | Adult Females: Unsentenced & Sentenced |
| # 3099 S.W. | Adult Females: Pre-Trial |
| # 3003 W. | Juvenile Females |
| # 3003 E. | Juvenile Males |
| # 3036 N.E. | Adult Males: First Offender, Pre-Trial, Non-Security risk |
| # 3025 N.W. | Adult Males: First Offender, Post-Trial, Non-Security risk |

4th Floor

| | |
|---|---|
| N.W. N.E. | Adult Males: Pre-Trial |
| S.W. S.E. | Adult Males: Non-Security risk |

5th Floor

| | |
|---|---|
| N.W. N.E. | Adult Males: Pre-Trial |
| S.W. S.E. | Adult Males: Non-Security risk |
| West East | Adult Males: Sentenced to Lucas County Correction Center, Non-security risk |

6th Floor

| | |
|---|---|
| # 6037 | Adult Males: Pre-Trial, Security risk |
| # 6018 | Adult Males: Sentenced, Unsentenced Security risk |
| # 6054 | Adult Males: Post trial security risk |
| # 6031 | Adult Males: 1st offense, Pre-trial, Security risk |
| # 6112 | Adult Males: 1st offense, Post-trial, security risk |
| # 6095 | Adult Males: Post-trial security risk |
| # 6131 | Disciplinary Isolation |
| # 6118 | Administrative Segregation |
| # 6073 | Adult Males: Sentenced to Lucas County Correction Center, Non-security risk |
| # 6003 | Adult Males: Sentenced to Lucas County Correction Center, Non-security risk |

The housing classification decision is based upon the pre-trial or sentenced status of the inmate as well as his sex, offense, age, mental condition, and physical condition as determined by the classification officer in the course of the classification interview. The latter does not have the benefit of the results of the inmate's intake medical examination at the time of this interview. Policies and procedures with respect to inmate privileges and surveillance are the same in all housing areas, regardless of the degree of "security risk" of inmates housed therein.

The classification procedures do not include an interview by a clinical psychologist to identify crisis intervention needs or to mesh the counseling needs of the prisoner with available resources. There is no reference to educational testing to determine whether or not the inmate will benefit from participation in an educational program. There is no emphasis upon determining the inmate's employment needs apart from information which is obtained in order to determine custody and housing status within the institution, and there is no suggestion of any assistance which might be forthcoming to enable the inmate to keep his job if he is already employed or, in the event that he is unemployed, to find a job upon his release. If the inmate has particular religious needs, the procedures do not call for any inquiry to determine the nature of those needs. Likewise, the classification procedure does not provide any linkage between the prisoner and outside persons or agencies who might be of assistance to him or his family.

During the course of his classification interview, the inmate is given a document entitled, "Rules and Regulations for Inmates" which describes the recreation, visiting, and medical policies but contains no information about counseling, religious, educational or other programming within the jail. If he is determined by the classification officer to be indigent, the inmate will be given a bag containing soap, deodorant, a toothbrush, and toothpaste. The Special Master assumed the role of an inmate in an interview with the classification officer, but learned little about the availability of pro-

gram activities other than the fact that counselors "are available" and that interfaith services are held on a weekly basis.

The process described above applies both to male and female prisoners. In the case of female inmates, however, these rudimentary classification and intake diagnostic procedures will be supplemented by the services provided by the newly formed Women's Offender Service Bureau. At the time of her intake, every female prisoner will be given a copy of a brochure explaining the range of services available through WOSB. Immediate support services including crisis intervention, emergency medical aid, and counseling will be provided to women detained for less than 12 hours and requesting or demonstrating a need for emergency service. When such inmates request or demonstrate a need for service and assistance, the WOSB will conduct a need inventory in order to determine the nature of the services which would be helpful to her. Following the development of this inventory, efforts will be made by WOSB staff to make referrals to community agencies such as Concentrated Employment Services, Day After Care, the Toledo Board of Education Adult Basic Education Program, and the Lucas County Drug Abuse Program. For female inmates incarcerated for more than 12 hours, WOSB will offer a one-to-one women's volunteer program. Trained volunteers will attempt to foster a supportive environment for the prisoner through personal contact, assist the inmate's family, especially her children, in adjusting to the difficulties created by the inmate's incarceration, and provide transportation for the inmate's family during visitation periods and at the time of other critical events. WOSB will attempt to create linkages between these inmates and community agencies which may be able to offer some assistance. In particular, WOSB will aid the female prisoner in increasing her employability and in obtaining further education. Finally, through individual and group counseling, efforts will be made to assist her in developing "responsible and more appropriate living skills." Following the female inmate's release from the jail, WOSB will attempt to assist her in making a marital readjustment and in dealing with other problems likely to be encountered upon re-entry into society. In particular, by identifying the individual needs of these women and providing contact between them and persons or agencies in the jail or otherwise which can be of assistance to her or her family, WOSB is providing classification and diagnostic procedures mandated by subparagraph 17(a) of the Court's order. The sad reality is that these procedures will be available to only a small fraction of the prisoners incarcerated in the Lucas County Correction Center. Between August 21, 1976 and February 21, 1977, 1,812 persons were booked into the Lucas County Jail; of these, only 155 (8.5%) were females.[52]

*Work or Study Release Programs.* In 1972 the Law Enforcement Assistance Administration awarded a grant to the Lucas County Sheriff's Department to implement a Work Release Program in the Toledo-Lucas County area. The grant was transferred to the control of the Court of Common Pleas in 1973 "when the Sheriff's Department was unable to implement the program."[53] In September, 1973, the present program director was hired. In December of that year, the Work Release Program began to occupy facilities provided by the Salvation Army in the Men's Social Center in Toledo. The first fourteen residents were transferred from the Lucas County Jail to the Work Release Center on January 29, 1974, and by May, 1974, there were fifty residents.[54] In May, 1975, the program moved to the Volunteers of America complex where housing space and food service were provided. Because prisoners sentenced by both Common Pleas and Munici-

---

**52.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Evaluation of the Lucas County Correction Center,* (unpaginated Appendix, Statistical Information 1977).

**53.** Toledo-Lucas County Work Release Program, *1976 Annual Report* at 1.1 (1976).

**54.** *Id.* at 1.1–1.2.

pal Court judges utilize the facility on an equal basis, expenses are shared by the City of Toledo and the Lucas County Court of Common Pleas. With the opening of the new Lucas County Correction Center, the Work Release Program—to the dismay of some—moved from the Volunteers of America complex to open dormitory quarters on the second floor of the new jail. These facilities include a dormitory for men, a dormitory for women, a multipurpose/dining room, a small service kitchen, and staff offices. Until the move to the new facility, the Work Release Program did not admit female offenders. Juveniles have been and will continue to be accepted into the Program only upon their certification as adults.

A screening procedure supervised by Work Release Program staff is available to sentencing judges. This process is utilized more by Common Pleas court judges than it is by Municipal Court judges.[55] The following factors are considered in the screening process:

1. Degree of threat to the community
2. Probability of recidivism
3. Likelihood to be a threat to property
4. Employability
5. Minimum and maximum term of sentence (60 days to one year)

The Work Release Program staff consists of a director, three counselors, six correctional officers, a secretary/bookkeeper, a volunteer coordinator, and a resource specialist. Work Release facilities in the new jail are completely separate from other areas and are under the direct control and supervision of the Work Release Program staff. The new facility provides space for approximately 70 males and 12 to 14 females. Residents participating in the Work Release Program are charged $5.00 per day, and the average man/day cost in 1976 was $10.76.[56] During that year, 225 different men participated in the program for a total of 15,299 man/days. The facility utilization over the course of the 1976 year was 84%.[57]

The man/day cost cited above may be compared to the equivalent figure with respect to inmates incarcerated in the former Lucas County Jail. According to the Chief of Administrative Services of the Sheriff's Department, direct jail expenditures in 1976 were $1,293,000. The average daily population for 1976 was 159 according to a 1976 summary prepared by jail officials. If 159 is multiplied by 366 (1976 having been a leap year), the total man/days served in 1976 was 58,194. When the year's jail expenses are divided by the total man/days served, the daily cost of incarcerating an inmate in the Lucas County Jail in 1976 is shown to have been $22.22.

During 1976, 6% of the residents participating in the Work Release Program were reported absent without leave and an additional 13% were terminated for cause (e. g. drug abuse). In the three years that he has been associated with the Program, the present director can recall only five or six instances in which Work Release participants have committed a crime while participating in the Work Release Program.

Although the Work Release Program will accept a resident on a combination work and study program, study release alone is a second priority according to the program director.

*Group and Individual Counseling Program.* At the time of the appointment of the Special Master, three line counselors were employed in the former Lucas County Jail. Neither this level of staff nor the nature of available facilities was sufficient to permit the establishment of effective group or individual counseling programs. Operating out of a single cramped office on the second floor of the old jail, these counselors provided crisis intervention counseling to the entire inmate population. In addition to the obvious need to counsel sui-

55. Toledo/Lucas County Work Release Program, *1976 Annual Report* at 5.1 (1976).

56. *Id.* at 10.1.

57. *Id.* at 4.1.

cidal inmates, counselors dealt with conflicts between inmates and their families as well as those between prisoners and security personnel. Drug withdrawal, drug overdose, alcoholism, mental and physical impairment, and pregnancy were among the other personal difficulties attempted to be dealt with by these counselors.

In addition to these crisis intervention and individual counseling duties, counselors in the old jail received inmate request slips from inmates seeking a wide range of services. These inmate request slips related to inquiries concerning personal property, the need to make emergency telephone calls, the need to contact attorneys, information concerning court dates and release dates, commissary inquiries, bond and visiting information, and the need for special religious diets. In January, 1977, according to a document prepared by the then Director of Inmate Services, the average number of such inmate request slips processed by each full-time counselor was 100.

In addition, counselors in the old facility were responsible for the signing in of visitors, the supervision of visitors' personal property, and notification of security personnel to transport an inmate to the visiting area. Counselors also served on the disciplinary board in connection with hearings concerning alleged violations of jail rules by inmates. Although secretarial assistance was limited to the part-time services of the Correction Administrator's secretary, the counseling department was responsible for complete documentation of numerous inmate activities. Finally, additional work hours were consumed by staff meetings and in-service training sessions at the Court Diagnostic and Treatment Center.

In the opinion of the Special Master, these three overworked persons would not agree with the opinion expressed by Mr. Wayne Patterson in his report to the Toledo-Lucas County Criminal Justice Regional Planning Unit: "In most cases, probably as high as 70% of the prisoners held for trial, they do not need and do not want extensive counseling after the original crisis created by arrest and detention has passed." Whether or not Mr. Patterson is correct in his assertion, it is clear that the range of duties assigned to counselors in the old jail made it impossible for a truly effective individual or group counseling program to exist.

The counseling staff in the new jail will be increased very substantially as a result of the stipulation agreed to by the parties and approved by the Court on May 19, 1977. One floor counselor will be present on each of the housing floors of the facility during the first and second shifts of each day. One counselor will be in the jail during the third shift. In order to provide these nine persons seven days a week, a total staff of 16 floor counselors will be necessary. In addition, projections prepared by the Toledo-Lucas County Criminal Justice Regional Planning Unit and approved by the defendants call for the hiring of one counselor to deal with visitors and visiting problems and one intake counselor to serve inmates in the holding area of the first floor of the jail. Floor counselors will be supervised by a full-time casework supervisor and will be assisted by a full-time secretary assigned to the Inmate Services Department. In addition, the projections call for the employment of a full-time clinical psychologist. This staff of 20 professionals should be sufficient to permit the establishment of group and individual counseling programs of outstanding quality.

Numbers of counselors, however, do not provide the entire solution to the problem. Unless highly qualified persons are hired, trained, and retained in these positions and their functions are adequately and clearly delineated, the projected program will fail to realize its full potential. Indeed, the presence of large numbers of ill-qualified and poorly trained counselors would be counterproductive. Because of the nature of the employee selection procedures described above, the Special Master has expressed his concern to the Sheriff and to the Correction Administrator that steps be taken to assure the employment of highly qualified individuals.

For this purpose, the Special Master, the Correction Administrator, and representatives from the Court Diagnostic and Treatment Center held several meetings. As the result of these meetings, the Court Diagnostic and Treatment Center indicated its willingness to assist the Correction Administrator in developing an adequate job description for counselors in the Center and to assist in the screening of applicants and training of those selected to serve. In view of the limited clinical background likely to be present in applicants for these positions, the Court Diagnostic and Treatment Center training program would emphasize the development of clinical skills. In addition, Court Diagnostic and Treatment Center staff would provide ten hours of clinical supervision per week during the initial period of the counselor's employment in the jail. The total cost of these services is estimated to be $5,911 for a total of 445 hours of staff time provided by the Court Diagnostic and Treatment Center.

In addition, the Court Diagnostic and Treatment Center has offered to provide a clinical psychologist from its staff to fill the position of clinical psychologist projected for the new jail. Actually, two clinical psychologists on CDTC's staff would provide this service on a shared basis. This offer of assistance, however, assumes the willingness of the jail's administration to create a position for a clinical casework director, which position would be filled by CDTC supervisory staff on a rotating basis. These persons would be responsible for providing clinical supervision to counselors dealing with inmates requiring group and individual counseling therapy. The overall administration of the counseling program and its relationship to other areas in the institution, however, would remain with a full-time employee of the Correction Center. This arrangement provides the best possible solution to the need to provide clinical supervision of counselors who will be engaged in clinical activity, a field in which they are not likely to possess extremely strong credentials. In addition, the involvement of the Court Diagnostic and Treatment Center would be likely to produce the availability of consultation by a qualified psychiatrist, thus obviating some of the difficulties posed by the need to develop a plan of compliance with respect to subparagraph 21(e) of the Court's order.

As of the time of the writing of this report, the Sheriff and the Correction Administrator are considering the proposal submitted by the Court Diagnostic and Treatment Center. Although the Special Master has expressed his opinion repeatedly that the assistance of CDTC staff in selecting, training, and providing clinical supervision for the counseling staff is highly desirable, he has received no assurance that the Correction Center will accept—or at least be willing to pay for—that assistance. It is the Special Master's belief that the proposal developed by the Court Diagnostic and Treatment Center offers the best hope for developing a counseling program of outstanding quality and for obtaining the professional services which are necessary in order to provide clinical counseling and psychiatric services to mentally disturbed inmates.

Finally, in addition to the regular counseling services which will be available in the new jail, female offenders will have the benefit of participation in counseling programs sponsored by the Women's Offender Service Bureau. As indicated above, WOSB plans to offer a full range of individual and group counseling services to female offenders in the jail. These counseling services will be in addition to those available through the regular jail counseling staff.

*Basic and Remedial Educational Programs.* According to information received from the Adult Education Division of the Toledo Public Schools, the following educational programs were conducted in the old Lucas County Jail under the auspices of the Toledo Board of Education:

| Year | Nature of Program | Number of Students Enrolled |
|---|---|---|
| 1971/72 | Adult Basic Education Class | 20 |
| 1972/73 | Adult Basic Education Class | 14 |
| | General Educational Development Class | 11 |
| 1973/74 | 2 Adult Basic Education Classes | 40 |
| 1974/75 | 2 Adult Basic Education Classes | 30 |
| | 2 Food Service Classes | 10 * |
| | 2 General Educational Development Classes | 60 |
| 1975/76 | 2 Adult Basic Education Classes | 40 |

* 5 students received certificates of completion.

Adult Basic Education consists of remedial reading, writing, and mathematics instruction, while General Educational Development consists of instruction which prepares the student to take a high school equivalency examination, successful completion of which results in the issuance of a G.E.D. certificate, the equivalent of a high school diploma. According to the supervisor of the Adult Education Center, "the academic classes generated almost no measurable progress because of the short time each student had access to the classes." No educational program of any kind has existed in the jail during the 1976/77 and 1977/78 school years.

In contemplation of the opening of the new Correction Center, the Sheriff's Department obtained a grant in the amount of slightly more than $11,000 to develop an education program in the new jail. As originally designed the Center contained two classrooms on the second floor and two classrooms on the fifth floor. Those on the second floor have been converted to office space for staff directing the Work Release Program; those on the fifth floor have been converted to an open dormitory for trusties.

The Toledo Board of Education has proposed to sponsor Adult Basic Education, G.E.D., and vocational classes in the new facility. Vocational classes which are projected include instruction in food services and in building maintenance. A proposed budget of $18,624 will permit two Adult Basic Education and two G.E.D. classes to be offered simultaneously along with two vocational educational programs. Apparently, funds are available through the Board of Education to supplement grant funds allocated to the Sheriff's Department to put this program into effect. Funding has not been agreed upon for subsequent school years.

Representatives from the Toledo Board of Education signed an agreement on March 8, 1977, to provide services commencing on March 14, 1977 and concluding on June 24, 1977. Because of the delay encountered in moving into the new Correction Center, this agreement was never signed by representatives from the Sheriff's Department. The educational services which are now being proposed by the Toledo Board of Education are projected to commence on September 12, 1977 and to end on May 19, 1978, for a total of 30 weeks of instruction. This program could serve a total of 75 to 100 inmates, male and female.

In the opinion of the representatives from the Toledo Board of Education the success of the education program in the jail will depend upon careful and accurate screening of inmates wishing to enter the program. Although no minimum requirements exist for participation in Adult Basic Education classes, an intake diagnostic test must be conducted on individuals seeking to pursue the G.E.D. program. At a minimum, such persons must score at the 7½ to 8½ grade level in English usage and at the 4th to 5th grade level in mathematics.[58] In

58. In this connection one statement in the institution's *Policies and Procedures Manual* raises some concern in the mind of the Special Master:

> The teaching staff shall not excuse an inmate because of illiteracy until it can be proven that he cannot reach this level. (sic)

This appears to be an intrusion into the area of expertise of the education staff, and it is the opinion of the Special Master that educational qualifications for admission into an educational program should remain within the sole province of the supervisors of that program.

addition, at least ten weeks of in-jail instruction are regarded as necessary to make the Adult Basic Education experience meaningful. A minimum of eight weeks and preferably ten to fifteen weeks of in-jail instruction should be required in the case of G.E.D. students. The food service vocational program would require ten weeks of in-jail instruction and the building maintenance vocational program would require five weeks. Thus, three food service classes and six building maintenance classes could be held in a period of 30 weeks. The successful operation of these educational programs is also related to enrollment levels. Enrollment in G.E.D. classes should be somewhere between ten and fifteen; in Adult Basic Education classes, ten students constitute the maximum.

In the statement of policies and procedures respecting planning and implementation of an education program prepared by the Correction Administrator, the statement is made that "the teaching staff will utilize the multipurpose rooms on each floor as classrooms," and that "there will be no mixing of floors when scheduling classes." Here again the configuration of the new structure and the difficulties posed by inmate movement constitute substantial obstacles to the development of adequate programming. Present classification and reclassification procedures do not contemplate placing inmates enrolled in education programs in specific housing areas. The requirement that there be no mixing of floors when scheduling classes may very well make it impossible to obtain the necessary number of students needed to make a particular program viable. In addition, such a policy will require unnecessary duplication. By housing inmates who are admitted to educational programs together—at least on the same floor—the effectiveness of the program can be enhanced. *This kind of arrangement is a primary function of the classification system.*

Use of the multipurpose rooms, if they are properly furnished and reasonably available, is probably feasible. The allocation of these rooms to the educational program, however, makes it all the more likely that they cannot be used on any kind of regular basis for attorney/client visits. In addition, it will be necessary to allocate at least one office to the education program so that the records and materials do not have to be carried to and from the jail. Intake and classification procedures must be modified in order to inform incoming prisoners of the range of educational programs available and to identify those who may benefit from participation therein. In order to make the education program effective, arrangements must be made for the prompt transportation of inmate/students to and from their classes. This constituted a major stumbling block in the old jail and played a large role in the eventual discontinuance of educational activities in that facility.

Finally, the Special Master must express his concern about the effect of continuing the present policy that male and female inmates cannot be mixed in educational classes. Arrangement of seating in the multipurpose rooms together with other reasonable security arrangements should overcome any problems which such mixing might create. Insistence upon separate educational classes for male and female inmates will further dilute the effectiveness of the program and result in additional unnecessary duplication of offerings. At a minimum, a modest degree of experimentation in holding coeducational classes would seem to be warranted.

*Recreation.* The practice in the former Lucas County Jail was to offer each inmate three hours of recreation per week. Some of this activity occurred in a small recreation room in the basement of the jail, furnished with weights and other limited equipment. Weather permitting, outdoor recreation was held in the small recreation yard which provided facilities for basketball. Other recreational activities included the presence of a television set in each housing area in the old jail. Television sets

were turned off at 11:45 p. m. except on occasional late nights when the set was permitted to remain on until 2:30 a. m. Radio broadcasts were offered seven days per week until 1:30 a. m. Card playing and other sedentary games such as checkers were permitted in the housing areas and apparently some limited amount of game material was available for distribution.

The regular recreation schedule for the new Correction Center is the following:

RECREATION SCHEDULE

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 9:00 to 9:50 | 3SE | 6NNE 6NNW | 4E 4W | 6SNW 6SNE | 4NW 4NE | 5NE 5NW |
| 10:00 to 10:50 | 3SW | 6NSE 6NSW | 4SE 4SW | 6SSW 6SSE | 5SE 5SW | 3NE 3NW |
| | LUNCH | LUNCH | LUNCH | LUNCH | LUNCH | LUNCH |
| 12:30 to 1:20 | 5NE 5NW | 6SNE 6SNW | 5SE 5SW | 6E 6W | 3E 3W | 5W |
| 1:30 to 2:20 | 3NE 3NW | 6SSE 6SSW | 4NE 4NW | 6NSW 6NSE | 4SW 4SE | 3SW |
| 2:30 to 3:20 | 5W | 6E 6W | 3E 3W | 6NNW 6NNE | 4E 4W | 3SE |

Under this schedule, an inmate's recreation is reduced to two hours per week. Perhaps as much as anything else, this reduction in recreation privileges evidences the programming limitations which result from the architectural design of the new jail. Two hours of recreation per week fall far short of standards proposed by correction experts themselves. For example, standards which have been proposed by the Nebraska State Bar Association Committee on Correctional Law and Practice require that

Each inmate over the age of 16 shall be permitted at least one hour of physical exercise and recreation each day. When weather allows, such recreation and exercise shall be permitted out of doors.[59]

In addition, the *Standard Minimum Rules for the Treatment of Prisoners* promulgated by the 4th United Nations Congress on Prevention of Crime and the Treatment of Offenders provide that

Every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits.[60]

The American Correctional Association has described the value of recreation programming in the following terms:

Recreation has become recognized not only because of its important part in alleviating the dull monotony of prison life and acting as a safety valve for the release of pent-up energies which might otherwise lead to disturbance, but because it can be directed toward helping inmates face and solve some of their personal problems.[61]

Although a number of inmates have complained to the Special Master that recreation is not being made available in the new jail, perusal by the Special Master of logs maintained by floor officers in modules 4NW, 3NE, 5NE, and 6N indicates that the

**59.** Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Standards* at 10–8 n. 7 (1977).

**60.** *Compendium of Model Correction Legislation Standards* 4–10 (U.S. Dept. of Justice Law Enforcement Assistance Administration 2nd ed. 1975).

**61.** American Correctional Association, *Manual of Correction Standards* 519 (1966).

**150**

recreation officer is, by and large, maintaining the schedule of two hours of recreation per week. Although an occasional day is missed, it would appear that reasonable efforts are being made to adhere to the schedule.

Television reception is remarkably worse in the new jail than it was in the old facility. Channel selection is controlled by the correctional officer responsible for the housing area and the sound emanating from the sets is almost unintelligible. No "late nights" are permitted.

Although outdoor recreation space is projected upon the completion of the demolition of the former jail, this space will be substantially curtailed as a result of the decision to leave the former Sheriff's residence standing. Although each housing floor in the new jail contains two open exercise decks measuring 15 feet by 14 feet, these decks cannot be utilized because no secure perimeter screen has been installed. The Special Master raised this matter with the defendants at a meeting on April 7, 1977, and shortly thereafter counsel for the defendant County Commissioners assured the Special Master that secure perimeter screening would be installed. As of June 18, 1977, however, no action had been taken to accomplish this objective.

Even when these areas are made secure, visual surveillance of inmates in the exercise deck area will be impossible unless a correctional officer is placed inside the module adjoining the deck. Because of an unwillingness to do this, the defendant Sheriff has stated that the exercise decks will not be utilized. He has asserted that these areas were never intended for outdoor recreation, but no one has been able to explain to the Special Master what other purpose they were intended to serve. The use of these decks on a regular basis will enhance the possibility that adequate outdoor recreation will be provided and the failure to use them will constitute but another admission that the new structure contains wasted and unusable space.

*Religious Programs.* In 1971 the Lucas County Jail Chaplaincy Committee organized and began to operate in the Lucas County Jail. The establishment of this committee resulted from the cooperative efforts of the Toledo Catholic Diocese, the Toledo Area Council of Churches, and the Sheriff's Department. Membership on the Jail Chaplaincy Committee is determined by a vote of those members of the Committee serving at the time that an application for membership is made. Although membership is not limited to clergymen serving congregations which are affiliated with the Toledo Catholic Diocese or the Toledo Area Council of Churches, it is restricted to clergymen whose faiths are based upon acceptance of the concept of Trinitarianism. The result of this limitation is that Muslim religious leaders, Rabbis, and clergymen representing such sects as the Jehovah's Witnesses and Unitarians are not eligible for membership.

In the old jail the responsibilities of the Jail Chaplaincy Committee included the holding of regular Sunday services of approximately 45 to 50 minutes in length. These services were limited to groups of 12 inmates, and separate services were held for men and women. Members of the Jail Chaplaincy Committee presided on a rotating basis. In addition, members of the Committee visited inmates who were hospitalized, provided individual counseling services, served on the institution's disciplinary board, passed out Bibles and other religious materials, made contact with inmates' families when it was necessary to do so, conducted Bible study courses, and held special religious services on some occasions.

Members of the Jail Chaplaincy Committee received special privileges to visit with individual inmates at times other than those reserved for regular visitation and were provided (at least intermittently) with special identification by the Sheriff's Department in order to facilitate cooperation by jail staff.

A very significant responsibility of the Jail Chaplaincy Committee was that of providing the Sheriff with information certifying the *bona fides* of clergymen other than those serving on the Jail Chaplaincy

Committee itself. On November 2, 1971, the Executive Director of the Toledo Area Council of Churches made the following observations in a letter, a carbon copy of which was directed to Sheriff Metzger:

> TACC (Toledo Area Council of Churches) can certify only that these men are serving churches which are members of our Council. We can in no way certify relative to the term "ordained clergyman," since that term means different things in different denominational traditions. Also, we can take no responsibility for men serving churches which are not members of our Council.

In a letter of January 3, 1977, the Chairman of the Jail Chaplaincy Committee made the following observations to Sheriff Hickey:

> As indicated in your order of February 20, 1976, regarding "Policy, Jail Chaplaincy Committee of Toledo Area Council of Churches" our committee is responsible to furnish and "to keep a current list of certified [clergy] who will be allowed into the jail as visiting clergy." The list has been furnished. However, the list includes only those clergy persons who are directly affiliated with the Council of Churches or the Diocese of Toledo.

In spite of these statements, the newly prepared *Policies and Procedures Manual* contains the following statements:

> It will also be the responsibility of the Jail Chaplaincy Committee to keep a current list of certified clergy who will be allowed into the Correction Center as visiting clergy. Ministers on this approved list must have a specific inmate to see or at the request of an inmate or their family. [sic]
>
> In the new facility members of the Jail Chaplaincy Committee will continue to enjoy special privileges. Only they will be entitled to conduct religious services, to meet privately with inmates outside of visiting hours, and receive identification provided by the Sheriff's office.

In a letter of February 20, 1976, to the Jail Chaplaincy Committee the defendant Sheriff made it clear that only "certified" clergy could provide religious service in the jail.

> Community clergy will be encouraged to visit their parishioners and other members of their faith in addition to participating, on request, services of worship and counseling sessions. [sic] *Certified* clergy will be permitted to visit inmates daily during regular visiting hours and upon special request. (emphasis added)

The requirement of acceptance of Trinitarianism for membership on the Jail Chaplaincy Committee, the special status accorded to such committee members, and the "certification" function which has been assigned to this group raise substantial concern in the mind of the Special Master. While recognizing difficulties posed by the need to identify the *bona fides* of persons presenting themselves as clergymen, he questions a policy which results in the routine exclusion of Muslim religious leaders, Rabbis and clergymen affiliated with other well-recognized denominations from the special status enjoyed by members of the Chaplaincy Committee. In addition, it appears that the failure of the Jail Chaplaincy Committee to certify a clergyman unaffiliated with the Toledo Area Council of Churches or the Diocese of Toledo will result in restrictions on inmates' access to clergymen of their choice.

None of what has been said above should be interpreted as being critical in any way of the motives or actions of members of the Jail Chaplaincy Committee. To the contrary, members of the Committee have provided yeoman service in the jail. As the Court stated in a letter of April 25, 1973, to the Chairman of the Chaplaincy Committee, "It is obvious that the program presented represents the result of a great deal of dedicated work and effort." The concerns expressed by the Special Master, on the other hand, relate to the apparent total delegation by the Sheriff's office to the Jail Chaplaincy Committee of all religious programming within the facility.

Religious services, like all other programming, present difficulties in the new jail.

Because of problems of inmate transportation, the specially designed chapel in the multipurpose/recreation area in the sub-basement is not being utilized. Here again the planners and designers of the facility constructed programming facilities without having developed concrete notions of the feasibility of the use of those facilities. As in the case of the outside exercise decks and the attorney/client booths, discussed above, the chapel area will constitute unused and wasted space in the new building unless programming is developed to permit utilization.

Recent notices issued by the Acting Director of Inmate Services indicate that separate religious services will be held on each of the housing floors of the new facility. One service for men and another for women will be held on the third floor. Two separate services will be held on the fourth and fifth floors and one service will be held on the sixth floor. Thirty minutes are allocated to each of these floors. No reference is made to services in the medical area apart from the following statement:

If chaplain is willing, he can make a quick stop in at medical area.

Services commence at 1:15 p. m. and will end at 3:15 p. m. Eventually, when the entire sixth floor is occupied, requiring two services, the hours will be extended to approximately 4:00 p. m.

Because of problems of inmate movement necessitated by the holding of these services throughout the building on Sunday afternoon, visitation hours in the new jail have been rescheduled to eliminate all Sunday afternoon visiting. Thus, an already inadequate visiting schedule, particularly for weekends, is being further restricted by architectural limitations of the new building and the failure on the part of the jail's administration to devise solutions to these difficulties other than by restricting inmate activities.

In point of actual practice, inmates in the new jail have not had the benefit of regular Sunday services. In sampling entries made in the various log books maintained by correctional officers on each floor, the Special Master learned that while religious services were held for inmates in module 4NE on May 29 and June 12, no such service was logged for June 5. Services were held for inmates in modules 6NE and 5NE on May 29, June 5, and June 12. With respect to module 4NW, however, no services were logged on May 29 or June 5. Services were held on June 12. Female inmates on the third floor had services on May 22. That log for May 29 contains the statement, "No church today," and no services were logged for these inmates on June 5, June 12 or May 15.

*Work Programs.* There are no work programs available involving "maintenance and other interior work in or about other County facilities under the direction of County employees other than the jail staff." As far as the Special Master has been able to learn, no such programs have been in existence since July 30, 1971, when the Court ordered the development of these programs.

The only work program which exists for inmates incarcerated in the jail is that which is available to a limited number of sentenced inmates designated as trusties by the Director of Inmate Services. These trusties work in the kitchen and provide cleaning and maintenance services throughout the jail. They are not permitted to clean the public lobby on the first floor of the jail, and an outside maintenance service has been employed for that purpose. As of June 29, only 24 sentenced inmates enjoyed trusty status. That additional trusties could be utilized is demonstrated by repeated requests on the part of the Director of Food Services that additional trusties be assigned to the kitchen in order to assist in cleaning and maintenance.

Although several areas of the jail exist in which constructive work programs might be developed, there are no plans to inaugurate such programs. During his inspection of the jail, Dr. F. Warren Benton noted the possibility of using unassigned space in the subbasement and basement areas for the

development of light industries in which inmates might participate. In particular, he suggested the possibility that inmates could provide printing, data processing, or other "paper-related" services to County offices whose budgets did not permit certain forms of labor intensive service of this kind. In the event that facilities outside the jail should ever be provided for the Work Release Program, the area currently assigned to this program would offer outstanding possibilities for development along these lines.

*Visiting Programs.* The visiting schedule in the former Lucas County Jail permitted an inmate 50 minutes of visiting on Saturday, Sunday, and one weekday evening. Thus a total of 150 minutes per week were permitted. Certain housing units received only evening visits; others received a combination of daytime and evening visits. All weekday visitation occurred between 6:00 p. m. and 8:50 p. m. Because of difficulties encountered in transporting inmates, these 50 minute periods were frequently shorter in actual practice. Apparently, special visits apart from this schedule could be arranged and were so arranged on occasion by counselors. These special visits were used to accommodate out-of-town visitors and certain emergency situations. Outside trusties were allowed visits every Sunday morning from 8:30 a. m. until 11:00 a. m. and inside trusties were allowed visits on every other Sunday morning during these hours.

Each inmate was permitted to be visited by only one adult visitor (over 12 years of age) and by children under the age of 12 when accompanied by an adult visitor. Shortly before the move to the new Correction Center, however, the limitation of one adult visitor was expanded to permit two adults to visit an inmate simultaneously. General visitation occurred in an area in the basement of the old facility where visitors and inmates were separated by floor-to-ceiling barriers and communicated through telephones. The top half of the dividing barrier was transparent. All trusties, however, were permitted contact visits.

An inmate incarcerated in the new Correction Center is permitted three visitation periods on three separate evenings other than Sunday. Each visit is limited to 50 minutes. In addition, 50 minutes of visiting is permitted on Sunday. Inmates held in the medical area receive the same amount of visiting time, but inmates held in the classification and holding areas are not allowed to have visitors. Trusties are allowed four 50 minute visits per week—one on Monday, Wednesday, Friday, and Sunday. Official holidays are treated like Sundays for visiting purposes.

During visits, all inmates other than trusties sit in areas adjoining their housing modules. The inmate is separated from his visitor by a floor-to-ceiling wall. The visitor sits in the open lobby area. Visual contact occurs through a small viewing window and voice contact is made through a mesh screen. Inmates and visitors sit across from one another on stationary, backless stools. Visitors sit shoulder-to-shoulder with each other as do inmates. Space is provided for four simultaneous visits in each of the 12 person modules and for five simultaneous visits for the 10 inmates housed in the two smaller modules on the third, fourth, and sixth floors. Inmates incarcerated in the small 4 person module on the fifth floor have their visits in areas adjoining the 12 person modules. On the sixth floor, two larger visiting rooms have been provided. Each can accommodate 12 simultaneous visits. The physical arrangements for these visits are the same as those described above. Trusties, on the other hand, are allowed contact visits in the center of the lobby area on the fifth floor. Tables are set up in this area allowing the visitor to sit on one side and the trusty on the other. Physical contact between the trusty and his visitor must "be kept at a reasonable minimum." All trusties are strip searched after a visit and before returning to the trusty dormitory.

The Special Master has observed the visiting facilities available to all non-trusty inmates with great care. In addition, he has received numerous complaints from inmates as well as from visitors about the

inadequacy of these facilities. If several visits are occurring simultaneously, it is almost impossible for the visitor and the prisoner to hear one another. Visual eye contact between the visitor and the prisoner is less in the new facility than it was in the old. The fixed stools which have been provided are uncomfortable for inmate and visitor alike. The former rule allowing two adults to visit a single inmate at the same time has been rescinded.

In the opinion of the Special Master, the visiting facilities provided in the new jail are altogether inadequate and in some respects worse than those which existed in the old jail. In addition, the amount of visiting time permitted falls below accepted correctional standards.

With respect to the facilities themselves, the Special Master agrees with the observation of Mr. William Nagel who toured the jail and reported,

I am appalled at the visiting arrangements on the third, fourth, and fifth floors. Many of the inmates of the Lucas County Jail will be untried and presumed to be innocent. It would seem to follow, therefore, that the least restrictive rules, as well as the rule that would say an untried person should not be handled more punitively than a tried person, would be of paramount consideration. The closed visiting facility, providing no opportunity for contact between the inmate and visitor, here at this brand new Lucas County Jail, is among the most repressive that I have ever seen. On one side of each small window is a stool and on the other side, where the visitor sits, a similar stool plus a small ledge for elbows. There is no such ledge on the inmate's side. A severe mesh provides for audio transmission. In such small apertures as I have seen in other institutions, the voice is barely audible, especially when there are visitors on either side. These little visiting stalls remind me of

that phrase from Conrad Weizer's poem, "Prison's Green and Glass Partitions"— "Shoulder to shoulder with others who come on Sunday afternoon, nameless people shouting intimacies reserved for the quiet of a home."

The conditions described by Mr. Nagel are a far cry from the standard outlined in the *Model Rules and Regulations on Prisoners' Rights and Responsibilities* which were prepared for the Massachusetts Department of Corrections:

Each institution shall make available a visiting room for inmates. This room shall be informal in style, furnished comfortably, and large enough so that several groups of inmates and visitors might meet simultaneously, yet maintain some degree of privacy.[62]

The American Correctional Association has this to say on the subject:

The tendency . . . is toward encouraging informal settings. No longer is it considered necessary to separate the inmates and visitor by screen or other barrier except in the maximum custody institution, and even here not all prisoners require this safeguard. . . . It may be pointed out that even in maximum security custody institutions, it may be possible to permit informal visiting. There are such institutions, for example, where the prisoners, before arriving at the visiting room have opportunity to change clothes and are given a thorough search before and after the visit, thus greatly reducing the problem of introduction of contraband.[63]

Finally, the National Advisory Commission on Criminal Justice Standards and Goals has adopted a standard which includes the following language:

Correctional authorities should facilitate and promote visitation of offenders by the following acts:

b. Providing appropriate rooms for visitation that allow ease and informality of communication in a natural envi-

**62.** S. Krantz, R. Bell, J. Brant & M. Magruder, *Model Rules and Regulations on Prisoners' Rights and Responsibilities* 56 (1973).

**63.** American Correctional Association, *Manual of Correctional Standards* 543–44 (3d ed. 1966).

ronment as free from institutional or custodial attributes as possible.[64]

In support of this standard, the Commission offered the following commentary:

> In many institutions the facilities are demeaning and degrading, as well as violative of privacy. This defeats the purpose of visiting. Screening or glass partitions between the offender and his visitor emphasize the separation rather than the retaining common bonds and interests.[65]

In assessing the adequacy of the institution's visiting facilities, one must take into consideration the fact that no inmates are permitted contact visitation privileges other than trusties. This policy of denying pre-trial detainees the right of contact visits raises serious constitutional issues. In the first place, it is obvious that the policy has the effect of favoring sentenced inmates over pre-trial detainees; this alone raises a substantial issue of equal protection. Other constitutional issues are involved as well. In support of its standard requiring that "all inmates shall be allowed contact visitation," [66] the Nebraska State Bar Association Committee offered the following statement:

> Section 10–(2)(e) requires contact visitation unless it presents a substantial threat to facility security, visitor's safety, or it is a non-contact visit requested by either the inmate or the visitor. There is today little doubt that this is constitutionally required for pre-trial detainees. Virtually every court that has considered the matter recently has concluded that denial of contact visitation to pre-trial detainees, unless maintenance of security or order requires it, violates the Constitution because it constitutes either punishment without due process of law or cruel and unusual punishment.[67]

The Committee cites *Rhem v. Malcolm*, 507 F.2d 333 (2nd Cir. 1974), *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973), aff'd 494 F.2d 1196 (1st Cir. 1974), and, interestingly enough, *Jones v. Wittenberg*, 323 F.Supp. 93 (N.D.Ohio 1971), aff'd *sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972). Reliance upon the Court's opinion in *Jones v. Wittenberg* as recognizing the requirement of contact visitation—at least for pre-trial prisoners—is justified by the language of Paragraph 20 of the Court's order. See pages 161–162, *infra.*

One last but essential point remains to be made with respect to the visiting facilities of the new Lucas County Correction Center. No doubt the thought to include visiting areas on each housing floor was intended to reduce the phenomenon of inmate movement throughout the institution. In this the designers have been effective. The difficulty is that inmates cannot be moved into or out of their housing units for medical, recreation, library, education, work, or other programming activity during the time that visitors are on the housing floor without creating potential problems of security. The mingling of the general inmate population and outside visitors, even under careful supervision by correctional officers, creates some hazard to the safety and the sensibilities of visitors. This has led Dr. F. Warren Benton, whose report is discussed above, to comment that the building is constructed in such a way as to permit visitation or other programs, but not both. The problem will be exacerbated by the provision of lengthier and more frequent visiting periods which the Special Master believes are mandated by the Court's order. When one takes into account the emerging requirement for contact visitation and a suggestion made by Mr. Nagel that the housing floor lobby areas be used for contact visitation, the problem of transportation of other non-visiting inmates becomes all the more clear. While the lobby areas, properly furnished, would offer adequate facilities for contact visiting,

---

**64.** National Advisory Commission on Criminal Justice Standards and Goals, *Corrections* 66 (1973).

**65.** National Advisory Commission on Criminal Justice Standards and Goals, *Corrections* 68 (1973).

**66.** Nebraska State Bar Association Committee on Correctional Law and Practice, *Jail Standards* at 10–3 (1977).

**67.** *Id.* at 10–H.

the problem of transportation would be acute.[68]

On the other hand, the vertical nature of the structure, combined with the presence of only one elevator for use by inmates, makes it difficult to develop central visiting facilities off the housing floors. Even if the inmate transportation problem could be solved, physical space for a central visiting area would have to be found. While some possibilities may exist in unassigned areas in the subbasement or basement of the facility, these no doubt will pose problems of convenience and security.

In giving this problem careful thought, the Special Master has come upon one solution which seems to accomplish the objective of developing more adequate visiting facilities while dealing with the problem of exposing visitors to contact with non-visiting inmates. Under the present arrangement, the inmate enters one side of the visiting area through an opening between the security vestibule and the visiting area. The security vestibule is separated from the dayroom area and from the open lobby by security gates. The opening from the security vestibule to the visiting area should be closed off by a security door. The next modification would be the elimination of the stools and the screens which separate inmates from their visitors. Transparent walls of perhaps six to eight feet in height then could be built to extend into the lobby area and enclose what is now the visitor's side of the visitation area. This would create secure and reasonably commodious rooms which could be furnished with comfortable furniture for contact visiting.

With the installation of a door leading from the lobby into the visiting room, visitors would have to walk only a few feet from the visitor's elevator into the visiting room where they could be closed off from other inmate traffic in the lobby area. These modifications would permit visitors and the inmates they are visiting to be isolated from other inmates moving to and from their living areas for other purposes, and the transparent walls would permit visual scrutiny of the visiting area by correctional officers.

The Special Master wishes to emphasize that unless this or some other acceptable solution is devised to the problem which has been described above, compliance with all of the provisions of the Court's order will not be possible. For this reason, the development of secure and adequate areas for visitation occupies the highest priority in the development of an overall plan for compliance with numerous provisions of the Court's order. It is not feasible to have both adequate visiting hours and adequate programming of other kinds simultaneously in the facility as it is now arranged. Because the visiting facilities as they now exist do not meet minimal requirements of decent comfort and effective communication, some modification of these areas is called for in any event.[69]

With respect to the appropriate length of visits, the American Correctional Association has stated that "ordinarily a visit of less than one hour would not be regarded as adequate."[70] The *Tentative Draft of Standards Relating to the Legal Status of Prisoners,* prepared by the American Bar Association's Joint Committee on the Legal Status of Prisoners

68. The existing visitation arrangement is not without its security problems. There is no assurance that inmates who are sick or violent will not have to be moved from housing modules during times when visitors are on the floor.

69. By making the modifications which the Special Master has suggested the defendants will deal with two difficult problems in one stroke. Apart from their use for visitation, the newly designed visiting areas could be furnished in such a way as to permit their use for food service as well. While all of the problems of food service will not be cured (e. g. the cooling

of food resulting from transportation from the kitchen), the eating area will be at least sufficiently far removed from the dayroom and cell areas to avoid the problem of sanitation which results from the present food service system. In addition, the use of these newly defined areas for food serving purposes will avoid the difficulties which might be entailed in attempting to feed large numbers of inmates from different housing areas at the same time in the open lobby area or in a centralized dining room.

70. American Correctional Association, *Manual of Correctional Standards* 546 (1966).

provides that "visitation periods should be at least one hour long. . . ." [71] Even the Toledo/Lucas County Criminal Justice Regional Planning Unit, an agency otherwise enamored of the new facility, acknowledges that "the length of visiting periods does not meet the minimum standards of the American Correctional Association or the requirement of the Court in subparagraph 17(h) of the Court's order in *Jones v. Wittenberg.*" [72]

With respect to the frequency and the timing of visiting periods, there is no need to go beyond the clear language contained in subparagraph 17(h) of the Court's order. The order requires daily visiting hours, both in the daytime and in the evening. There are no daytime visiting periods on weekdays and no evening periods after 6:50 p. m. on Sunday or on holidays. No daytime periods are scheduled on Saturday. Although visiting periods are scheduled seven days per week, no inmate is permitted to have visitors on a daily basis.

The policies and actual practices of the Lucas County Correction Center with respect to visits by children are not altogether clear. Apparently, children under the age of 12 years may visit only when accompanied by an adult. Children of the age of 12 or more years are considered to be adults, and only one "adult" may visit an inmate on a particular visit. It should be stressed that these are *policies* as contained in an order promulgated by the defendant Sheriff on November 12, 1975. In fact, however, according to a number of inmates, teenage children—perhaps 12, 13, 14 years of age— are sometimes not permitted to visit alone. Whatever the practice, the fact is that the present visiting policy does not permit an inmate to see his wife and his 13 year old son at the same time. While a 13 year old child can (and must) enter the visiting area unaccompanied by an adult, an 11 year old child must be so accompanied in order to visit a relative.

Finally, subparagraph 17(h) of the Court's order requires the defendants to adopt policies and procedures for "limitation or removal of visiting privileges for disciplinary purposes, or for abuse of visiting privileges." Disciplinary policies of the institution provide that limitation or suspension of visiting privileges may be ordered by the Disciplinary Board in connection with a disciplinary hearing. Records of cases decided by the Disciplinary Board indicate that this sanction has been imposed on a number of occasions. Therefore the defendants have complied with this portion of subparagraph 17(h).

This provision of the Court's order, however, raises concern in the mind of the Special Master. The Court has *ordered* the defendants to utilize the removal of visiting privileges for disciplinary purposes. While it is true that there is some support for such a policy, the issue is one upon which correction experts are divided. For example, the American Correctional Association's position is the following:

> There is some difference of opinion among administrators whether inmates in punishment status should be allowed visits. If, however, one bears in mind that the purpose in encouraging visits is that the inmate may profit from the constructive influence that these afford, it seems that the argument is on the side of permitting such visits. In such cases an official should first talk to the visitor, explain the reason for the punishment, and advise him on a constructive course of action. If the prospective visitor displays an inclination to condemn the institution, the visit probably should not be permitted. On the other hand, an understanding visitor can often do more than institution officials toward making the inmate see the error of his ways. Further, it might be commented that denying a close relative of a visit involves punishment for him as well as for the inmate.[73]

**71.** 14 Am.Crim.L.Rev. 377, 500 (1977).

**72.** Toledo/Lucas County Criminal Justice Regional Planning Unit, *Staffing Requirements*

*and Analysis of the Lucas County Corrections Center* at III–11 (1977).

**73.** American Correctional Association, *Manual of Correctional Standards* 544 (1966).

The American Bar Association's Joint Committee on the Legal Status of Prisoners has adopted a standard which provides that

All prisoners, including those undergoing punishment for disciplinary infractions, should be entitled to weekly visitation.[74]

In support of this proposed standard, the Commission offers the following commentary:

Although many prison systems still forbid visitation for persons in punishment or administrative segregation, the number is decreasing, possibly because of the salutary effects which visiting often has upon prison behavior. See Federal Prison Service Policy Statement 7300.4A(f)(3) (July 25, 1975); Pa.Code § 95.233(a)(2); *Agron v. Montayne*, 392 F.Supp. 454 (W.D.N.Y. 1975) and *Giampetruzzi v. Malcolm*, 406 F.Supp. 836 (S.D.N.Y.1975) (both enforcing New York State's prison regulations allowing persons in segregation to have visits.)[75]

In view of these opinions, it is the recommendation of the Special Master that the language, "and provisions for limitation or removal of visiting privileges for disciplinary purposes, or for abuse of visiting privileges," be deleted from subparagraph 17(h) of the Court's order. The effect of such deletion would not be to forbid the continuation of restriction of visiting privileges for disciplinary purposes; rather, it would be to permit the defendants to reach their own conclusions on this matter in light of emerging correctional theory. In the opinion of the Special Master, if the defendants feel that visiting privileges should not be utilized as a disciplinary sanction, or if they feel that they should be so used only in cases involving abuse of visiting privileges, they should be free to make this judgment.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants have not developed classification and intake diagnostic procedures for male prisoners which meet any of the requirements of subparagraph 17(a) apart from housing needs. In addition, the defendants have not yet established adequate and effective group and individual counseling programs although the additional counselors about to be hired will make it possible for them to do so. This assumes, however, that these counselors will be carefully screened before hiring and adequately trained after they are hired. It is the further finding of the Special Master that the defendants have not yet fully established adequate basic and remedial educational programs and that present institutional policies and practices, as well as the inadequacy of the classification program, will hinder the development of these programs in spite of the willingness of the Toledo Board of Education to provide these services.

The Special Master finds that the recreation program presently offered by the defendants falls below accepted correctional standards and fails to comply with subparagraph 17(e) of the Court's order. The existing religious program must be expanded to provide to all clergymen at least certain of the privileges which are now reserved to members of the Jail Chaplaincy Committee and to assure that all *bona fide* clergymen are given access to the jail. In addition, steps must be taken to assure that regular religious services are held for all inmates desiring them. The defendants are in non-compliance with the provisions of subparagraph 17(g) of the Court's order requiring constructive work programs outside the jail. The work program within the jail is likewise inadequate.

The Special Master finds that the visiting program maintained by the defendants fails to meet the requirements of the Court's order in that visiting facilities as well as length and frequency of visits are entirely inadequate. In addition, visits by children are effectively limited by the institution's visiting policies which treat children over 12 years of age as adults while limiting the number of adult visitors to one. At least with respect to pre-trial detainees, contact visits must be permitted as they are at the

---

**74.** 14 Am.Crim.L.Rev. 377, 500 (1977).

**75.** *Id.* at 505 (1977).

present time in the case of sentenced trusties.

It is the finding of the Special Master that all of the program requirements of Paragraph 17 are adversely affected by the physical configuration of the new facility, and the procedures and policies which have been adopted in response thereto, but that solutions to these problems can be found with a minimum of physical alteration. In particular, development of physical facilities for visitation which separate inmates and their visitors from other inmate traffic on the floor is essential.

The Special Master finds that the defendants are in compliance with subparagraph 17(b) of the Court's order as a result of the implementation of the Work Release Program under the supervision of the Lucas County Court of Common Pleas.

## PARAGRAPH 18

IMMEDIATELY EFFECTUATE AN ORGANIZED AND SUPERVISED PROGRAM OF DAILY CLEANING, INCLUDING MOPPING, SCRUBBING, WALL WASHING, ETC., WHICH WILL INSURE THAT INMATES CLEAN THEIR OWN CELLS, THE PLUMBING FIXTURES THEREIN, AND MAKE THEIR BEDS FOR INSPECTION BY THE SUPERVISING GUARD OFFICER AT A SPECIFIED TIME EACH MORNING.

The policies and procedures of the Lucas County Correction Center require inmates to "assume responsibility for the maintenance and cleaning of the living quarters," and call for daily inspections at 8:00 a. m. Correctional officers on the housing floors are required to issue to each module a broom, mop, bucket, cleaning cloth, and can of window cleaner on a daily basis. Apparently, the practice is for the correctional officer to fill the bucket with water and detergent before giving it to the inmates. Examination of logs maintained by correctional officers supervising the housing areas, however, indicates that the necessary supplies are not made available to inmates on a daily basis. (The *Policies and Procedures Manual* requires specifically that the "correction officer will record in the daily log the time item was placed in each module and the time cleaning item was removed from the module.") The following chart summarizes log entries in three housing units selected at random by the Special Master:

| | Date | Cleaning Supplies In | Cleaning Supplies Out |
|---|---|---|---|
| 3NE | 5–23 | 18:02 | 18:13 |
| | 5–24 | 09:40 | 10:08 |
| | 5–25 | 09:09 | 09:22 |
| | 5–26 | No | |
| | 5–27 | 22:00 | 22:45 |
| | 5–28 | 20:35 | 20:50 |
| | 5–29 | 09:30 | 10:00 |
| | 5–30 | 21:00 | 22:00 |
| | 5–31 | 21:40 | 22:30 |
| | 6–1 | No | |
| | 6–2 | No | |
| | 6–3 | No | |
| | 6–4 | No | |
| | 6–5 | No | |
| | 6–6 | 13:35 | 13:50 |
| | 6–7 | No | |
| | 6–8 | No | |
| | 6–9 | No | |
| | 6–10 | No | |
| | 6–11 | No | |
| | 6–12 | 13:25 | 13:42 |
| 4NW | 5–23 | 17:30 | 17:49 |
| | 5–24 | 10:20 | 11:00 |
| | 5–25 | 17:12 | 17:48 |
| | 5–26 | No | |
| | 5–27 | No | |
| | 5–28 | 09:10 | 10:06 |
| | | 19:05 | 19:56 |
| | 5–29 | 22:21 | 22:37 |
| | 5–30 | 09:00 | 09:30 |
| | | 22:42 | 23:02 |
| | 5–31 | 10:26 | 10:35 |
| | | 22:37 | 23:07 |
| | 6–1 | 15:09 | 15:35 |
| | 6–2 | 21:40 | 22:20 |
| | 6–3 | No | |
| | 6–4 | No | |
| | 6–5 | No | |
| | 6–6 | 10:29 | ? |
| | 6–7 | 15:05 | 15:36 |
| | 6–8 | 08:15 | 08:47 |
| | | 15:40 | ? |
| | 6–9 | 10:27 | 10:45 |
| | 6–10 | No | |
| | 6–11 | No | |
| | 6–12 | 10:33 | 11:20 |
| | 6–13 | 09:27 | 09:50 |
| 5NE | 5–23 | 22:45 | 23:05 |
| | 5–24 | 12:35 | 15:03 |
| | | 17:15 | 20:15 |
| | | 21:40 | 27:35 |
| | 5–25 | 23:05 | 23:25 |
| | 5–26 | 15:00 | ? |
| | | 22:58 | 23:25 |
| | 5–27 | 09:15 | ? |
| | | 13:20 | 14:10 |
| | | 20:19 | 20:30 |
| | | 23:10 | 23:20 |

| | | |
|---|---|---|
| 5–28 | No | |
| 5–29 | No | |
| 5–30 | 22:55 (not used) | |
| 5–31 | No | |
| 6–1 | 09:52 | 10:20 |
| 6–2 | 08:45 | 09:10 |
| 6–3 | No | |
| 6–4 | No (need for cleaning noted by correctional officer) | |
| 6–5 | 23:00 | 23:20 |
| 6–6 | 23:15 | 23:30 |
| 6–7 | 23:15 | ? |
| 6–8 | No | |
| 6–9 | No | |
| | 12:20 | 12:38 |
| | 23:25 | 23:52 |
| 6–11 | 23:07 | ? |
| 6–12 | 09:10 | 10:10 |
| | 17:25 | ? |
| | 21:00 | ? |
| | 22:25 | 22:40 |

In addition to the fact that supplies are not always sent into the modules, these figures indicate that sometimes they remain in the module only a short period of time. Whether these data reflect the failure of correctional officers to make cleaning supplies available and to supervise cleaning or the unwillingness of inmates to do the cleaning tasks, it is clear that there is no "organized and supervised program of daily cleaning" in the housing areas.

Although the policies and procedures of the Center require the correctional officer to make a daily sanitary inspection at 8:00 a. m., correctional officer logs contain no entries beyond the regular entry of a "security check" shortly after 8:00 a. m. every day. There are no entries indicating that a sanitary inspection has occurred.

The policies and procedures of the Center require that there be a sweeping and mopping of each housing area after breakfast, lunch and dinner in addition to the early morning cleaning. The entries listed above establish beyond doubt that cleaning supplies are not being sent into the module four times a day. Without belaboring a point already discussed in some detail above, the Special Master wishes to point out that the failure to effectuate a program of daily cleaning in the housing areas has

especially serious ramifications in view of the fact that food is served and consumed in these areas. Unless more careful attention is given to this matter, the new Correction Center soon will become uncontrollably filthy.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in a state of noncompliance with the provisions of Paragraph 18 of the Court's order in that there is no organized and supervised daily cleaning or sanitary inspection program in the housing areas of the new facility.

## PARAGRAPH 19

IMMEDIATELY PROVIDE FOR THE FOLLOWING:

(a) CLEAN BLANKETS, SHEETS, PILLOW AND PILLOWCASE, TOWEL AND WASH CLOTH SHALL BE ISSUED EACH NEWLY COMMITTED PRISONER: AND A REGULAR AND FREQUENT PROGRAM ESTABLISHED FOR ISSUING FRESH LINENS.

(b) PRISONERS SHALL BE DRESSED IN JAIL CLOTHING AND ALL ITEMS SHALL BE LAUNDERED AND EXCHANGED REGULARLY.

(c) EACH PRISONER WHO DOES NOT BRING SUCH ITEMS WITH HIM WHEN HE ENTERS THE JAIL SHALL BE FURNISHED WITH SOAP, TOOTHBRUSH, TOOTHPASTE, AND SHAVING GEAR SO AS TO BE ABLE TO MAINTAIN GOOD PERSONAL HYGIENE.

On July 28, 1972, subparagraph 19(b) was modified to the following effect:

Clothing shall include pants, shirt and/or coveralls, underwear, socks and/or other foot covering.

According to the policies and procedures published by the Lucas County Correction Center, inmates are issued one blanket, one mattress, two sheets, one towel, and one

uniform (one piece for men, dress for women). An entry of June 9, 1977, in the correctional officer's log for module 5SW, however, states that one inmate was transferred to that module and placed in a cell without a mattress. Although log entries indicate that pillows and pillowcases are issued in at least some instances, there does not appear to be any written Center policy on these items. The written policy does not mention washcloths, and clothing issued to inmates does not include underwear.

Virtually no prisoner enters the jail with soap, toothbrush, toothpaste, and shaving gear in hand. During the period that the prisoner is held in the holding area, he will not have access to any of these materials. According to the classification officer, an indigent inmate will be furnished with soap, toothbrush, and toothpaste at the time of his interview with the classification officer. In order to replace his toothpaste or toothbrush, the indigent must prevail upon the institution's dentist. Non-indigent inmates do not receive any of these supplies until they reach their regular cells 36 or more hours after their admission to the jail and are able to order them through commissary. Further delay is encountered as a result of the fact that commissary delivery occurs only once a week. The practice is to permit these items to be brought in on visits, and an inmate—indigent or otherwise—may prevail upon the dentist from time to time to furnish him with toothbrush and toothpaste. There is no regular program, however, for the provision of these items. Inmates are not permitted to keep razors in their cells but a razor is made available to an inmate on a daily basis upon request.

Numerous inmates have reported to the Special Master that linen and clothing exchanges have not been made regularly in the new facility, and entries in correctional officer logs selected at random by the Special Master confirm these accounts. For example, inmates housed in module 4NW received uniforms and new linens on May 18 when they moved into the new jail. The first uniform and linen change reflected in the correction officer's log for that module occurred on May 31, thirteen days later. Even then two inmates failed to receive new uniforms because proper sizes were not available. Inmates housed in module 4NE received new uniforms on May 28, ten days after their previous change. Linens were not exchanged in this module until May 31, thirteen days after the previous issue. Uniforms issued on May 28 to this module were not exchanged until June 9, twelve days later. The first uniform change reflected by the log for module 5SW occurred on June 4, sixteen days after inmates received new uniforms on May 18. The first entry indicating a linen change in that module is dated June 6, eighteen days after the last issue.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in noncompliance with the provisions of Paragraph 19 in that fresh linens and clothing are not issued on a frequent and regular basis. In addition, underwear is not issued to prisoners in violation of the Court's order of July 28, 1972. The defendants are also in noncompliance in their failure to provide soap, toothbrushes, and toothpaste on a regular basis to all incoming prisoners. Finally, the written policies of the institution do not provide for issuance of all items listed in subparagraph 19(a) of the Court's order.

### PARAGRAPH 20

INMATES WHO ARE AWAITING TRIAL ARE NOT TO BE PUNISHED AT ALL, EXCEPT TO THE EXTENT NEC-. ESSARY TO PRESERVE ORDER AMONG MEMBERS OF A GROUP LIVING IN CLOSE QUARTERS. PRISONERS AWAITING TRIAL MAY NOT BE LIMITED IN THEIR COMMUNICATIONS WITH PERSONS OUTSIDE THE JAIL EXCEPT TO THE EXTENT NECESSARY TO PREVENT ABUSE OF

PRIVILEGES, OR AS A MEANS OF EN-
FORCING DISCIPLINE.

The paragraph quoted above reflects language in the reported opinion in this case under the heading. "Communication and Attorney Visitation." *Jones v. Wittenberg,* 330 F.Supp. 707, 719 (N.D.Ohio 1971). The import of the language in that context seems to be that there can be no restrictions whatsoever on the communication rights of prisoners awaiting trial unless the restrictions are "necessary to preserve order among members of a group living in close quarters." Thus, Paragraph 20 relates directly to Paragraphs 6 and 8 which are discussed above. To the extent that the Special Master found that the mail and telephone policies of the defendant constitute violations of Paragraph 6, these instances of noncompliance violate the provisions of Paragraph 20 as well. The same can be said with respect to the glaring inadequacy of facilities provided for attorney/client conferences covered by Paragraph 8 of the Court's order. In the opinion of the Special Master, general visitation constitutes yet another form of "communication" with the outside world and falls within the scope of the provisions of Paragraph 20. Thus the inadequate visiting facilities, policies, and practices described in connection with subparagraph 17(h), *supra,* constitute unauthorized restriction of inmates awaiting trial.

## FINDINGS RELATING TO COMPLIANCE

 It is the finding of the Special Master that the defendants are in a state of noncompliance with the provisions of Paragraph 20 of the Court's order to the extent that they are in noncompliance with the provisions of Paragraphs 6, 8, and 17(h) insofar as the latter violations affect inmates awaiting trial. Plans of compliance developed with respect to those paragraphs of the Court's order must meet the standards imposed by Paragraph 20 to the extent that such plans affect inmates awaiting trial.

## PARAGRAPH 21

IMMEDIATELY DISCONTINUE THE USE OF THE TWO SOLITARY CELLS IN THE JAIL.

(a) ISOLATION MAY BE USED AS A DISCIPLINARY MEASURE, BUT ONLY FOR PHYSICALLY VIOLENT PRISONERS WHOSE BEHAVIOR JEOPARDIZES THE HEALTH AND SAFETY OF OTHER INMATES.

(b) ISOLATION FACILITIES MUST BE FURNISHED WITH PROPER HEATING, VENTILATION AND SANITARY FACILITIES.

(c) ISOLATION FACILITIES MUST NOT BE USED FOR EXTENDED PERIODS OF TIME, AND PRISONERS PLACED IN ISOLATION MUST NOT BE DEPRIVED OF CLOTHING.

(d) ISOLATION SHALL DIFFER FROM NORMAL CONFINEMENT ONLY IN THE LOSS OF FREEDOM AND PRIVILEGES PERMITTED TO OTHER INMATES.

(e) PRISONERS WHO APPEAR TO BE DANGEROUSLY VIOLENT OR SUICIDAL MUST BE EXAMINED IMMEDIATELY BY A PHYSICIAN AND IF HE DEEMS IT ADVISABLE, REMOVED TO A MENTAL HOSPITAL.

Following the issuance of the Court's order in this case, use of the two isolation cells in the basement of the former Lucas County Jail was discontinued. Isolation, when it occurred, consisted of placing an inmate "on fire" in his own cell. The major difficulty created by this arrangement, however, was that it resulted in the punishment of the offending inmate's cellmate as well since at virtually no time since 1971 did the old jail permit single celling. In addition, a single isolation cell on the first floor was used for dangerously violent prisoners.

Isolation facilities utilized after the closing down of the "holes" in the basement of the old jail were furnished, heated and ventilated in the same manner as other cells in

the facility. The same could be said about the presence or absence of sanitary facilities. Isolation was used in the old jail as a disciplinary measure, but the list of offenses which could result in isolation indicates that this penalty could be assessed against inmates who were not physically violent. See Appendix F, page 189 *infra*. Furthermore, some behavior punishable by isolation could not be characterized as jeopardizing "the health and safety of other inmates." For example, possession of unauthorized clothing was punishable by isolation for a period of 10 to 20 days. The same was true of altering clothing. Using profane language to an employee or lying to an officer or supervisor was punishable by a period of isolation of 5 to 10 days.

Isolation could be imposed for up to 35 days for extremely serious offenses such as arson and attempted escape. That length of term applied as well, however, to possession of contraband including money. This should be contrasted with the provisions of the Ohio Department of Rehabilitation and Correction's Administrative Regulation 5120–9–98(C) which limits the period of disciplinary isolation to 15 days.[76] Isolation in the old jail consisted of loss of all freedom and privileges accorded to other inmates, but did not carry with it any special deprivations such as restrictions upon food or denial of clothing.

Much of what has been said above applies with equal force to the new jail where isolation continues to be used as a disciplinary measure. This punishment is not limited to prisoners who are physically violent, and some conduct for which an inmate may be isolated does not jeopardize the health and safety of other inmates. See Appendix G, page 190 *infra*. A prisoner who is isolated is locked in his own single occupancy cell; thus there are no special heating, ventilation, or sanitary problems connected with isolation. Under new guidelines developed by the Correction Administrator,

the maximum length of isolation is 15 days and the minimum is one day. Inmates who are isolated in the new jail are not deprived of clothing and suffer no particular losses other than that of freedom and usual privileges such as telephone and visiting. As was true in the old facility, a correctional officer, with the approval of his immediate supervisor, may place an inmate on fire for a period of up to 24 hours without any disciplinary hearing whatsoever. Such an inmate may or may not be charged and subsequently brought up for a disciplinary hearing.

A few specific examples will suffice to demonstrate that isolation in fact is imposed upon inmates who are not physically violent and whose conduct does not jeopardize the health and safety of other inmates. On January 13, 1977, an inmate was sentenced to 15 days of isolation for refusing to obey an order to return to his cell. In the course of the hearing, the inmate was acquitted of a related charge of fighting. In a written report of the Disciplinary Board hearing held on June 7, 1977, it appears that another inmate was placed on fire for 24 hours by a correctional officer for "disrespect to an officer, disobeying a direct order, and playing his radio after 11:30 p. m." In the course of the disciplinary hearing, the charging officer testified that "the words spoken to him by (the) inmate . . . were not any more serious in nature than he hears numerous times by inmates during every working day." On March 17, 1977, a third inmate was sentenced to 15 days of isolation on two counts of disobeying an order. His disobedience consisted of refusing to remove an extra piece of meat from his food tray. Although the inmate was accused of threatening an employee in connection with this incident, that charge was dropped by the Disciplinary Board which imposed the sentence of isolation.

Subparagraph 21(e) raises special problems. Classification and intake diagnostic

---

**76.** Moreover, the administrative regulation referred to provides that "The Rules Infraction Board shall not impose a total of more than fifteen (15) days in disciplinary isolation for any series of offenses arising out of a 'spree of offenses.' "

procedures, described above, are not sufficient to identify dangerously violent or suicidal inmates, although obvious behavior which is detected by the classification officer or the medical staff will be noted. In some instances, prisoners are placed on special watch requiring correctional officers to pay particular attention to such inmates' behavior, and a security check of such inmates is required to be made every 15 minutes. At least in some instances, correctional officer log records indicate that these security checks are made.

When a prisoner engages in dangerously violent activity, such as fighting, he is generally subdued by a correctional officer and/or a counselor and placed in isolation. It is unlikely that he will be taken to the medical area, even if the jail physician is on duty. If the jail physician is not on duty, it is clear that he does not return to the jail to examine the inmate, who may or may not be seen by other medical personnel on duty.

With respect to suicidal inmates, the policies and procedures of the Lucas County Correction Center require correctional officers to make an effort to detect the presence of suicidal inmates. When evidence of suicidal tendency is discovered, however, the regulation simply provides that "the Center physician will be asked to examine the inmate during his next visit to the Center." Another policy provides as follows:

> It shall be the policy of this division to dispatch any inmate, via an emergency vehicle to a hospital if, due to . . . attempted self-destruction, the threat of loss of life is imminent.

Thus it would seem that when a suicide attempt appears to threaten imminent loss of life, the inmate is removed to a hospital for treatment; otherwise he is seen by such medical personnel as are in the building at the time. If medication appears to be necessary, the doctor will be called and will prescribe by telephone.

Efforts have been made in the past by the jail's medical staff to remove dangerously violent or suicidal patients to a mental hospital. Private hospitals in the city apparently are unwilling to accept inmates under these circumstances. Efforts to refer prisoners to the Toledo Mental Health Center have been equally unavailing. On those occasions when inmates have been sent to that facility, they routinely have been returned as being "untreatable." Apparently, any inmate requiring security supervision (because he is an inmate in the jail) is "untreatable." Thus, effectuation of the purpose of subparagraph 21(e) may well require the development of in-house capability and facilities (apart from the two padded cells in the first floor holding area) for the treatment of dangerously violent inmates.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in compliance with the provisions of Paragraph 21 in that isolation facilities in the new jail are furnished with proper heating, ventilation, and sanitary facilities, and prisoners placed in isolation are not deprived of clothing. In addition, prisoners placed in isolation suffer no losses other than those of freedom and ordinary privileges permitted to other inmates.

It is the finding of the Special Master, however, that the defendants are in a state of noncompliance with the provisions of this paragraph in that isolation is used as a disciplinary measure for inmates who are not physically violent and whose behavior does not jeopardize the health and safety of other inmates. In addition, imposition of isolation for more than 15 days constitutes a violation of subparagraph 21(c). Finally, the Special Master finds that the defendants are in a state of noncompliance in that dangerously violent and suicidal inmates are not examined immediately by a physi-

cian. Efforts to remove dangerously violent or suicidal inmates to a mental hospital have been unsuccessful, although this has not been through the fault of the defendants.

### PARAGRAPH 22

DISCIPLINE IMPOSED SHOULD HAVE A DIRECT RELATIONSHIP TO THE INSTITUTIONAL RULE VIOLATED, AND SHOULD BE SUFFICIENTLY IMMEDIATE IN TIME THAT THE RELATIONSHIP IS RECOGNIZED BY THE INDIVIDUAL.

(a) IT MUST HAVE NO RELATIONSHIP TO THE ACT OR ALLEGED ACTS WHICH HAVE LED TO THE INMATE'S INCARCERATION.

(b) RULES OF THE JAIL AND THE PENALTY FOR VIOLATIONS MUST BE ESTABLISHED IN ADVANCE AND MADE CLEARLY KNOWN TO ALL INMATES.

(c) NO DISCIPLINARY MEASURES MAY BE IMPOSED ARBITRARILY OR FOR LONG PERIODS OF TIME.

(d) RECORDS MUST BE KEPT THEREOF.

(e) NO INMATE SHALL BE PERMITTED TO MAKE OR ENFORCE ANY DISCIPLINARY RULE. ONLY PRISON PERSONNEL MAY EXERCISE DISCIPLINARY AUTHORITY.

(f) DISCIPLINE IS TO BE ENFORCED BY LOSS OF PRIVILEGES.

(g) WRITTEN RECORDS MUST BE KEPT ON AN INDIVIDUAL PRISONER BASIS SHOWING THE TIME AND PLACE OF THE INFRACTION OF THE RULES AND THE DISCIPLINARY MEASURE IMPOSED.

(h) ANY PRISONER AGGRIEVED BY A PARTICULAR IMPOSITION OF DISCIPLINE SHALL HAVE THE RIGHT TO ASK THAT IT BE REVIEWED AT A HIGHER LEVEL OF AUTHORITY THAN THAT OF THE AUTHORITY WHICH IMPOSED IT.

At the outset it can be said that the Special Master has obtained no evidence that discipline is imposed upon an inmate for acts or alleged acts which have led to that person's incarceration. In addition, disciplinary rules are not made or enforced by other inmates. To the extent that disciplinary rules are enforced by anyone, they are enforced by jail personnel.

The provisions of Paragraph 22 of the Court's order were affected by a stipulation entered into among the parties and approved by this Court on November 1, 1972. A copy of this stipulation is attached as Appendix H, p. 191 *infra*. In general, the terms of this stipulation have defined the disciplinary process utilized in the jail since November, 1972, and these provisions have been adopted and made a part of the rules for the jail promulgated by the Lucas County Court of Common Pleas. The system developed under the terms of this stipulation is basically the following.

When a correctional officer believes that an inmate has broken a jail rule, he writes a Correction Officer Report about the incident. The report is reviewed by the shift supervisor. If the latter approves, the inmate will be given notice to appear before the Disciplinary Board. In some instances, with the approval of the shift supervisor, an offending inmate may be placed immediately in isolation for a period of up to 24 hours. The stipulation provides that three or more days after the notice has been provided to the inmate, he will appear before the Disciplinary Board consisting of the sergeant in charge, the chief social worker, a minister, an ex-inmate, and an administrative assistant to the Correction Administrator. The accused inmate is present for the disciplinary hearing and evidence is taken. The Disciplinary Board then consults in private and immediately informs the inmate of its decision. If the decision is to discipline the inmate, he is notified of his right to appeal.

The practice is for the Correction Administrator to cover the appeal with his own recommendation to the Sheriff who takes final action. A written report of the disciplinary hearing is then prepared and all records are maintained by the Director of Inmate Services.

Some difficulties have been encountered by the Correction Administrator in administering the system. In a letter of March 1, 1977, to the defendant Sheriff, the Correction Administrator indicated that the jail's "disciplinary function has suffered" because of the inability to hold hearings promptly due to the unavailability of ministers and ex-inmates on short notice and the failure of these persons to appear after making a commitment to do so.

In several respects, the provisions of the stipulation and of Paragraph 22 of the Court's order are not being met by present practices. Until the middle of June, 1977, inmates did not receive any comprehensive statement of jail rules or the penalties which would result from violations, and the practice in this respect is still somewhat uneven. Record keeping is extremely inadequate. When the Special Master requested copies of all Disciplinary Board records since the adoption of the stipulation in November, 1972, he received no records dated before August, 1976. Records for 1977 indicate that 32 hearings involving 42 inmates and 55 separate charges have been held. Although the stipulation provides that the hearing shall not be held "sooner than three days after notice is provided the inmate," the practice is to hold such hearings after the lapse of 24 hours following the inmate's receipt of notice. That discipline is enforced generally by isolation rather than loss of privileges is demonstrated by the fact that 28 (75.6%) of the 37 inmates found guilty in 1977 were punished by isolation. The average length of sentence was 9.96 days. Under procedures now in force in the jail, punishment by isolation may extend from a period of 1 to 15 days; under former procedures, the maximum term of isolation was 35 days. To the knowledge of the Special Master, written records are not kept on an individual prisoner basis showing the time and place of the infraction of the rule and the disciplinary measure imposed. Finally, although records for 1977 indicate that 10 appeals were made to the Sheriff, those same records disclose only two instances in which a formal decision on appeal was rendered. (In both cases, the appeal was unsuccessful.)

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the defendants are in compliance with the provisions of Paragraph 22 and the stipulation related thereto in that discipline bears no relationship to the act or alleged acts which have led to the inmate's incarceration and in that no inmate is permitted to make or enforce a disciplinary rule. The Special Master finds, however, that the defendants were in a state of noncompliance until jail rules and the penalties for the violation thereof began to be distributed to inmates in June, 1977. Some of the offenses listed in the newly promulgated "Guidelines for Inmate Disciplinary Action" will require further clarification, however, before they can be understood by most inmates. It is the finding of the Special Master that adequate disciplinary records including written records kept on individual prisoners and records of decisions on appeal are not maintained and that discipline is generally enforced by isolation rather than loss of privileges.

With respect to the length of isolation periods imposed, it is the finding of the Special Master that the former policy of imposing sentences of up to 35 days was excessive but that the limit of 15 days adopted in June, 1977, is not excessive. Finally, in view of records which have been provided to him, the Special Master finds that the appeal process had been meaningless in large numbers of cases in which no result has been reported and/or that the

reporting and record keeping procedures with regard to appeals are unsatisfactory.

## CONCLUSION

Six months of investigation by the Special Master have made it clear that the defendants have failed to comply with numerous provisions of the Court's order of July, 1971, as well as with supplemental orders which have been issued in the course of this litigation. In and of itself, the construction of a new $12,000,000 jail has remedied only very few of the problems which led to the original order in this case; indeed, in a number of important respects the new facility has compounded these problems. The time for careful planning and for solicitation of expert opinion on the physical design of the new structure has long passed. The County has built its jail; the task which remains is the development of programs, services, policies, and procedures which will permit the institution to be operated in accordance with constitutional norms.

In spite of the conclusions which he has drawn in this report, the Special Master is optimistic that such programs, services, policies, and procedures can be developed. The Correction Administrator and members of his staff have the will to do so. The frustration which these individuals have demonstrated about the situation in which they find themselves nearly equals that of the inmates themselves. The efforts of the Correction Administrator and his staff, however, will require the wholehearted support of the Sheriff and the County Commissioners. In too many instances, the Correction Administrator has found himself in an impossible position, bound by the requirements of the Court's order but unable to exercise the authority necessary to bring about compliance.

There is an understandable tendency on the part of persons who participated in the planning of the new Correction Center to be defensive about it. Fortunately, a majority of the defendants are not in this position, and the Special Master has been encouraged by the generally constructive attitudes which have characterized negotiations over the past six months. It cannot be good news to the defendants to hear that changes must be made in a facility so recently opened or that operation of the jail will require even greater outlays of public monies. As public officials, however, they must share the interest of the Court in assuring that Lucas County maintains a constitutional jail for those of its citizens who must be incarcerated therein. The present Sheriff and Board of County Commissioners did not create the problem, but it is theirs to solve.

The principal purpose of this report is to establish the extent to which compliance with the Court's order has been achieved. What is equally important, however, is that the findings contained herein should serve as an impetus to the development of solutions to the many difficult problems which remain. Many are intractable and will require substantial effort on the part of the defendants, their attorneys, a number of community agencies, and the Special Master; all, however, can be solved. What can emerge from this process is nothing less than the institution described by the Toledo/Lucas County Criminal Justice Regional Planning Unit in its recent report: an excellent facility of which the entire community can be proud. Such a goal is fully worthy of pursuit.

Respectfully submitted,

(s) <u>Vincent M. Nathan</u>
Vincent M. Nathan
Special Master

July 18, 1977

## APPENDIX A

### LUCAS COUNTY JAIL MENU

| DATE | Mar. 28—April 3, 1977 | | |
|------|-----------------------|---|---|
| TIME | 7:00 AM | 11:45 AM | 4:45 PM |
| MEAL | BREAKFAST | LUNCH | DINNER |
| MONDAY<br>COFFEE<br>9:00 PM<br>1 Pc. Cake | 1 Roll—1 C Milk<br>1 Bl. Frosted Flakes<br>1 Banana<br>1 C Grape Juice<br>1 C Coffee | 1 Pickle Loaf Sandwich<br>1 Bl. Tomato/Vegt. Soup<br>½ C Salad (Cook's Ch)<br>2 Slices Pineapple<br>1 C Tea | 1 4 Oz. Grilled Steak W/Onion Gr<br>1 C French Baked Potato<br>¾ C Buttered Green Beans<br> W/Tomatoes<br>½ C Applesauce<br>1 C Milk |
| TUES.<br>COFFEE<br>9:00 PM<br>1 Cookie | 1 Roll—1 C Milk<br>1 Bl. Farina<br>½ Grape Fruit<br>1 C Orange/Pineapple Juice<br>1 C Coffee | 2 Hot Dogs on Buns<br>1 Bl. Baked Beans W/<br> Bacon<br>1 C Potato Chips<br>2 Pickle Spears<br>1 C Cold Drink | 8 Ozs. Creamed Beef<br>1 C Mashed Potatoes<br>¾ C Buttered Peas<br>1 Butterscotch Tart<br>1 C Milk |
| WED.<br>COFFEE<br>9:00 PM | 1 Roll—1 C Milk<br>2 Med. Boiled Eggs<br>1 Pc. Buttered Toast<br> W/Jelly<br>1 Whole Orange<br>1 C Coffee | 1 Fried Dutch Sandwich<br>1 Bl. Chicken Gumbo Soup<br>½ C Combination Salad<br>3 Apricot Halves<br>1 C Tea | 4 Ozs. Sliced Roast Beef<br>1 C. Candied Yams<br>¾ C Succotash<br>½ C Tapioca<br>1 C Milk |
| THURS.<br>COFFEE<br>9:00 PM<br>1 Cookie | 1 Roll—1 C Milk<br>1 Bl. Corn Flakes<br>1 Whole Apple<br>1 C Grape Juice<br>1 C Coffee | 8 Ozs. Turkey Casserole<br>½ C Butter Beets<br>¾ C Lime/Fruit Jello<br>1 Cookie<br>1 C Cold Drink | 1 4 Ozs. Meat Loaf<br>1 Buttered Diced Potatoes<br> W/Celery Gravy<br>¾ Mixed Vegetables<br>2 Green Gauge Plums<br>1 C Milk |
| FRIDAY<br>COFFEE<br>9:00 PM<br>1 Pc. Cake | 1 Roll—1 C Milk<br>1 Bl. Oatmeal<br>1 Whole Pear<br>1 C Orange Juice<br>1 C Coffee | 1 Grilled Ham/Cheese<br> Sandwich<br>1 Bl. Vegt. Beef Soup<br>1 C Potato Chips<br>½ C Fruit for Salad<br>1 C Tea | 2 2 Oz. Perch Fillets<br>1 C Hash Browns<br>¾ C. Butter Wax Beans<br>½ C Prunes<br>1 C Milk |
| SAT.<br>COFFEE<br>9:00 PM<br>OPEN | 1 Roll—1 C Milk<br>2 Hard Boiled Eggs<br>1 Pc. Buttered Toast<br>1 C Grape Juice<br>1 C Coffee | 1 Hamburger<br>1 Jumbo Shell Macaroni<br>½ C Chef Salad<br>2 Purple Plums<br>1 C Cold Drink | 8 Ozs. Chicken Chop Suey<br>1 C Steamed Rice<br>1 C Chow Mein Noodles<br>2 Pear Halves<br>1 C Milk |
| SUNDAY<br>COFFEE<br>9:00 PM<br>OPEN | 1 Roll<br>1 Bl. Cream of Wheat<br>1 C Orange Juice<br>1 C Milk<br>1 C Coffee | 1 4 Oz. Slice Pork Roast<br>1 C Mashed Pot W/Gravy<br>¾ C Glazed Peas &<br> Carrots<br>½ C Chunk Pineapple<br>1 C Cold Drink | 6 Ozs. Tuna Casserole<br>¾ C Stewed Tomatoes<br>½ C Spinach<br>½ C Sliced Peaches<br>1 C Milk |

■■■■■■
■■■■■■
■■■■■■

| DATE | 4–4–10–77 | | |
|------|-----------|--|--|
| TIME | 7:00 AM | 11:15 AM | 4:45 PM |
| MEAL | BREAKFAST | LUNCH | DINNER |

| | | | |
|------|-----------|-------|--------|
| MONDAY | 1 Roll—1 C Milk | 1 Minced Baloney Sandwich | 8 Ozs. Corned Beef Hash |
| COFFEE | 1 Bl. Sugar Pops | 1 Bl. Chicken Noodle Soup | 1 Medium Potato |
| 9:00 PM | 1 Banana | 1 C Potato Chips | ¾ C Buttered Mixed Vegetables |
| 1 Cookie | 1 C Grape Juice | 2 Red Apple Rings | ½ C Fruit Combo |
| | 1 C Coffee | 1 C Tea | 1 C Milk |
| | | | |
| TUESDAY | 1 Roll—1 C Milk | 1 Sausage Burger on Bun | 1 Hot Beef Sandwich |
| COFFEE | 2 Hard Boiled Eggs | ¾ C French Fried Potatoes | 1 C Mashed Potatoes |
| 9:00 PM | 1 Pc. Buttered Toast | ½ C Salad (Vin/Oil Drsng) | ¾ C Buttered Green Beans |
| 1 Pc. Cake | W/Honey | 3 Apricots | ½ C Applesauce |
| | 1 Whole Pear | 1 C Cold Drink | 1 C Milk |
| | | | |
| WEDNESDAY | 1 Roll—1 C Milk | 1 Honey Loaf Sandwich | 1 4 Oz. Barbequed Ribs |
| COFFEE | 1 Bl. Grits | 1 Bl. Boston Baked Beans | 3 Yam Patties |
| 9:00 PM | ½ Grapefruit | 1 C Potato Chips | ¾ C Mexicorn |
| 1 Cookie | 1 C Orange Juice | ½ C Fruit Cocktail | 1 Cherry Tart |
| | 1 C Coffee | 1 C Tea | 1 C Milk |
| | | | |
| THURSDAY | 1 Roll—1 C Milk | 1 Cheeseburger | 1 ¼ Smothered Chicken |
| COFFEE | 1 Bl. Rice Flakes | 1 Bl. Split Pea Soup | 1 C Yellow Rice |
| 9:00 PM | 1 Whole Apple | ½ C Chef Salad | ¾ C Buttered Peas & Carrots |
| 1 Pc. Cake | 1 C Grape Juice | 2 Pear Halves | 2 Peach Halves |
| | 1 C Coffee | 1 C Cold Drink | 1 C Milk |
| | | | |
| FRIDAY | 1 Roll—1 C Milk | 2 2 Oz. Pcs. Fish Fillets | 2 Meat Balls |
| COFFEE | 2 Medium Boiled Eggs | ¾ C Butter Beans | 1 C Spaghetti |
| 9:00 PM | 1 Pc. Buttered Toast | ½ C Cole Slaw | ¾ C Buttered Wax Beans |
| 1 Cookie | W/Jelly | ½ C Fruit for Salad | 2 Purple Plums |
| | 1 Whole Orange | 1 C Tea | 1 C Milk |
| | 1 C Coffee | | |
| | | | |
| SATURDAY | 1 Roll | 2 Fried Knockers | 8 Ozs. Beef Stew |
| COFFEE | 1 Bl. Farina | 1 C Seashell Salad | 1 C Stewed Tomatoes |
| 9:00 PM | 1 C Apple Juice | 1 C Potato Chips | ½ C Turnip Greens |
| OPEN | 1 C Milk | ½ C Sliced Peaches | 1 Slice Pineapple |
| | 1 C Coffee | 1 C Cold Drink | 1 C Milk |
| | | | |
| SUNDAY | 1 Roll | 1 4 Oz. Grilled Steak | 1 r Oz. Sliced Baked Spiced Ham |
| COFFEE | 1 Bl. Oatmeal | 1 C Mashed Potatoes | 1 C Macaroni W/Cheese |
| 9:00 PM | 1 C Orange Juice | ¾ C Blackey Peas | ½ C Spinach |
| OPEN | 1 C Milk | ½ C Banana Pudding | 1 Cookie |
| | 1 C Coffee | 1 C Cold Drink | 1 C Tea |

170

| DATE | April 11–17, 1977 | | |
| TIME | 7:00 A.M. | 11:45 A.M. | 4:45 P.M. |
| MEAL | BREAKFAST | LUNCH | DINNER |

| | | | |
|---|---|---|---|
| MONDAY<br>COFFEE<br>9:00 PM<br>1 Pc. Cake | 1 Roll—1 C Milk<br>1 Bl. Special K.<br>1 Banana<br>1 C Grape Juice<br>1 C Coffee | 1 Pickle Loaf Sandwich<br>1 Bl. Beef/Vegt. Soup<br>½ C Green Salad W/1000<br> Island Dressing<br>½ C Sliced Apple<br>1 C Cold Drink | 1 Polish Sausage<br>1 C Yams<br>¾ C Creamed Corn<br>2 Green Gauge Plums<br>1 C Milk |
| TUES.<br>COFFEE<br>9:00 PM<br>1 Cookie | 1 Roll<br>1 Bl. Cream of Wheat<br>1 Pc. Buttered Toast<br> W/Jelly<br>1 Whole Orange<br>1 C Milk—1 C Coffee | 1 Turkey Burger<br>1 Bl. Baked Beans<br>1 C Potato Chips<br>2 Peach Halves<br>1 C Tea | 1 Stuffed Pepper<br>1 C Mashed Potatoes<br>¾ C Buttered Mixed Vegetables<br>1 Lemon Tart<br>1 C Milk |
| WED.<br>COFFEE<br>9:00 PM<br>1 Pc. Cake | 1 Roll—1 C Milk<br>1 Bl. Corn Flakes<br>1 Whole Apple<br>1 C Grape Juice<br>1 C Coffee | 1 Baloney & Cheese Sandw.<br>1 Bl. Chicken Gumbo Soup<br>½ C Chef Salad<br>3 Apricots Halves<br>1 C Cold Drink | 1 4 Oz. Liver W/Onion Gravy<br>1 C O'Brien Potatoes<br>¾ C Green Beans W/Tomatoes<br>½ C Fruit Salad<br>1 C Milk |
| THURS.<br>COFFEE<br>9:00<br>1 Roll | 1 Roll—1 C Milk<br>2 Hard Boiled Eggs<br>1 Pc. Buttered Toast<br>½ Grapefruit<br>1 C Coffee | 8 Ozs. Macaroni W/Franks<br>½ C Wax Beans<br>½ C Jello (fruit jello)<br>1 Cookie<br>1 C Tea | 1 4 Oz. Veal Patti<br>1 C French Baked Potato<br>¾ C Buttered Lima Beans<br>½ C Sliced Peaches<br>1 C Milk |
| FRIDAY<br>COFFEE<br>9:00 PM<br>1 Cookie | 1 Roll—1 C Milk<br>1 Bl. Farina<br>1 Whole Pear<br>1 C Orange Juice<br>1 C Coffee | 8 Ozs. Beef Raviola<br>¾ C Combination Salad<br>3 Purple Plums<br>1 C Cold Drink | 2 2 Oz. Perch Fillets<br>1 C Spaghetti<br>¾ C Buttered Peas<br>½ C Prunes<br>1 C Tea |
| SATURDAY<br>COFFEE<br>9:00 PM<br>OPEN | 1 Roll—1 C Milk<br>1 Bl. Raisin Bran<br>1 Whole Apple<br>1 C Grape Juice<br>1 C Coffee | 1 Dutch Loaf Sandwich<br>1 Bl. Chicken W/Rice Soup<br>1 C Potato Chips<br>2 Pear Halves<br>1 C Milk | 1 4 Oz. Baked Pork Chop<br>1 C Hash Brown Potatoes<br>¾ C Butter Beans<br>½ C Fruit Cocktail<br>1 C Tea |
| SUNDAY<br>COFFEE<br>9:00 PM<br>OPEN | 1 Roll<br>1 Bl. Grits<br>1 C Orange Juice<br>1 C Milk<br>1 C Coffee | 1 4 Oz. Sliced Baked Ham<br>1 C Hot Potato Salad<br>¾ C Peas/Carrots<br>1 Boiled Egg<br>½ C Cranberry Sauce<br>2 Slices Pineapple<br>1 C Cold Drink | 8 Oz. Hamburg Casserole<br>¾ C Turnip Greens<br>2 Red Apple Rings<br>1 Cup Tea |

| DATE | April 25—May 1, 1977 | | |
|------|------|------|------|
| TIME | 7:00 AM | 11:45 AM | 4:45 PM |
| MEAL | BREAKFAST | LUNCH | DINNER |
| MONDAY<br>COFFEE<br>9:00 PM<br>1 Cookie | 1 Roll<br>1 Bl. Cheerios<br>1 Banana<br>1 C Milk<br>1 C Coffee | 1 Fried Baloney Sandw.<br>1 Bl. Baked Beans W/Franks<br>½ C Salad (Cook's Ch)<br>2 Slices Pineapple Rings<br>1 C Tea | 8 Ozs. Beef & Noodles<br>¾ C Glazed Carrots<br>½ C Turnip Greens<br>3 Apricot Halves<br>1 C Milk |
| TUESDAY<br>COFFEE<br>9:00 PM<br>1 Pc. Cake | 1 Roll—1 C Milk<br>1 Bl. Grits<br>1 Pc. Buttered Toast<br> W/Jelly<br>1 C Orange Juice | 1 Tuna Fish Sandwich<br>1 Bl. Beef Vegt. Soup<br>1 C Potato Chips<br>½ C Fruit for Salad<br>1 C Cold Drink | 1 4 Oz. Sliced Turkey<br>1 C French Baked Potato<br>¾ C Buttered Mixed Vegt.<br>2 Pear Halves<br>1 C Milk |
| WEDNESDAY<br>COFFEE<br>9:00 PM<br>1 Roll | 1 Roll—1 C Milk<br>1 Bl. Sugar Pops<br>1 Whole Orange<br>1 C Grape Juice<br>1 C Coffee | 8 Ozs. Hamburger Casserole<br>½ C Buttered Green Beans<br>¾ C Lemon Lime Jello<br>1 Sugar Cookie<br>1 C Tea | 1 4 Oz. Pc. Baked Ham<br>2 Medium Boiled Potatoes<br>¾ C Boiled Cabbage W/Carrots<br>½ C Prunes<br>1 C Milk |
| THURSDAY<br>COFFEE<br>9:00 PM<br>1 Cookie | 1 Roll—1 C Milk<br>2 Medium Boiled Eggs<br>1 Pc. Buttered Toast<br> W/Honey<br>½ Grapefruit | 2 Pcs. Goose Liver/Sandw.<br>1 Bl. Turkey soup<br>½ C Chef Salad<br>2 Peach Halves<br>1 C Milk | 1 4 Oz. Grilled Steak<br>3 Yam Patties<br>¾ C Cream Style Corn<br>½ C Tapioca<br>1 C Cold Drink |
| FRIDAY<br>COFFEE<br>9:00 PM<br>1 Pc. Cake | 1 Roll<br>1 Bl. Oatmeal<br>1 Whole Orange<br>1 C Milk<br>1 C Coffee | 2 2 Oz. Perch Fillets<br>¾ C Butter Beans<br>½ C Potato Chips<br>½ C Fruit Cocktail<br>1 C Tea | 8 Ozs. American Chop Suey<br>1 C Steamed Rice<br>¾ C Butter Wax Beans<br>2 Purple Plums<br>1 C Milk |
| SATURDAY<br>COFFEE<br>9:00 PM<br>OPEN | 1 Roll—1 C Milk<br>1 Bl. Special K.<br>1 Whole Pear<br>1 C Orange Juice<br>1 C Coffee | 1 Egg Salad Sandwich<br>1 Bl. Split Pea Soup<br>½ C Salad, Cook's Ch<br>½ C Sliced Peaches<br>1 C Cold Drink | 1 8 Oz. Barbequed Beef Sandw.<br>1 C O'Brien Potatoes<br>¾ C Butter Lima Beans<br>2 Slices Red Apple Rings<br>1 C Milk |
| SUNDAY<br>COFFEE<br>9:00 PM<br>OPEN | 1 Roll<br>1 Bl. Cream of Wheat<br>1 C Grape Juice<br>1 C Milk<br>1 C Coffee | 1–¼ Pc. Baked Chicken<br>1 C Candied Yams<br>¾ C Buttered Peas/Carrots<br>½ C Applesauce<br>1 C Cold Drink | 1 Sloppy Joe Sandwich<br>1 Medium Baked Potato<br>¾ C Buttered Mixed Vegt.<br>½ C Butterscotch Pudding<br>1 C Milk |

# APPENDIX B

## A. Entrance Examinations—(General Population)

*Principle:* Each individual committed to an institution of incarceration or detention, should receive a reception health assessment and no person shall be admitted who is not conscious.

*Public Health Rationale:* The assessment of every person's health status is essential to provide for: a) the detection of health problems which require attention for the protection and well-being of the individual and the institution; b) the gathering of data as a reference and point of departure for planning and delivering immediate and long range comprehensive individual health care; and, c) the collection of information to establish an epidemiological and statistical profile by which health system needs are recognized and program planning decisions are made.

1. At the time of reception and initial evaluation, the inmate shall be made aware of the health services in the institution. This should be written and also explained to each inmate.
2. The reception evaluation shall be recorded in the individual's medical record which shall be started at this time.
3. Those evaluative procedures clearly necessary to detect health problems requiring immediate action to protect the individual and the institution, shall be completed before the inmate is placed in any holding unit or integrated into the institutional population.
4. All other evaluative procedures needed to complete the admitting health profile and to assist in work and activity classification, shall be completed in a scheduled manner not to exceed seven calendar days from the date of initial reception and incarceration.
5. A well-defined written plan and orders formulated by the administrative and professional staffs shall exist and be available for the care and disposition of health problems identified upon admission.
6. Any prisoner found to be in acute health stress on admission and in need of emergency care shall be referred to an appropriate treatment facility immediately.
7. Those health problems identified as a result of the assessment during incarceration which need continuing intervention or attention, shall be referred to appropriate persons and agencies.

The initial evaluation shall take place in an area that is conducive to the encounter. The patient shall be comfortable and clothed in garment suitable for the examination. The initial medical assessment shall include:

1. Measuring of the blood pressure, respiratory rate, temperature, and pulse.
2. Inquiry about:
 a. Headache, recent head injury and loss of consciousness;
 b. Use of prescribed medicines;
 c. Chronic health problems, such as heart disease, hypertension, seizure disorders, asthma, sickle cell disease, diabetes mellitus, and tuberculosis;
 d. Regular use of barbiturates, sedatives, opiates, alcohol, and non-prescribed drugs;
 e. Unusual bleeding or discharge;
 f. Recent fever or chills;
 g. Unusual pains and recent injury;
 h. Allergy to medication and other substances;
 i. Lacerations, bruises, abscesses, ulcers and itchiness.
3. A visual inspection for signs of trauma, recent surgery, abscesses, open wounds, parenteral drug use, jaundice, pediculosis and communicable disease.
4. Observation and evaluation of consciousness, awareness of surroundings and events, and appropriateness of personal interactions as well as height and weight and gross body composition.
5. Physical assessment of:
 a. Head—defects, contusions, lacerations and dried blood;
 b. Ears—gross hearing loss, blood/discharge;
 c. Nose—blood and other discharges, recent injury;
 d. Eyes—bruises, jaundice, gross movements, pupil reactivity;

 e. Chest—labored or unusual breathing, penetrating wounds;

 f. Abdomen—tenderness, signs of blunt injury, surgical scars;

 g. Genitalia—discharge, lesions, lice;

 h. Extremities—sign of drug use, hyperpigmentation of anticubital fossae, abscesses, deformity, "tracks".

6. Implantation of tuberculosis skin test where not contra-indicated.*

7. Obtaining urine for the detection of glucose, ketones, blood protein and serum for serology.

The procedures necessary to complete the evaluation shall include:

1. Inquiry about:
 a. Prior significant illnesses and hospitalization;
 b. Familial and domiciliary diseases of significance such as diabetes mellitus, hypertension, tuberculosis, and hepatitis;
 c. Immunization status;
 d. Current symptoms and abnormalities in the nervous, gastro-intestinal, respiratory, auditory, integumentary, endocrine, cardiovascular, opthalmic, musculoskeletal, and blood forming systems.

2. Physical inspection and examination of organs and structure of head, neck, chest, abdomen, genitalia, rectum, and extremities with particular emphasis and comment about the presence or absence of abnormalities suggested by the previously obtained history.

3. Mental health screening and evaluation which shall
 a. be conducted by a health worker sensitive to the crisis state in which the new prisoner is liable to be;
 b. include, as a minimum, the following elements of personal history: mental illness, mental health treatment, education, work, social, sexual, family, drug and alcohol use; and assessment of coping mechanisms and ego strengths; and any indication by the prisoner of a desire for help;
 c. be documented in writing in a standardized fashion;
 d. include explanation to the new prisoner of the mental health services available and procedure(s) for application.

4. Collective specimens for hepatitis screening, white blood cell count, hematocrit, and other indicated laboratory tests.

5. Vision testing with Snellen Chart and auditory testing with a reliable standard.

6. Immunization with Td in current needle users.

Serologically, syphilis has a long incubation period and is not detectable until the infection has been established. Thus, the serological test should be repeated three months after the initial intake exam.

Repeat venereal disease testing should be available upon request. Facilities should also be available for the diagnosis and treatment of other sexually transmitted diseases such as yeast and trichomonal infections, and genital herpes.

## B. Entrance Examinations—(Women)

*Principle:* A substantial number of health needs of women require the service and sensitivity of persons clinically trained in gynecology and obstetrics.

*Public Health Rationale:* Each woman committed to a correctional institution shall receive an initial examination in accordance with the principles outlined above with special emphasis on the breasts and reproductive organs.

---

* Note: The importance of quickly diagnosing and treating venereal diseases and TB cannot be overemphasized. This is not only true for the inmate's protection, but also for the protection of all inmates, the staff, and the outside community.

*Satisfactory Compliance:* The initial health assessment of women shall also include:

1. Inquiry about:
 a. The menstrual cycle and unusual bleeding;
 b. The current use of contraceptive medications;
 c. The presence of an I.U.D.;
 d. Breast masses and nipple discharge;
 e. Pregnancy.

2. The physical assessment, in addition to the examination performed on men, shall include:
 a. A pelvic examination which must be conducted with the maximum concern for human dignity and which must not be subverted for security purposes;
 b. A breast examination.

3. Specimens collected shall include a culture for gonorrhea, a pap smear, and a serological test for syphilis.

4. The written plan shall provide for the special dietary and housing needs of pregnant women, and the continuation of contraceptives utilized both for family planning and therapeutic reasons. The complete history shall include information about family planning services being utilized or desired.

5. Those procedures necessary for protecting the individual and the institution shall be performed prior to the housing and classification of the inmate.

**Addendum:**

When an inmate is received from another institution where an *adequate* health evaluation has been performed, it may not be necessary to repeat the entire procedure. The medical record shall be reviewed and the patient interviewed and appropriate supplementary examination and testing performed.

APPENDIX C

## INMATE OFFENSE REPORT
**Lucas County Jail**

**Nº 0220**

Name _____ Area assigned to _____

Date _____ Hour _____

**Details of offense:** (Include names of all participants, names of any guards present during the incident; names of any guards asked for assistance or offering assistance; location of incident; injuries suffered, if any; etc.)

Names of witnesses _____

Signature of inmate _____ Date signed _____

Signature of person helping
inmate complete report _____

**ROUTING:** Inmate - White, Sheriff - Canary, Warden - Pink.

176

APPENDIX D

criminal
justice
training &
education
center

316 n. michigan street suite 900 toledo, ohio 43624 (419) 244-3041

The Lucas County Sheriff's Department

Pre-Service Training Program

For

New Corrections Officers

At The

Lucas County Corrections Center

Designed By

The Criminal Justice Training & Education Center

80 Hours Paul R. Paquette
(Dates To Be Announced) Corrections Component Leader

---

*Introduction:*

The failure of traditional detention practices in stemming the incidence of crime has been quite obvious in recent years, and the need for new approaches and experimentation is all too clear. Changing the jail function from detention alone, to one that includes correctional programming will make new demands on jail personnel that they must be prepared to meet. This challenge can be met through training, leadership, and community support.

The Lucas County Correction Center is an instrument of organized community government. As such, it is intended that the Correction Center serve the community in the following ways:

1. To provide for the protection of the community by the safe keeping of offenders committed to institutional custody.

2. To provide for the protection, care, and welfare of inmates.

3. To provide a suitable program for the rehabilitation of offenders.

4. To establish and maintain an efficient correctional agency.

Correctional institutions for offenders have been provided, for their custodial care and rehabilitative treatment of those confined to its custody. Although such institutions may have adequate physical facilities, proper equipment, and policies and operating procedures governing their operations that have been well formulated, the key to the successful operation of a correctional institution for the attainment of the previously stated goals will always depend upon

the caliber of the personnel involved. The staff must not only be comprised of carefully selected individuals, they must also be trained to render effective correctional service as well, to aid in the rehabilitation of the offender.

*Problem/Needs Statement*

The concepts of both pre-service and in-service training implies that formal instruction is to be given to each employee in correctional service beginning at the time of initial employment and continuing throughout each year until the employee leaves the service. Training programs are provided to develop the knowledge, skills, and attitudes of correctional workers which are conducive to the rehabilitative process. Such development should be regarded as a continuous and cumulative process. Whatever may be gained from such training, of course, must be supplemented by on-the-job direction and guidance provided by supervisory personnel.

In February, 1975, the Ohio Criminal Justice Supervisory Commission published its "Standards for the Recruitment and Training of Adult Corrections Personnel in Ohio." Standard 1.0 dealing with Correctional Staff Development states:

— All new staff members should have at least 40 hrs. of orientation training during their first week on the job, and at least 60 hrs. of additional training during their first year.

— All staff members, after their first year should have at least 40 hrs. of additional training a year to keep them abreast of all changing nature of their work, and introduce them to current issues affecting corrections.

The above standards also comply with Section 14.11 of the National Standards and Goals for Corrections. In addition to the above standards the United States District Court has issued a Federal Mandate calling for the following requirements in terms of

pre-service training for corrections officers at the Lucas County Corrections Center:

— All jail personnel are to take the Programmed Instruction Course prepared by the United States Bureau of Prisons for Jail Officers and jail administrators.

— Successful completion of this course shall be a requirement for employment or continued employment in the Corrections Center.

*The Training Program*

The basic pre-service training program for new corrections officers at the Lucas County Corrections Center has been designed to provide them with instruction in how to perform tasks essential to their jobs as well as providing them with a basic understanding of the human relations aspect of their work and the need establishing good interpersonal relationships in the performance of their duties.

The pre-service training program for corrections officers consists of a total of 80 hrs. of instruction which shall be broken down as follows:

1. 40 hrs. of individual study which will require the use of the program instruction material published by the U.S. Bureau of Prisons dealing with—*The Jail: Its Operation and Management*

2. 40 hrs. of classroom instruction dealing with their specific duties as corrections officers and the Operating Policies and Procedures of the Lucas County Corrections Center (Old/New Settings).

It is recommended that during the first week of employment, the new corrections officers fill out the appropriate work forms, be issued their uniforms, take their physical/psychological exams, and complete the programmed instruction course from the U.S. Bureau of Prisons.

Prior to the start of the 40 hrs. of classroom instruction during the second week of employment, all c/o trainees should be given the final examination for the program instruction course in jail operations, which would then be sent in to Washington for scoring and certification of those who successfully pass the exam. During the second week of employment, the c/o trainees would receive the 40 hrs. of classroom instruction which would further help prepare them for assuming their new role by instructing them in the goals, objectives, and operations of the Lucas County Correctional Facility (Jail) as well as where and how they fit in; and how to be effective in the performance of their specific duties. Upon completion of the forty hrs. of classroom training, the trainees will be given a test which will help determine their level of competence in terms of knowing their specific responsibilities as corrections officers and also their capability in terms of being able to perform their duties in an effective manner that will compliment the rehabilitative process. Each trainee that successfully passes the test will be issued a certificate of achievement from the Criminal Justice Training and Education Center. Those who do not score passing grades will receive certificates of attendance and will be recommended for further intensive training.

### Goals of the Training Program

The main goal of this pre-service training program for new corrections officers will be to develop the knowledge, skills, and attitudes of the trainees that will be necessary for them to perform their duties in an effective yet efficient manner. Related goals would include:

1. Developing the capabilities of the trainees for participation in the security, supervision, classification, and treatment of prisoners committed to their care.
2. Developing the effectiveness of the trainees in carrying out their assigned duties, and thereby obtaining greater efficiency and economy in the operations of the Correction Center.
3. Developing the trainees capacity to recognize, understand, and solve the problems which commonly occur in a correctional institution.
4. Developing a sense of pride as a corrections officer through promoting job satisfaction and job advancement opportunities by stressing the importance of effectiveness and efficiency in the performance of their duties, in a manner that is consistent with the goals and objectives of the Corrections Center.

### Objectives of the Training Program

In view of the goals stated above this instructional program has been designed to meet the following objectives in terms of training the new corrections officers to:

1. Be familiar with the Lucas County Sheriff Department's organizational chart and structure as well as their position in it and the role that they are to fill within the organization.
2. Maintain high professional standards in the performance of their duties.
3. Contribute to the development and maintenance of a healthy climate within the Corrections Center that is conducive to the successful rehabilitation of the offender.
4. Perform duties that are related to the maintenance of institutional security.
5. Perform assigned tasks in connection with routine institutional operations in an efficient yet effective manner.
6. Provide adequate supervision of inmates that is effective in terms of maintaining the security and well being of both the inmates and the staff.

7. Effectively manage inmates who present special problems within the institutional setting.

8. Control dangerous or destructive individuals to keep them from hurting themselves or others.

9. Maintain general discipline within the Corrections Center in a manner that is conducive with the rehabilitative effort.

10. Act appropriately in emergency situations to re-establish control in an effective manner.

11. Protect the individual rights of all inmates, regardless of their status or classification.

12. Promote good relationships between the Lucas County Corrections Center and the community.

*Training Tasks to be Presented and Discussed in Terms of Meeting the Stated Objectives*

*Professionalism:*

In the performance of their duties, corrections officers must conduct themselves and their activities in such a way as to—

1. Maintain the custody and security of the inmates assigned to his care.

2. Protect the lives, safety, and property of the individuals being detained, awaiting trial, or under sentence, in a manner consistent with human dignity. To do so the corrections officer must be able to:

a. Understand the function and purpose of detention and the role of the jail in this connection.

b. Understand the legal framework within which the corrections officer performs his/her duties, and the legal contraints which are imposed upon their actions.

c. Apply basic knowledge of human behavior in dealing with the problems of individuals lawfully committed to the facility under their supervision.

d. Exercise the basic principles of supervision in their relationships with the inmates according to established policies and procedures.

e. Recognize the areas of jurisdiction of local, state, and federal agencies which have responsibility for jail standards and operations as well as housing prisoners there.

*Jail Climate:*

In terms of maintaining a healthy climate within the Corrections Center, corrections officers must—

1. Understand the psychological and emotional aspects of confining an individual in a correctional institution.

2. Be sensitive to conditions and situations which contribute to stress, including for example:

a. Dehumanizing institutional procedures.

b. Inmate harassment and strong-arming.

c. Racial and ethnic group tensions.

d. Negative staff attitudes and behaviors.

e. Family crises and emergencies.

3. Become skilled in utilizing factors and promoting programs and activities which help to reduce stress, fears and the anxieties of detainees and inmates.

4. Act in ways which will promote better relationships between the inmates and corrections officers.

*Institutional Security:*

In terms of maintaining institutional security, corrections officers must be able to—

1. Accurately make physical count of prisoners/inmates as required.

2. Exercise proper control over keys, tools, and weapons.

3. Make thorough security inspections.

4. Utilize methods appropriate for the control of contraband:
 a. Conduct thorough shakedowns, frisks, and body searches.
 b. Conduct thorough day room and individual module searches.
5. Understand the uses of, and where necessary, be able to operate security equipment under your control.
6. Maintain appropriate control and supervision of drugs and medications administered to the inmates.

*Routine Institutional Operations:*

In performing assigned tasks in connection with daily routine operations, corrections officers must—

1. Be knowledgeable of basic policies and operating procedures of the Lucas County Corrections Center in connection with:
 a. Inmate correspondence and visitations.
 b. Institutional sanitation and environmental health.
 c. Food services.
 d. Medical services.
 e. Clothing issues.
 f. Institutional maintenance.
 g. Records and reports.
 h. Institutional programs, including:
 —Individual and group counseling Services.
 —Religious Services.
 —Education and Training Programs.
 —Recreational Programs.
 —Work and Study Release.
 —Trustee Program.
 —Emergency Furloughs.
 —Women's Services Bureau.
 —Library Services.
 —Others.

*Supervision of Inmates:*

In order to provide effective supervision of inmates in an efficient manner, corrections officers must—

1. Understand the purposes and objectives of supervision in the Corrections Center, and its relationship to establishing the jail "climate."
2. Apply appropriate supervisory methods and techniques in the management of inmates.
3. Maintain appropriate interpersonal relationships with inmates in order to foster mutual cooperation.
4. Understand the role and responsibilities of the corrections officer in providing for the adequate supervision of inmates during the various activities that occur on a day to day basis.
5. Be aware of how to supervise special groups of inmates, such as:
 a. Trustees.
 b. Females.
 c. Juveniles.

*Management of Inmates with Special Problems:*

In order to work effectively with the various types of individuals that pose special problems within the institutional setting, corrections officers must be able to—

1. Recognize gross symptoms of persons who may be:
 a. Acute or chronic alcoholics.
 b. Drug addicts or users.
 c. Mentally Disturbed.
 d. Emotionally Disturbed.
 e. Mentally retarded.
 f. Sexual deviants.
 g. Diabetics.
 h. Epileptics.
 i. Suffering from acute or chronic illness.
 j. Acutely depressed.
2. Understand the special problems related to the supervision and care of inmates who exhibit any of the problems outlined above.
3. Apply sound basic principles in the appropriate management of inmates who present special problems, such as those listed above.

4. Use appropriate supervisory methods and techniques to assure that such inmates are properly protected and cared for.

*Maintaining General Discipline:*

In order to maintain fair, consistent and effective discipline within a correctional institution, corrections officers must—

1. Have a working knowledge of the basic rules and regulations related to the conduct of inmates.
2. Apply rules and standards of behavior among inmates in an objective, impartial, and consistent manner at all times.
3. Apply basic knowledge of human behavior to the appropriate management of disciplinary situations.
4. Know when it is appropriate to employ informal and formal methods for handling rule infractions.
5. Fully understand the formal methods that exist for handling serious disciplinary actions, and be able to:
 a. Conduct adequate investigations of rule violations.
 b. Prepare formal written reports of disciplinary violations.
 c. Testify before a disciplinary board, board of inquiry, or court in an objective manner.
6. Understand the constraints upon his/her investigative authority when a crime has been committed by an inmate within the institution.

*Controlling Dangerous or Destructive Individuals:*

In terms of dealing effectively with aggressive individuals who pose a threat to themselves as well as to others, corrections officers must be able to—

1. Apply some basic knowledge of defiant behavior in terms of motivation and response to gain and maintain control of such individuals.

2. Utilize appropriate defensive methods and tactics involved with the application of force in an effective manner to subdue a dangerous person.
3. Properly use appropriate and authorized nonlethal weapons and restraints in subduing a dangerous inmate.

*Protecting Inmate Civil Rights:*

In order to guard the individual rights of all inmates committed to the Corrections Center, corrections officers must—

1. Understand the enforceable constitutional rights of all categories of inmates under their supervision.
2. Be fully informed (knowledgeable) of procedures designed to insure the protection of individual rights within the Corrections Center.
3. Perform their duties in a manner that is consistent with the policies and procedures dealing with the inmate's individual civil rights within the correctional setting.
4. Be able to accurately and fully report on their rationale and course of action in matters involving possible restrictions upon the individual rights of inmates.
5. Be able to testify accurately before appropriate bodies, including the courts, concerning their behavior in regards to the individual civil rights of inmates.
6. Be aware of the liabilities which the corrections officer may incur because of some form of abuse of authority which infringes upon the individual rights of the inmate.

*Dealing with Emergency Situation:*

In order to be able to deal with the various types of emergencies, that are com-

mon to such an institutional setting, in an effective manner, corrections officers must:

1. Develop a working knowledge of emergency plans and procedures within the Corrections Center for dealing with various types of crisis situations, and know their responsibilities in connection with such emergencies as:
 a. Injuries and Illnesses
 b. Attempted Escapes.
 c. Fights & Riots.
 d. Other Institutional Disturbances.
 e. Fires.
 f. Natural Disasters.
 g. Attempted Suicides.
2. Be able to effectively utilize equipment, tools, and/or weapons necessary for handling an emergency—depending upon the situation.

*Promoting Good Community Relations:*

In order for corrections officers to do their part in promoting a good relationship between the Corrections Center and the surrounding community they must—

1. Be able to relate in a professional manner with members of the inmates family, and others who have concerns about his needs.
2. Maintain professional relations with representatives of community agencies and groups who are concerned with the inmates and their needs.
3. Have the ability to communicate effectively with community agencies and groups regarding jail policies, procedures, and programs.

The objectives and training tasks described in the above specifications are the minimum which are to be taught in the basic training course for new corrections officers. Instructors are encouraged to develop classroom materials and presentations that will contribute in practical ways to the capacity of the new corrections officers to perform their assigned duties in an efficient and effective manner.

*Outline Schedule of Training Activities*

*1st Week* (Self-Study) 40 hrs.

All students will be required to complete the U.S. Bureau of Prisons programmed instruction self-study course on—*"The Jail: Its Operation and Management."* They will be responsible for studying the following sections of that training program:

Section 1—Correctional History and Philosophy
Section 2—Jail Operations
Section 3—Jail Climate
Section 4—Supervision
Section 5—Discipline
Section 6—Special Prisoners

In addition to the above, during the 1st week of employment, all new corrections officers should:

1. Complete all necessary LCSO work forms.

2. Undergo the required psychological testing.

3. Be issued their uniforms.
 (To be worn during the 40 hrs. of classroom training the following week).

*2nd Week* (Classroom Instruction) 40 hrs.

All trainees will be required to attend all classroom training activities, unless they have an excused absence. They will be expected to be on time each day, and should be required to wear their uniforms to all training activities in order to create a professional appearance as well as learning to develop a professional attitude concerning their role as corrections officers.

## Day 1

**Morning:**

| | |
|---|---|
| Registration | 8:30– 9:30 a. m. |
| Welcome and Introduction to the Lucas Criminal Justice System | 9:00– 9:30 a. m. |
| Introduction from CJTEC | 9:30– 9:45 a. m. |
| Introduction to the Training Program (Expectations and Overview) | 9:45–10:15 a. m. |
| Review, Questions, and Discussion on Programmed Instruction Material | 10:15–10:45 a. m. |
| Examination on the Self-Study Course | 11:00–12:00 p. m. |

**Afternoon:**

| | |
|---|---|
| Introduction to the Lucas County Sheriff Department | 1:00– 5:00 p. m. |
| Table of Organization and Chain of Command | 1:00– 2:00 p. m. |
| Civil Branch | 2:00– 2:30 p. m. |
| Law Enforcement Branch | 2:30– 3:00 p. m. |
| Job Descriptions for CIO's | 3:15– 4:30 p. m. |
| Job Advancement Opportunities through further training and education—CJTEC Programs, and the LEEP Program | 4:30– 5:00 p. m. |

## Day 2

**Morning:**

| | |
|---|---|
| Table of Organization for the Lucas County Corrections Center | 8:30– 8:45 a. m. |
| Chain of Command and Flow Chart | 8:45– 9:00 a. m. |
| Breakdown of Organizational Chart (Explain the Functions of the Different Areas) | 9:00–12:00 p. m. |
| Booking and Holding Area | 9:00– 9:20 a. m. |
| Classification and Assignment | 9:20– 9:40 a. m. |
| Medical Ares (Responsibilities and Capabilities) | 9:40–10:00 a. m. |
| Initial Counseling Services | 10:00–10:15 a. m. |
| Inmate Services: | 10:30–11:30 a. m. |

 1. Counseling
 2. Education
 3. Recreation
 4. Religious
 5. Library
 6. Women Services Bureau

| | |
|---|---|
| Living Modules: | 11:30–12:00 p. m. |

 1. Twelve Man Module
 2. Six Man Module
 3. Four Man Module
 4. Sixth Floor
 —Includes location and types of offenders found in
 each

**Afternoon:**

| | |
|---|---|
| Film—<u>Inmate Security in a Correctional Institution</u> | 1:00– 1:30 p. m. |
| Discussion of film concerning the general concepts in Security (What to Check/What to Look For) | 1:30– 2:00 p. m. |
| Presentation and Discussion of the Specific Security Policies and Procedures for the Lucas County Corrections Center | 2:00– 5:00 p. m. |

Day 3

Morning:

Theme—Developing an Effective Jail Climate Conducive to the Rehabilitative Process

| | |
|---|---|
| Film—What You Are is Where You Were, When | 8:30–10:00 a. m. |
| Discussion of the film, dealing with Values Clarification and Developing Interpersonal Relationships | 10:00–10:30 a. m. |
| Role—Playing and Confrontation | 10:45–11:45 a. m. |
| Slide/Tape Narration—Jail Climate | 11:45–12:00 p. m. |

Afternoon:

| | |
|---|---|
| Film—Supervision of Inmates | 1:00– 1:30 p. m. |
| Discussion of Film—What is "Good" Supervision | 1:30– 2:00 p. m. |

Presentation and Discussion of Specific Policies and Procedures or Supervising Inmates in the Lucas County Corrections Center:

1. Rules and Regulations
 a. Handbook for CIO's
 b. Handbook for Inmates
2. Policies dealing with Supervision
3. Operating Procedures for the Supervision of Inmates
4. Federal Mandate
5. Disciplinary Board for Inmates 2:00– 5:00 p. m.

Day 4

Morning:

Theme—When Things Go Wrong? How to Handle It

| | |
|---|---|
| Film—Emotional Disturbances in a Correctional Facility | 8:30– 9:00 a. m. |
| Discussion of Film and the Effects of Being Placed in Confinement | 9:00– 9:30 a. m. |
| General Aspects of Crisis Intervention (The Crisis Intervention Team) | 9:30–10:30 a. m. |

Procedures for Handling Specific Problem Situations in the Corrections Center:

| | | | | |
|---|---|---|---|---|
| 1. | Illnesses | 8. | Thefts | |
| 2. | Seizures | 9. | Gambling | |
| 3. | Injuries | 10. | Diversions | |
| 4. | Suicides | 11. | Riots | |
| 5. | Fights | 12. | Fires | |
| 6. | Rapes | 13. | Escapes | |
| 7. | Weapons | 14. | Hostages | 10:45–12:00 p. m. |

Afternoon:

Report Writing: Introduction to the Various Report Forms
1. What to write up
2. Basic Elements to Good Report Writing 1:00– 2:00 p. m.

Role Play Exercise—A Problem Situation—Write a Report on the Event—Discuss What you Wrote with the Group—How does your report measure up? 2:15– 5:00 p. m.

Day 5

Morning:

| | |
|---|---|
| Final Exam on Classroom Instruction | 8:30– 9:30 a. m. |
| Tour of the Lucas County Corrections Center | 9:30–10:30 a. m. |
| First Aid Training | 10:30–12:30 p. m. |

Afternoon:

| | |
|---|---|
| Personal Defense Training | 1:30– 4:30 p. m. |
| Graduation—Ramada Inn, Southwycke | 7:30 p. m. |

Agenda:

Dinner
Congratulatory Remarks
Class Representative Comments
Graduation Address
Presentation of the Class—Issuing Certificates and Badges
Swearing In Ceremony
Closing Remarks

Materials and Equipment Needed for the Training Program

Films:
1. "Inmate Security in a Correctional Facility"
2. "Supervision on Inmates in a Correctional Facility"
3. "Emotional Disturbances in a Correctional Facility"
4. "What You Are is Where You Were, When"

Slidetape Narration:
1. "Jail Climate"

Equipment:
1. Movie Projector
2. Slide/Tape Projector
3. Movie Screen
4. Overhead Projector

Materials:
1. Handbook for Corrections Officers
2. Handbook for Inmates
3. Federal Mandate
4. Notebooks
5. Overhead Projection Sheets
6. Other Appropriate Handouts

Space:
1. Classroom in the Lucas County Corrections Center

Programmed Text:
1. "The Jail: Its Operation and Management" (U.S. Bureau of Prisons)

*Evaluation of the Training Program*

*Student Evaluation:*

All trainees will be evaluated on the basis of two examinations—

1. The first exam will test the knowledge that they have gained from the Programmed Instruction Self-Study Course issued by the U.S. Bureau of Prisons. The tests will be sent in to Washington for scoring, and those who pass will be certified by the U.S. Bureau of Prisons as Corrections Officers—thus qualifying them for employment according to the Federal Mandate.
2. A second exam will be administered to test the knowledge, insights, and skills the trainees gained from the classroom instruction which will help them perform their duties in an effective and efficient manner. Those who score 75% or better on the exam will receive Certificates of Achievement from the Criminal Justice Training and Education Center.

*Instructor Evaluations:*

Upon completion of the training program, the trainees will be asked to evaluate the various instructors utilized in the program. CJTEC will supply the appropriate forms for this purpose.

*Course Evaluation:*

Upon completion of the training program both the instructors and the students will be asked to evaluate the "quality" of the program itself. CJTEC will supply the appropriate course evaluation forms.

*Written Evaluation:*

Based upon the evaluations and test scores the Criminal Justice Training and Education Center will be responsible for compiling a written report which will include the following—

1. A summary of all the evaluation forms concerning the quality of the instruction received, and the quality of the training program design itself.
2. A summary of the student test results, indicating strengths and weaknesses in terms of knowledge and skills gained through the training process.
3. Recommendations for follow-up in-service training based upon expressed needs and the evaluation of the test results mentioned above.

CLASSIFICATON FORM #08C1

## APPENDIX E

Identifier

Name _____ D.O.B. _____ Current Offense _____ Soc. Sec. No. _____

Booking No. _____ State _____

A.K.A.: _____ County _____

Sex: _____ Ethnic: _____

Education

Last School Attended _____ Date _____

Highest Grade Level Achieved _____ Date _____

Special Education G.E.D. _____ A.B.E. _____ Voc. Educ. _____

Educational Interest(s) _____

Legal Status
 Under Investigation _____ Awaiting Appeal _____
 Awaiting Indictment _____ Awaiting Transfer _____
 Awaiting Trial _____ Awaiting Probation or Parole Revocation Hearing _____

 Awaiting Sentencing _____ Serving Sentence _____
 Transit: Federal _____ Military _____ Other _____

Residence
 Present 1 yr. or present and prior 1½ yrs. _____
 Present 6 months or present and prior 1 yr. _____
 Present 4 months or present and prior 6 mos. _____
 Four (4) years or more in the community/county but no
 permanent address _____
 No permanent Address _____

Family Ties at Classification
 Lives with Spouse and Children _____
 Lives with Parents, Spouse; Single Parent with Children _____
 Lives with other Relatives _____
 Lives with Friend(s) or Regular Contact with Family _____
 Lives Alone, no Regular Contact with Family _____

Employment
 Present job one (1) year and can go back _____
 Present job one (1) year _____
 Present job 4 months or present and prior six (6) months _____
 Present job less than 4 months or unemployed no more than 3 mos. and prior job for at least 9 mos. or receiving Unemployment or Workmen's Compensation _____

Health
 General Physical Condition
 Good to Fair _____
 Poor health, regular visits to Doctor _____
 Alcohol Addiction _____
 Drug Addiction _____
Physical Condition at Intake
 Good _____ Fair _____ Chronic or long term illness _____
 Acute injury or illness _____
 Alcohol intoxicated _____
 Drug intoxicated _____

Prior Record
 Number of Convictions _____ Number of Open Cases _____
 Number of Felonies _____ Number of Prior Incarcerations _____
 Number of Misdemeanors _____

* Date of Intake _____ Date of Conviction_____
* Date of Release _____
* Means of Release _____
 DATE FILLED OUT _____
* See Instruction Sheet

## CLASSIFICATION FORM 08C1–A

NAME _____ S.S. # _____ BOOKING # _____

DATE _____ TIME: _____

| OFFENSE | | RESIDENCE | | AGE | |
|---|---|---|---|---|---|
| Fatal | (0) | Under Six Months | (1) | Under 26 | (1) |
| Aggressive | (2) | Six Months to One Year | (2) | 26 to 35 | (1) |
| Non-Aggressive | (4) | One Year and Over | (3) | Over 35 | (3) |

| MARRIED | | SINGLE | | EMPLOYMENT | |
|---|---|---|---|---|---|
| Married with Family | (4) | Supporting Dependents | (4) | Full Time | (3) |
| Full Support | (3) | Major Support | (3) | Part Time | (2) |
| Major Support | (2) | Partial Support | (2) | Unemployed | (1) |
| Partial Support | (1) | Independent | (1) | No Employment | |
| No Support | (0) | Supported | (0) | One Year or More | (0) |

| DURATION IN COMMUNITY | | PRIOR COMMITMENTS | | CREDIT STABILITY | |
|---|---|---|---|---|---|
| Under Six Months | (0) | None | (3) | Transient | (0) |
| Six Months to One Year | (1) | One | (2) | Living With | (1) |
| One Year to Four Years | (2) | Two or Three | (1) | Rent | (2) |
| Four Years and Over | (3) | Over Three | (0) | Purchase | (3) |

| PHYSICAL BUILD | | KNOWN ENEMIES | CO–DEFENDANTS |
|---|---|---|---|
| Large | (1) | | |
| Medium | (2) | | |
| Small | (3) | | |

| V.A. Benefits | Welfare Benefits | Religion |
|---|---|---|

JUDGMENT (0–10) _____

_____

_____

POINT DISTRIBUTION: Max. 3–16 Med. 17–26 Min. 27–39

TOT. Score

_____

## APPENDIX F

### GUIDELINES FOR INMATE DISCIPLINARY ACTION

CLASS I Offenses Restriction days

1. Arson (also attempted fire or explosion) ----------------------------------------- 30–35
2. Contraband (possession or dealing narcotics, money, firearms
 except marijuana possession) ----------------------------------- 30–35
3. Escape (also attempts) --------------------------------------------------------- 30–35
4. Aggressive assault with weapon or object ------------------------------------ 15–30
5. Possession of escape contraband ------------------------------------------- 15–30
6. Criminal damage to property—value $50 or more -------------------------- 15–30
7. Possession of needle or syringe ------------------------------------------- 15–30
8. Possession of knife, shiv, razor blade, spring or any weapon --------------------- 15–30
9. Bribery of an employee (also attempts) ------------------------------------ 15–30
10. Theft—value $50 or more -------------------------------------------------- 15–25

CLASS II OFFENSES

11. Threatening an employee ------------------------------------------------- 10–20
12. Refusing to go to cell --------------------------------------------------- 10–20
13. Running from Officer --------------------------------------------------- 10–20
14. Refusing to obey an order ---------------------------------------------- 10–20
15. Fighting (except in self defense, no weapon) ---------------------------- 10–20
16. Unauthorized clothing -------------------------------------------------- 10–20
17. Altering Clothing ------------------------------------------------------ 10–20
18. Throwing water, food, or anything at personnel -------------------------- 10–20

CLASS III OFFENSES

19. Theft—value under $50 ------------------------------------------------- 5–20
20. Damage to property—value under $50 ----------------------------------- 5–20
21. Possession or smoking of marijuana ------------------------------------ 5–20
22. Sniffing glue or other chemical products ------------------------------- 5–20
23. Possession of lock pick ------------------------------------------------ 5–20
24. Possession of dice ----------------------------------------------------- 5–20
25. Using profane language to an employee --------------------------------- 5–20
26. Refusing to keep individual cells clean -------------------------------- 5–20
27. Lying to an officer or supervisor -------------------------------------- 5–10

Inmate disciplinary action also may or may not result in the following loss of privileges:

1. Visiting
2. Commissary
3. Television and/or radio
4. Telephone (restricted usage)
5. Group recreation
6. Program attendance

# APPENDIX G

## GUIDELINES FOR INMATE DISCIPLINARY ACTION

**CLASS I OFFENSES** Restriction Days

a. Disobedience of a direct order, which shall include aggravated insubordination _____ 5–15
b. Refusal to carry out work or other institutional assignments _____ 5–15
c. Refusal of classification action or assignment _____ 5–15
d. Creating a minor disturbance _____ 5–15
e. Fighting—with or without weapons, including instigation of fighting _____ 5–15
f. Stealing or embezzlement of property, obtaining property by fraud, or receiving
 stolen, embezzled, or fraudulently obtained property _____ 5–15
g. Possession or consumption of any intoxicant, such as alcoholic
 beverages or drugs, unless with permission _____ 5–15
h. Possession or manufacture of weapons and contraband which shall include any
 article knowingly possessed for which permission has not been given _____ 5–15
i. Consensual sex acts _____ 5–15
j. Threats _____ 5–15
k. Gambling or possession of gambling articles _____ 5–15
l. Forging documents _____ 5–15
m. Dealing, which shall include any transaction for which payment of
 any kind is made, promised or expected _____ 5–15
n. Disrespect to an officer, staff member, or visitor _____ 5–15
o. Malicious destruction, alteration, or misuse of property _____ 5–15
p. Any act not specifically set forth herein, knowingly done, which constitutes
 an obviously immediate and direct threat to the security of the institution,
 its staff, other inmates, or the inmate himself _____ 5–15
q. Any act of an inmate aiding and abetting a Class I Rule violation _____ 5–15
r. Any repeated violation of Class II Rules where a determination is made that
 remedies for Class II Rule violations serve no deterrent effect _____ 5–15
s. All acts which constitute a felony or misdemeanors specified in the
 Ohio Revised Code or U. S. Code such as mail violations _____ 5–15
t. Conspiracy to violate a Rule of Conduct _____ 5–15
u. Attempt to violate a Class I Rule _____ 5–15
v. Violation of visiting or mail rules _____ 5–15
w. Giving false information or lying _____ 5–15
x. Being out of place _____ 5–15
y. Aiding and abetting Class I Rule violations _____ 5–15

**CLASS II OFFENSES**

a. Disrespect to an inmate or visitor _____ 1–10
b. Attempt to violate a Class II Rule _____ 1–10
c. Horseplaying _____ 1–10
d. Smoking in prohibited areas _____ 1–10
e. Inadequate work performance _____ 1–10
f. Excessive loud noise, such as from radio or shouting _____ 1–10
g. Seductive and obscene acts _____ 1–10
h. Carelessness with equipment _____ 1–10
i. Dirty clothing, living quarters, or poor personal hygiene _____ 1–10
j. Manufacturing items without permission _____ 1–10
k. Self mutilation, including tattooing _____ 1–10
l. Making unfounded complaints and charges against members of the staff,
 inmates and the institution with malicious intent _____ 1–10
m. Aiding and abetting Class II Rule violations _____ 1–10
n. Violation of any other published Center Rules, Regulations or Procedures _____ 1–10

## APPENDIX H

### STIPULATION

It is hereby stipulated among the parties that the following agreement between plaintiffs and defendant Metzger with regard to the disciplinary procedure prescribed by paragraph 22 of the Order of the Court entered July 30, 1971, be made part of and become the Order of the Court in this action.

1. Discipline shall mean confinement of an individual or loss of an individual inmate's privileges for the violation of specific published rules and regulations of the county and may also be imposed for obvious discipline violations which are severe enough in nature to be disturbing to other individuals or which may endanger their safety.

2. When these disciplinary rules are enacted, no deputy shall impose discipline on an inmate without approval of his immediate supervisor. For rule infractions listed in the revised rules and regulations for prisoners, an inmate is entitled to a hearing before the Disciplinary Board, unless the severity of the violation or a repetitiveness on the part of the inmate requires that he may be confined to his individual cell or placed in the isolation cell for a period of no longer than twenty-four (24) hours. Under no circumstances shall confinement in an individual cell or placement in the isolation cell for twenty-four (24) hours result in denying privileges other than radio, television or visitors without a hearing by the Disciplinary Board.

3. Privileges are:
 a. to have visitors,
 b. to purchase from the commissary,
 c. to have television and radio,
 d. to attend religious services,
 e. to enjoy the service of the jail mobile library.

Except that no individual shall be denied the right to write sealed letters not exceeding two (2) per week, nor shall he be denied the right to be visited by a clergyman of his choice, the attorney of his choice, and to consult with either of these individuals in private.

4. Only when an inmate is accused of an act of violence, possibly endangering himself or others, may he or she be placed in an isolation cell, but for no longer than twenty-four (24) hours. Isolation shall mean the removal of television, radio, and visiting privileges only.

If an inmate is determined by a physician to require hospitalization in a mental institution, he may be confined to an isolation cell until suitable arrangements can be made to hospitalize him. All reasonable efforts shall be made to transport him to such a mental institution without delay. Such an inmate shall not be denied privileges, other than being placed in an isolation cell.

5. No individual shall be denied any privileges on account of the fact that his cellmate has been guilty of an infraction of the rules, nor shall any individual or group of individuals be punished because unascertained individuals in a cellblock have committed infractions of the rules. Under no circumstances shall an inmate's privileges be denied based on the actions of another inmate.

6. No discipline shall be imposed on an inmate except for violations of the written jail rules. (This not to exceed 24 hours of restrictions except in the manner set forth below):
 a. A right to a hearing to determine the guilt or innocence of an inmate before a hearing board shall be granted an inmate before imposition of discipline.
 b. The hearing board shall consist of the following:
 1. The sergeant in charge
 2. The chief social worker
 3. A minister
 4. An ex-inmate
 5. An administrative assistant
 c. Within twenty-four (24) hours of the occurrence, giving rise to the charges, the inmate shall be given a written

notice stating his rights, the charges against him, and the time and place of the hearing. When an inmate is illiterate, he shall be afforded oral notice of his rights, charges against him, and the time and place of the hearing. Provisions shall be made to communicate either orally or in writing to inform those inmates whose primary language is other than English of their rights, charges against them, and the time and place of the hearing. The date of the hearing shall be no sooner than three (3) days after notice is provided to the inmate.

d. The accused inmate must be present at the hearing and present witnesses in his own behalf.

e. Where the inmate is illiterate or where charges are especially complex, the inmate may be allowed the assistance of another inmate.

f. The decision shall be based only on the evidence presented at the hearing. Evidence which does not bear directly upon the accusations may not be taken into consideration by the hearing board in making its decision, nor may feelings or attitudes about the inmate affect the decision of the board.

g. A written record of the hearing shall be made by the hearing board which shall include a statement of the case and a summary of the evidence presented and the decision of the board shall state the reasons upon which the decision is based.

h. The accused inmate shall be granted an opportunity for appeal from the decision of the hearing board. Notice to the inmate of his right of appeal shall be given at the time the decision is made by the hearing board. The appeal shall be to a higher authority, which shall be the Sheriff, or in his absence a designated administrative substitute.

i. An appeal shall consist of reviewing the decision made by the hearing board. The request for an appeal may be made orally or in writing by the inmate or a representative on his behalf. The decision from the appeal shall not be stricter in punishment than that which the hearing board decided. A written record of the appeal shall be made, including the decision and reasons which shall be made no later than seven (7) days from the date of request.

The intent of the above procedure is not only to assure just disciplinary practices in the Lucas County Jail, but to inform all incoming inmates of their rights and to define their privileges. It should also be understood by all inmates that any violation of laws while inside the jail which would ordinarily be a felony or misdemeanor on the outside will be prosecuted. This will include sexual assault, assault with a dangerous weapon, etc. In short, inmates accused of violent acts or repeated violations of written rules of the jail will be subject to confinement in their individual cells or the isolation cell for twenty-four (24) hours at the discretion of the guard and the sergeant on duty. Serious offenses falling in between these two categories will be handled by the Disciplinary Board in the manner described above.

/s/ Frank S. Merritt
 Counsel for Plaintiffs

/s/ Anthony Pizza
 Counsel for Defendant Metzger

/s/ John F. Hayward
 Counsel for Defendants Wittenberg, et al.